UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on November 9, 2012

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 14-CR- |
| v. | Grand Jury Original |
| | **FILED UNDER SEAL** |
| FLORENCE BIKUNDI, also known as "FLORENCE NGWE," and "FLORENCE IGWACHO," | Violations: 18 U.S.C. § 1347 (Health Care Fraud) |
| Defendant. | 42 U.S.C. § 1320a-7b(a)(3) (Medicaid Fraud – Concealing and Failing to Disclose) |
| | 18 U.S.C. § 1956 (Laundering of Monetary Instruments) |
| | 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity) |
| | 18 U.S.C. § 2 (Aiding and Abetting; Causing an Act to Be Done) |
| | Forfeiture: 18 U.S.C. § 982(a)(1) & (7); 21 U.S.C. § 853(p) |

## INDICTMENT

The Grand Jury charges that:

Unless otherwise indicated, at all relevant times:

### INTRODUCTION

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health

and Human Services ("HHS"). In the District of Columbia, Medicaid ("D.C. Medicaid") was jointly funded by the federal and District of Columbia governments. Until September 30, 2008, Medicaid in the District of Columbia ("D.C. Medicaid") was administered by the Department of Health's Medical Assistance Administration; since October 1, 2008, D.C. Medicaid has been administered by the District's Department of Health Care Finance ("DHCF"). D.C. Medicaid provided health insurance coverage to residents of the District of Columbia whose incomes were below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by D.C. Medicaid were referred to as Medicaid "beneficiaries." D.C. Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

2. In the District of Columbia, home care agencies ("HCAs") were authorized to provide home care services, including personal care services, to D.C. Medicaid beneficiaries. Such services were provided by personal care aides ("PCAs") and were intended to assist D.C. Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

3. In order to receive payments from D.C. Medicaid for providing covered PCA services, HCAs had to submit a provider enrollment application and execute a written provider agreement. In the provider application, the HCA agreed to know, understand, and follow and abide by all federal and local laws and D.C. Medicaid rules and regulations applicable to HCAs.

4. The D.C. Medicaid provider agreement required, among other things, that the provider include: "A description of ownership and a list of major owners (stockholders owning or controlling five percent or more outstanding shares)." The provider agreement further specified that D.C. Medicaid could reject or terminate the agreement if the "owners, officers,

2

managers or other persons with substantial contractual relationships have been convicted of certain crimes or received certain sanctions as specified in Section 1128 of the Social Security Act." By signing the provider agreement, the HCA and its authorized representative certified that they understood that payment of a claim by D.C. Medicaid was conditioned upon certification that the claims and the underlying transactions complied with all relevant laws, regulations, and applicable program instructions, and with all applicable conditions of participation in D.C. Medicaid.

5. Providers accepted into the D.C. Medicaid program were given a unique provider identification number, which was a necessary identifier for billing purposes. Only providers who had been assigned a provider number could submit claims for payment to D.C. Medicaid.

6. With a D.C. Medicaid provider number, an HCA could submit or cause the submission of claims to D.C. Medicaid for payment of PCA services provided to D.C. Medicaid beneficiaries. To receive payments from D.C. Medicaid, HCAs operating in the District of Columbia were required to submit a claim, either electronically or in paper form, to DHCF through its fiscal agent, Xerox (formerly known as Affiliated Computer Services), which then processed the claims.

7. Once Xerox processed a claim, it sent the approved claim amount back to DHCF; DHCF then forwarded the information to the D.C. Treasury, which paid the approved claim either by check sent through the U.S. mail or by an electronic fund transfer, whichever method the provider had requested.

8. On each claim form that an HCA submitted or caused to be submitted to D.C. Medicaid, the HCA had to identify certain information, such as the name of the beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was purportedly provided, and the amount of money being claimed by the HCA as payment from

D.C. Medicaid. D.C. Medicaid only paid for services that were medically reasonable and necessary, and that were actually provided as claimed.

9. The HHS Office of Inspector General ("HHS-OIG") was authorized by federal law to exclude health care providers from participation in the Medicaid program.

## INDIVIDUALS AND ENTITIES

10. Defendant FLORENCE BIKUNDI ("**BIKUNDI**"), also known as "Florence Ngwe" and "Florence Igwacho," was a resident of the Commonwealth of Virginia and a resident of the state of Maryland. Defendant **BIKUNDI** was a director, administrator, officer, and primary owner/stockholder of three HCAs operating in the District of Columbia and Maryland: two entities named Global Healthcare, Inc., and one named Flo-Diamond Inc. Between July 2007 and the present, these entities received more than $78 million from Medicaid.

11. Global Healthcare, Inc. ("GLOBAL-VA") was incorporated in Virginia on or about May 2, 2007. Incorporating documents identified defendant **BIKUNDI** as the sole director. GLOBAL-VA's status as an active and lawful Virginia corporation was terminated on or about September 30, 2008, for failure to pay required annual registration fees, and was re-instated on or about October 25, 2012. GLOBAL-VA's status was again terminated for the same reason effective September 30, 2013.

12. On January 24, 2008, GLOBAL-VA registered to do business in the District of Columbia as a foreign (Virginia) corporation and identified its principal place of business as 14531 Oak Cluster Drive, Centerville, Virginia 20120 – the address listed on its Virginia incorporation documents. In its two-year report filed with the District of Columbia on or about July 23, 2012, GLOBAL-VA listed its address as 1818 New York Ave., N.E., Washington, D.C. 20002.

13. On or about October 9, 2008, GLOBAL-VA also registered to do business in Maryland as a foreign (Virginia) corporation, listing its principal place of business as the same Centerville, Virginia, address. GLOBAL-VA's foreign corporation registration in Maryland identified defendant **BIKUNDI** as the resident agent.

14. On or about April 28, 2009, defendant **BIKUNDI** filed a request with Maryland to terminate GLOBAL-VA's foreign corporation registration, and on the same day defendant **BIKUNDI** incorporated in Maryland another company called Global Healthcare, Inc. ("GLOBAL-MD"). The incorporation filings identified "Florence Bikundi" as the sole incorporator, sole director, and resident agent. According to its public filings, GLOBAL-MD's original principal place of business was 15703 Appleton Court, Bowie, Maryland 20716, which was also the residential listing for defendant **BIKUNDI**. On or about February 23, 2011, defendant **BIKUNDI** as the secretary and resident agent of GLOBAL-MD filed with the state of Maryland a resolution changing GLOBAL-MD's principal place of business to 806 Jennings Mill Drive, Bowie, Maryland 20721, a residential property that was purchased by defendant **BIKUNDI** in or around August 2009 and is her principal residence.

15. Flo-Diamond, Inc. ("FLO-DIAMOND") was incorporated in Maryland on or about April 13, 2005, by defendant **BIKUNDI** (using the name "Florence Ngwe"). The articles of incorporation named defendant **BIKUNDI** as FLO-DIAMOND's sole director and resident agent. On or about March 18, 2011, defendant **BIKUNDI**, using the name "Florence Bikundi," signed and filed with state of Maryland a resolution changing both FLO-DIAMOND's principal place of business and resident agent address to 600 Reisterstown Road, Pikesville, Maryland 21208. On or about September 19, 2012, defendant **BIKUNDI**, using the name "Florence Igwacho," filed another resolution changing FLO-DIAMOND's principal place of business to 3042 Mitchellville Road, Bowie, Maryland 20716.

16. GLOBAL-VA was licensed in the District of Columbia as a home care agency and was enrolled as a provider in D.C. Medicaid. GLOBAL-VA purported to provide PCA services to D.C. Medicaid beneficiaries.

17. GLOBAL-MD and FLO-DIAMOND were licensed in Maryland as resident service agencies and were enrolled as providers in Maryland Medicaid. Both entities purported to provide PCA services to Maryland Medicaid beneficiaries.

18. CFC HOMETRADE & INVESTMENT LLC was incorporated in October 2012 in Maryland and according to its Articles of Organization was engaged in the business of real estate development.

19. Between on or about January 2008 and the present, GLOBAL-VA received more than $75 million from D.C. Medicaid.

20. From at least 2007 through 2013, in addition to serving as director, officer, administrator, and owner of GLOBAL-VA, GLOBAL-MD, and FLO-DIAMOND, defendant **BIKUNDI** was employed by and paid at least $302,200 in reported wages from GLOBAL-VA, and was employed by and paid at least $501,749 in reported wages from FLO-DIAMOND.

### **DEFENDANT BIKUNDI'S DISCIPLINARY HISTORY**

*Virginia Nursing License and Revocation*

21. On or about October 17, 1995, defendant **BIKUNDI** obtained a licensed practical nurse ("LPN") license from the Commonwealth of Virginia, under the name "Florence Ngwe Igwacho."

22. Following an investigation and hearing conducted by the Virginia Board of Nursing, effective on or about August 4, 1999, the Virginia Board of Nursing revoked defendant **BIKUNDI**'s LPN license.

23. On or about April 13, 2004, defendant **BIKUNDI** executed a Virginia Application for Reinstatement of License as an LPN.

24. Following further review by the Virginia Board of Nursing, on or about December 29, 2004, the Board issued an Order denying defendant **BIKUNDI**'s request for reinstatement of her LPN license.

### *District of Columbia Nursing Licenses and Revocations*

25. On or about March 28, 1996, defendant **BIKUNDI** obtained an LPN license in the District of Columbia under the name "Florence N. Igwacho." This LPN license expired on June 30, 1999.

26. On or about October 21, 2002, defendant **BIKUNDI** submitted an application to the District of Columbia Board of Nursing for an LPN license under the name of "Florence Igwacho." Effective November 15, 2002, the District of Columbia Department of Health issued an LPN license to defendant **BIKUNDI** under the name "Florence Igwacho."

27. On or about June 20, 2003, defendant **BIKUNDI** submitted an application to the District of Columbia Department of Health for a registered nurse ("RN") license, under the name "Florence I. Ngwe." Effective September 4, 2003, the District of Columbia issued a RN license to defendant **BIKUNDI** under the name "Florence Ngwe."

28. On or about May 18, 2005, the District of Columbia's Board of Nursing revoked defendant **BIKUNDI**'s RN and LPN licenses.

### *South Carolina Nursing Licenses and Revocation*

29. Defendant **BIKUNDI** obtained an RN license in South Carolina under the name "Florence Igwacho Ngwe"; that RN license expired on January 31, 2004.

30. On or about March 20, 2004, defendant **BIKUNDI** submitted an application to the South Carolina Board of Nursing, seeking reinstatement of her expired RN license.

31. On or about November 21, 2007, the South Carolina Board of Nursing permanently revoked defendant **BIKUNDI**'s RN license.

## **DEFENDANT'S EXCLUSION FROM FEDERAL HEALTH CARE PROGRAMS**

32. On or about April 20, 2000, HHS-OIG notified defendant **BIKUNDI** in writing that she was excluded from participation in Medicare, Medicaid, and all Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f). HHS-OIG based defendant **BIKUNDI**'s exclusion on the revocation of defendant **BIKUNDI**'s LPN license in Virginia. The exclusion prohibited defendant **BIKUNDI** from submitting or causing the submission of claims to, and receiving funds from, Federal health care programs such as Medicaid, and further prohibited defendant **BIKUNDI** from furnishing, ordering, or prescribing any item or service including administrative and managerial services that would be paid for, in whole or in part, by Medicaid.

33. The written exclusion notice informed defendant **BIKUNDI** that if and when her license was reinstated in Virginia, she could re-apply for participation in Federal health care programs, but that re-instatement was not automatic. The written exclusion letter and attachments sent to defendant **BIKUNDI** further contained the following information: "If you are an individual, program payment will not be made to any entity in which you are serving as an employee, administrator, operator, or in any other capacity, for any services including administrative and management services that you furnish, order, or prescribe on or after the effective date of this exclusion." In bold and underlined letters, the exclusion notice stated: "**obtaining a provider number from a Medicare contractor, a State agency, or a Federal health care program does not reinstate your eligibility to participate in those programs**."

34. The exclusion notice further warned: "you cannot submit claims or cause claims to be submitted for payment under any Federal health care program. Violations of the conditions of your exclusion may subject you to criminal prosecution . . . (42 U.S.C. 1320a-7b)."

8

35. Defendant **BIKUNDI** was excluded from participation in all Federal health care programs under the name "Florence N. Igwacho," and her exclusion was publicly recorded under that name. Although defendant **BIKUNDI** submitted applications for and obtained Medicaid provider numbers for HCAs that she owned and controlled, she never applied to HHS-OIG for re-instatement to participate in Federal health care programs.

## GLOBAL'S MEDICAL PROVIDER APLICATIONS AND AGREEMENTS

### *D.C. Department on Disability Services Waiver Provider Enrollment Application*

36. On or about January 30, 2008, defendant **BIKUNDI**, on behalf of GLOBAL-VA, submitted a Department on Disability Services Waiver Provider Enrollment Application ("DDS Waiver Application") to the District of Columbia Department of Health ("Department of Health"). Defendant **BIKUNDI**, on behalf of GLOBAL-VA, applied for a D.C. Medicaid provider number so as to be paid for providing services to mentally challenged adults in the District of Columbia. GLOBAL-VA's application identified its name as Global Healthcare, Inc., doing business as "GHCS." The application identified defendant **BIKUNDI** as the sole owner, and supporting documentation submitted with the application variously identified defendant **BIKUNDI** as a 60% and 70% shareholder. The application identified defendant **BIKUNDI** as a person "having direct or indirect ownership or a controlling interest of 5 percent or more." Defendant **BIKUNDI** signed the DDS Waiver Application using the name "Florence Bikundi."

37. On or about March 17, 2008, defendant **BIKUNDI** signed the ownership and disclosure statement using the title of "CEO" and the name "Florence Bikundi." In the provider agreement, submitted with the DDS Waiver Application, defendant **BIKUNDI**, on behalf of GLOBAL-VA, agreed to comply with all requirements imposed on D.C. Medicaid providers, including all the provisions of the Social Security Act and all applicable federal and local laws and regulations, including all D.C. Medicaid rules and regulations. Directly above the signature

line in the provider agreement, the provider agreement included the following certification: "I/we agree that receipt by the D.C. Medicaid program of the first and each succeeding claim for payment from me/us will be the Medicaid program's understanding of my/our declaration that the provisions of this Agreement and supplemental providers manuals and instructions have been understood and complied with." Defendant **BIKUNDI**'s signature appears as the provider and as the primary individual "responsible to enforce compliance with" the provisions of the agreement.

38. The DDS Waiver Application included a consent form authorizing the District of Columbia Medical Assistance Administration to obtain all information relevant to the evaluation of the application. Defendant **BIKUNDI** signed the consent form as "Authorized Applicant/Provider." As part of the consent form, defendant **BIKUNDI** "warrant[ed]" that all of her responses and information were "correct and complete to the best of [her] knowledge and belief."

39. The DDS Waiver Application ownership and disclosure section contained the following warning, in all capital letters, directly above the signature line: "WHOEVER KNOWINGLY AND WILLFULLY MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR REPRESENTATION OF THIS STATEMENT, MAY BE PROSECUTED UNDER APPLICABLE FEDERAL OR STATE LAWS." The application contained a further warning that failure to "fully and accurately" disclose the information requested in the application could result in a denial of the application or termination of the provider agreement.

40. In the DDS Waiver Application, defendant **BIKUNDI** failed to disclose her nursing license revocations and her exclusion from participation in all Federal health care programs. In response to the following question on the application: "Has the applicant/provider ever been rejected or suspended from the Medicare or Medicaid program, or has your

participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled or sanctioned)," the "No" box is checked. In response to the following question on the application: "Within the last five (5) years, has the applicant/provider ever been sanctioned, reprimanded or otherwise disciplined in any manner by any state licensing authority or other professional board or peer committee," the "No" box is checked.

41. None of the information provided by defendant **BIKUNDI** in the DDS Waiver Application and accompanying provider agreement contained any references to, or use of, the names Igwacho or Ngwe.

42. The D.C. Department of Health approved GLOBAL-VA's D.C. DDS Waiver Application effective April 21, 2008, and GLOBAL-VA was assigned D.C. Medicaid DDS waiver provider number xxxxx6900.

### *D.C. Medicaid Provider Application*

43. On or about June 2, 2009, GLOBAL-VA submitted another D.C. Medicaid provider application to DHCF. The names J.M. and "Florence Igwacho Bikundi" appeared as the contact names on the application. The application contained the same certification language as that contained in the 2008 DDS Waiver Application. GLOBAL-VA also submitted a D.C. Medicaid provider agreement with the application.

44. The application and accompanying provider agreement were signed by "J.M." as GLOBAL-VA's authorized representative and director of nursing. Directly below the space marked "signature of individuals responsible to enforce compliance with these conditions" were listed several names, including defendant **BIKUNDI** using the name "Florence Bikundi" as "Chief Executive Officer."

45. As part of the application, GLOBAL-VA was required to identify all individuals "having direct or indirect ownership or controlling interest" in the company. However, GLOBAL-VA did not list any individuals.

46. GLOBAL-VA's 2009 D.C. Medicaid provider application failed to fully disclose defendant **BIKUNDI**'s ownership and control of GLOBAL-VA, and failed to disclose defendant **BIKUNDI**'s prior nursing license revocations and her exclusion from all Federal health care programs.

47. DHCF granted GLOBAL-VA's 2009 D.C. Medicaid provider application effective August 13, 2009, and GLOBAL-VA was assigned D.C. Medicaid provider number xxxxx2200.

*GLOBAL-MD's Maryland Medicaid Provider Applications and Agreements*

48. On or about April 5, 2010, GLOBAL-MD submitted a Maryland Medicaid provider application to the Maryland Department of Health and Mental Hygiene for the "Living at Home Waiver Program." This application was signed by defendant **BIKUNDI** in the space for the provider signature. The Provider Ownership and Control Form identified defendant **BIKUNDI** and her husband as the only officers or directors of GLOBAL-MD. Defendant **BIKUNDI** and her husband were listed as having a combination of direct or indirect ownership interest equal to 5% or more. Defendant **BIKUNDI** signed the ownership form as "Director of Human Resources." Defendant **BIKUNDI** signed the accompanying Medicaid provider agreement between GLOBAL-MD and the Maryland Department of Health as "Provider." The agreement required GLOBAL-MD to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Maryland Medicaid recipients without "prior written approval."

49. The Maryland Department of Health approved the application effective May 13, 2010, and issued GLOBAL-MD, in the name of "Global Healthcare Services," Maryland Medicaid Living at Home waiver provider number xxxxx2500.

50. On or about April 27, 2011, GLOBAL-MD submitted another Maryland Medicaid provider application to the Maryland Department of Health. The application listed the only owners of GLOBAL-MD as defendant **BIKUNDI** and her husband. The Provider Ownership and Control Disclosure Form included with the application named defendant **BIKUNDI** and her husband as the only officers or directors with each of them having a direct or indirect ownership interest of 5% or more. Defendant **BIKUNDI**'s husband signed the ownership form as "C.E.O."

51. The Maryland Medicaid provider agreement accompanying the 2011 application required GLOBAL-MD to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Maryland Medicaid recipients without "prior written approval."

52. The Maryland Department of Health approved the application effective February 16, 2012, and issued GLOBAL-MD Medicaid provider number xxxxx7800.

53. Both Maryland Medicaid provider applications and agreements failed to disclose that defendant **BIKUNDI** was excluded from participation in all Federal health care programs.

*Flo-Diamond's Maryland Medicaid Provider Applications and Agreements*

54. On or about March 1, 2006, FLO-DIAMOND submitted a Maryland Medicaid provider application for Medicaid Waiver for Older Adults to the Maryland Department of Health. The application was signed by defendant **BIKUNDI**'s husband, and failed to disclose any ownership or control or interest of defendant **BIKUNDI**. In the provider agreement, FLO-DIAMOND agreed, among other things, not to employ or contract with any person who had been disqualified to provide services to Maryland Medicaid recipients.

55. The Maryland Department of Health approved the application effective March 28, 2006, and issued FLO-DIAMOND Maryland Medicaid waiver provider number xxxxx4500.

## COUNT ONE
### (Health Care Fraud)

56. The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 55 as if fully set forth herein.

57. From at least in or around January 2008, continuing until the present, in the District of Columbia, and elsewhere, defendant **BIKUNDI** did knowingly and willfully execute and attempt to execute a scheme and artifice (a) to defraud the District of Columbia Medicaid program which was a health care benefit program as defined in Title 18, United States Code, Section 24(b); and (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of the District of Columbia Medicaid program, in connection with the delivery of and payment for health care benefits, items, and services.

58. It was a purpose of the scheme to defraud for defendant **BIKUNDI** to conceal her exclusion from participation in all Federal health care programs in order to make money through payments from D.C. Medicaid.

### Manner and Means

59. The manner and means by which defendant **BIKUNDI** sought to accomplish the purpose of the scheme to defraud included, among others, the following:

    a. Defendant **BIKUNDI** incorporated or caused the incorporation of GLOBAL-VA for the purpose of defrauding and obtaining money from D.C. Medicaid.

  b. Defendant **BIKUNDI** signed and submitted, and caused others to sign and submit, D.C. Medicaid provider applications and agreements for GLOBAL-VA that concealed and failed to disclose that defendant **BIKUNDI**'s nursing licenses had been revoked.

  c. Defendant **BIKUNDI** signed and submitted, and caused others to sign and submit, D.C. Medicaid provider applications and agreements, among others, for GLOBAL-VA that concealed and failed to disclose that defendant **BIKUNDI** was excluded from participation in all Federal health care programs.

  d. In violation of the terms of her exclusion, defendant **BIKUNDI** submitted and caused GLOBAL-VA to submit claims to D.C. Medicaid.

  e. In violation of the terms of her exclusion, from July 2008 through the present, defendant **BIKUNDI** caused the payment of D.C. Medicaid funds to GLOBAL-VA for items or services, including administrative and managerial services, that defendant **BIKUNDI** furnished or ordered while she served as an owner, employee, administrator, and in other capacities at GLOBAL-VA in excess of $75 million.

**(Health Care Fraud, in violation of Title 18, United States Code, Section 1347, and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 2.)**

## COUNT TWO
**(Medicaid Fraud – Concealing and Failing to Disclose)**

60. The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 55 and 59, as if fully set forth herein.

61. From in or around January 2008, continuing through the present, in the District of Columbia and elsewhere, defendant **BIKUNDI**, having knowledge of the occurrence of any event affecting defendant **BIKUNDI**'s and GLOBAL-VA's initial and continued right to any payment under a Federal health care program, concealed and failed to disclose such event with intent

fraudulently to secure such payment either in a greater amount and quantity than was due or when no such payment was authorized, namely: that defendant **BIKUNDI** was excluded from participation in all Federal health care programs including D.C. Medicaid, and that defendant **BIKUNDI** was an owner, officer, director, and employee of and actively participating in the management and administration of GLOBAL-VA while she was excluded.

**(Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 2.)**

## COUNTS THREE THROUGH SIX
### (Laundering Monetary Instruments)

62.   The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 55 and 59, as if fully set forth herein.

63.   On or about the dates and in the amounts set forth below, defendant **BIKUNDI**, having participated in the transfer of the proceeds of specified unlawful activity, that is: Health Care Fraud, in violation of 18 U.S.C. § 1347; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(a)(3); from the District of Columbia to the District of Maryland, did knowingly conduct and attempt to conduct a financial transaction in and affecting interstate commerce and involving the proceeds of said specified unlawful activity, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Date | Amount | Financial Transaction |
|---|---|---|---|
| 3 | May 10, 2013 | $370,000 | Wire from Bank of America account No. xxxxxxxx8612 to Bank of America account No. xxxxxxxx6749 |
| 4 | June 7, 2013 | $400,000 | Check No. 2024 drawn from Bank of America account No. xxxxxxxx8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account No. xxxxxxxx6749 |
| 5 | June 21, 2013 | $240,000 | Check No. 2027 drawn from Bank of America account No. XXXXXXXX8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account No. XXXXXXXX6749 |
| 6 | August 2, 2013 | $360,000 | Check No. 2054 drawn from Bank of America account No. XXXXXXXX8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account No. XXXXXXXX6749 |

**(Laundering of Monetary Instruments, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 2.)**

## COUNTS SEVEN THROUGH NINE
(Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity)

64. The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 55 and 59, as if fully set forth herein.

65. On or about the dates and in the amounts set forth below, defendant **BIKUNDI** having participated in the transfer of the proceeds of specified unlawful activity, that is: Health Care Fraud, in violation of 18 U.S.C. § 1347; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(a)(3); from the District of Columbia to the District of Maryland, did knowingly engage and attempt to engage in a monetary transaction in and affecting interstate commerce, in criminally derived property of a value greater than $10,000 and that was derived from said specified unlawful activity:

| Count | Date | Amount | Monetary Transaction |
|---|---|---|---|
| 7 | January 23, 2013 | $25,000 | Check No. 438 drawn from Citibank account No. xxxxxx7466 payable to Porsche Silver Spring |
| 8 | June 21, 2013 | $56,000 | Check No. 1021 from Bank of America account No. xxxxxxxx6749 payable to Florence Bikundi |
| 9 | June 27, 2013 | $30,000 | Check No. 548 drawn from Citibank account No. xxxxxx7466 payable to Annapolis Motor Cars |

**(Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957, and Abetting and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 2.)**

## CRIMINAL FORFEITURE ALLEGATION

1. Upon conviction of any of the offenses alleged in Counts One through Two, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The specific property subject to forfeiture upon conviction of any of the offenses alleged in Counts One through Two includes the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland 20721, more particularly described as Lot 27, in Block B, as shown on Plat entitled, Plat Four, Woodmore at Oak Creek, per Plat Book REP 200 at Page 59, and recorded among the Land Records of Prince George's County, Maryland. The United States will seek a forfeiture money judgment against the defendant in the amount of at least $75,000,000 upon conviction of any of the offenses in Counts One through Two.

2. Upon conviction of any of the offenses alleged in Counts Three through Nine, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property. The United States will seek a forfeiture money judgment against the defendant in an amount equal to the value of any property, real or personal, involved in the offense, or any property traceable to such property. The specific property subject to forfeiture upon conviction of the offense alleged in

Count Eight includes the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland 20721, more particularly described as Lot 27, in Block B, as shown on Plat entitled, Plat Four, Woodmore at Oak Creek, per Plat Book REP 200 at Page 59, and recorded among the Land Records of Prince George's County, Maryland.

    3.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 982(a)(1) & (7); and Title 21, United States Code, Section 853(p).)**

A TRUE BILL:

_____
FOREPERSON

ATTORNEY OF THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA