**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No. 14-CR-00030-01 (BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| **FLORENCE BIKUNDI, also known as** | : | |
| **"FLORENCE NGWE," and** | : | |
| **"FLORENCE IGWACHO,"** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**GOVERNMENT'S MOTION IN LIMINE FOR WILLFUL BLINDNESS INSTRUCTION
AS TO COUNTS THIRTEEN AND FOURTEEN AND PERMISSION FOR THE
GOVERNMENT TO REFER TO WILLFUL BLINDNESS IN ITS OPENING
STATEMENT WHEN DISCUSSING THESE COUNTS**

The United States of America, by and through its attorney, the Acting United States
Attorney for the District of Columbia, respectfully moves the Court to find that a willful
blindness instruction is appropriate for Counts Thirteen and Fourteen and permit the Government
to refer to willful blindness in its opening statement when discussing these counts.  In support
thereof, the Government states as follows:

**BACKGROUND**

On September 7, 1999, the U.S. Department of Health and Human Services Office of
Inspector General ("HHS-OIG") sent a letter to Florence Igwacho at 9127 Edmonton Terrace #
304, Greenbelt, Maryland 20770 ("the Edmonton Terrace address") informing her that it was
"considering excluding [her] from participation in the Medicare, Medicaid, and **all** Federal health
care programs as defined in section 1128B(f) of the Social Security Act (Act).  This action is
predicated on the fact that your license was revoked, suspended or otherwise lost, or because
your license was surrendered while a formal disciplinary proceeding was pending for reasons
bearing on your professional competence, professional performance, or financial integrity."  Ex.

A.  The letter explained that a Federal health care program is "any plan or program that provides health benefits, whether directly through insurance, or otherwise, which is funded directly, in whole or in part, by the United States government."  It informed the defendant that "exclusion would affect [her] ability to claim payment from these programs of items or services which [she] render[s]."  The letter notified Florence Igwacho that she had thirty days to provide any information she wanted HHS-OIG to consider prior to making an exclusion determination.  It stated that she would be "informed of the [exclusion] decision and notified of [her] appeal rights."

Florence Igwacho sent a handwritten letter to HHS-OIG responding to her possible exclusion. Ex. B.  She wrote the Edmonton Terrace address at the top of the letter below her name.  She acknowledged that she had received a letter from the Virginia Board of Nursing informing her that her license had been revoked.  She wrote that she did not respond to the HHS-OIG letter

> in a timely manner because my son died back in Africa back in June and I had to travel back home.  I only returned yesterday 10/5/99 where I received both your letter and the one from Virginia Board of Nursing . . . I would also appreciate if you can give me more time to take a lawyer and gather my facts together in this matter.  Let me know your decision.  I'm still grieving so please help me. Florence Igwacho.

On March 31, 2000, HHS-OIG sent a letter to Florence Igwacho at the Edmonton Terrace address notifying her that she is "being excluded from participation in the Medicare, Medicaid, and **all** Federal health care programs" because of the revocation of her Virginia nursing license. Ex. C.  The letter explained that "[t]his program exclusion is effective 20 days from the date of this letter and will remain in effect as long as your license is revoked, suspended, or otherwise lost.  Once your license has been returned to active status by the licensing board or agency taking the disciplinary action in the State of Virginia, you will be eligible to apply to the Office of

2

Inspector General for reinstatement to the Federal health care programs.  We have considered the information you furnished to our field office in response to its letter to you."  The letter informed Florence Igwacho that "**[o]btaining a license or obtaining a provider number from a Medicare contractor, a State agency, or a Federal health care program does not reinstate your eligibility to participate in those programs.**"

The exclusion notice sent to Florence Igwacho included a document explaining the authority for the exclusion and its effect.  The top of the document instructed Igwacho to "**Please read carefully and retain.**"  It informed her that

> You are excluded from participation in the Medicare, Medicaid, and **all** Federal health care programs as defined in section 1128B(f) of the Social Security Act. The effect of your exclusion is that no program payment will be made for any items or services, including administrative and management services, (other than an emergency item or service not provided in a hospital emergency room) furnished, ordered, or prescribed by you, except as provided in regulations found at 42 CFR 1001.1901(c), during the period you are excluded.  Your exclusion affects only your ability to claim payment from those programs for items or services you render; it does not affect your right to collect benefits under these programs.
>
> This exclusion has national effect and applies to all Federal procurement and non-procurement programs and activities.
>
> If you are an individual, program payment will not be made to any entity in which you are serving as an employee, administrator, operator, or in any other capacity, for any services including administrative and management services that you furnish, order, or prescribe on or after the effective date of this exclusion. . . .
>
> Any service you provide is a non-covered service.  Therefore, you cannot submit claims or cause claims to be submitted for payment under any Federal health care program.  Violations of the conditions of your exclusion may subject you to criminal prosecution and the imposition of civil monetary penalties (42 U.S.C. 1320a-7a – 42 U.S.C. 1320a-7b). In addition, submitting claims or causing claims to be submitted or payments to be made by the programs for items or services you furnish, order, or prescribe, including management services or salary can serve as the basis for denying your reinstatement to the programs. . . .
>
> Obtaining a license or obtaining a provider number from a Medicare contractor, a State agency, or a Federal health care program does not reinstate your eligibility

to participate in those programs.

All home care agencies serving patients in the District of Columbia "under the auspices" of the D.C. Medicaid program are required "to comply with all applicable requirements and conditions of participation" in the program, District of Columbia regulations, and "all other applicable federal and District laws and rules." D.C. Mun. Regs. tit. 22-B, §§ 3900.2, 3900.8. "Willful submission of false or misleading information . . . in connection with an application for licensure or related to licensing procedures" or a violation of District of Columbia or United States laws or regulations can result in "suspension, revocation, limitation, or refusal to issue or renew [a home care agency's] license." Id. § 3107.7(c).

The Code of Federal Regulations provides that "no payment will be made by Medicare, Medicaid or any of the other Federal health care programs for any item or service furnished" by an excluded individual. 42 C.F.R. § 1001.1901(b)(1). Florence Bikundi, as an excluded individual, was subject to civil monetary penalties under 42 U.S.C. § 1320a-7a(a)(1)(D) and criminal liability under 42 U.S.C. § 1320a-7b(a)(3) if she "submit[ted], or cause[d] to be submitted, claims for items or services furnished during the exclusion period." Id. § 1001.1901(b)(3).

Florence Bikundi signed and submitted and caused the submission of D.C. Medicaid provider applications and agreements in which she failed to disclose her nursing license revocation and her exclusion from the Medicaid program. See Superseding Indictment, ECF No. 44 ¶¶ 80(b)-(d). For example, Florence Bikundi, on behalf of Global Healthcare, submitted a Department on Disability Services Waiver Provider Enrollment Application Package ("DDS Waiver Application"), dated March 17, 2008, to the District of Columbia Department of Health ("D.C. Department of Health"). Ex. D. She signed the application as "C.E.O" and identified

4

herself as the majority owner.  "No" is checked in response to the following questions:  "10p) Has the applicant/provider ever been rejected or suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled or sanctioned)?; 10q) With the last five (5) years, has the applicant provider ever been sanctioned, reprimanded or otherwise disciplined in any manner by any state licensing authority or other professional board or peer committee?"

Florence Bikundi signed the DDS Waiver Provider Agreement between Global Healthcare and the D.C. Department of Health.  Ex. E.  She signed once as "Provider" and once as an individual "responsible to enforce compliance with the[] conditions" in the agreement.  The Provider Agreement stated, among other requirements, that the provider must "comply with applicable Federal and District standards," satisfy all requirements of the Social Security Act, and "be in full compliance with the standards prescribed by Federal and State standards."

On April 5, 2010, Florence Bikundi, on behalf of Global Healthcare, signed the Provider Agreement between Global Healthcare and the Maryland State Department of Health and Mental Hygiene.  Ex. F.  The agreement requires Global Healthcare to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

Additionally, the Global Healthcare Maryland office had a form entitled "Certification of Eligibility to Participate in Federal Health Care Programs."  Ex. G.  The certification explained that financial penalties may be imposed against health care providers that employ excluded individuals and that health care providers "may face exposure if they submit claims to a Federal health care program for health care items or services provided, directly or indirectly, by excluded individuals."  It noted that individuals may be excluded from participation in Federal health care

programs for license revocation.  By signing the form, individuals certified that they "were not subject to exclusion."

On December 18, 2014, a grand jury issued a Superseding Indictment charging Florence Bikundi, also known as "Florence Ngwe" and "Florence Igwacho," and other defendants on multiple counts of heath care fraud and money laundering.  Superseding Indictment, ECF No. 44. Counts Thirteen and Fourteen, respectively, charge Florence Bikundi with Health Care Fraud, in violation of 18 U.S.C. § 1347, and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(a)(3).  Counts Thirteen alleges that Florence Bikundi concealed her exclusion from all Federal health care programs in order to make money through payments from D.C. Medicaid. Id. ¶ 79.  Count Fourteen alleges, among other things, that Florence Bikundi concealed and failed to disclose her exclusion with the intent to fraudulently secure payment from D.C. Medicaid when she knew that no such payment was authorized as a result of her exclusion.  Id. at 82.

## ARGUMENT

"The doctrine of willful blindness is well established in criminal law."  Global-Tech Appliances, Inc. v. SEB S.A., 131 S.Ct. 2060, 2068 (2011) (approving use of willful blindness instruction in civil lawsuit).  "[I]n the federal courts, willful blindness instructions—sometimes called 'deliberate ignorance' or 'conscious avoidance' or 'ostrich' instructions—are now commonly given and commonly upheld."  United States v. Alston-Graves, 435 F.3d 331, 338 (D.C. Cir. 2006) (collecting cases); see also Global-Tech, 131 S.Ct. at 2069 (noting "long history of willful blindness and its wide acceptance in the Federal Judiciary").

A willful blindness jury instruction prevents defendants from "escap[ing] the reach of" statutes that require knowledge or willfulness as an element, "by deliberately shielding

themselves from clear evidence of critical facts that are strongly suggested by the circumstances." Global-Tech, 131 S.Ct. at 2068-69; see also United States v. Holloway, 731 F.2d 378, 381 (6th Cir. 1984) (deliberate ignorance instruction "prevents a criminal defendant from escaping conviction merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct.") "The traditional rationale for th[e] [willful blindness] doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge." Global-Tech, 131 S.Ct. at 2069.

In Global-Tech, the Supreme Court surveyed Courts of Appeals cases applying willful blindness in the criminal context. Id. at 2070 & n.9. It found that "[w]hile the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." Id. at 2070. It held that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." Id. at 2070-71.

In Alston-Graves, which was decided before Global-Tech, the D.C. Circuit expressed concern that a willful blindness instruction might result in a jury "convict[ing] a defendant for acting recklessly . . . or even for acting negligently." Alston-Graves, 435 F.3d at 340 (footnotes omitted). The Supreme Court directly addressed that concern in Global-Tech. It concluded that the two requirements for willful blindness that it had pronounced "give willful blindness an appropriately limited scope that surpasses recklessness and negligence." Global-Tech, 131 S.Ct. at 2070.

The Third Circuit's model jury instruction for willful blindness incorporates the two

requirements in Global-Tech. See Third Circuit, Model Jury Instructions ch. 5, § 5.06 (Apr. 2015), available at, http://www.ca3.uscourts.gov/sites/ca3/files/Chapter%205%20Rev%20 April%202015.pdf. The Government requests that the Court use that same instruction for Counts Thirteen and Fourteen ("the exclusion counts").[1]

The Government does not need to "present direct evidence of conscious avoidance to justify a willful blindness instruction."[2] United States v. Stadtmauer, 620 F.3d 238, 259 (3d Cir. 2010) (emphasis omitted). A sufficient factual predicate exists if "there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity." United States v. Macias, No. 13-2166, 2015 WL 3377773, at *3 (7th Cir. May 26, 2015).

The September 7, 1999, HHS-OIG letter to Florence Bikundi informing her that, based on the revocation of her Virginia nursing license, HHS was going to determine if she should be excluded, and her reply acknowledging receipt of the letter and asking HHS to "let me know your decision" are the ultimate red flags that Florence Bikundi knew that there was a high probability that she had been excluded from the Medicaid program when she submitted provider applications to D.C. Medicaid. See United States v. Wahl, 563 F. App'x 45, 50 (2d Cir. 2014) (approving conscious avoidance instruction when defendant "received many 'red flags' "); see also Moore v. Hartman, No. CV 92-2288, 2015 WL 1812852, at *56-57 (D.D.C. Apr. 17, 2015)

---

[1] At the close of evidence, the Government may request a willful blindness instruction for other counts as well. It anticipates that defense counsel for Florence Bikundi and Michael Bikundi, Sr. will argue that the defendants were oblivious to the endemic fraud at Global Healthcare, including fraud committed by family members and trusted employees, and did not know that the millions of dollars in financial transactions they conducted involved the proceeds of unlawful activity. See United States v. Williams, 32 F.3d 570 (7th Cir. 1994) (approving ostrich instruction when defendant's employees testified that defendant "attempt[ed] to insulate herself from guilty knowledge by directing others" to commit fraud "while she avoided active participation" in the fraud.).

[2] "The government [is] not required to choose between arguing direct knowledge and arguing deliberate indifference and c[an] present the same evidence in support of both theories." United States v. Gray, No. 2:07 CR 166, 2011 WL 321454, at *8 (N.D. Ind. Jan. 28, 2011).

("plainly or deliberately ignor[ing] [] red flags" raises issue of willful blindness).

Since before the inception of Global Healthcare, HHS-OIG has provided a searchable database of excluded individuals at http://oig.hhs.gov/fraud/exclusions.asp. A search of that database under the last name of Igwacho would have revealed that the defendant was excluded on April 20, 2000. As Director, President, Owner, CEO, CFO, Director of Human Resources, and Administrator for Global Healthcare, among other titles, and as the signatory on D.C. Medicaid Provider agreements and applications, Florence Bikundi knew that she had a duty to comply with federal law and regulations, including provisions related to exclusion. As documented by the Global Healthcare certification in Ex. G and other evidence that the Government will introduce at trial, Global Healthcare, at least superficially, attempted to ensure its employees did not violate the exclusion provisions.

Based on these circumstances, there is sufficient evidence that if Florence Bikundi did not know that she was excluded then her lack of knowledge was due to a "deliberate action[] to avoid confirming a high probability" that she was excluded, and that she "can almost be said to have actually known [this] critical fact[]."    Global-Tech, at 2070-71 (defining "a willfully blind defendant"); see also United States v. Nazon, 940 F.2d 255, 259-60 (7th Cir. 1991) (defendant's claim of no "guilty knowledge" about his billing practices in conjunction with his "duty to familiarize himself with the Medicaid requirements and observe his legal duty to submit truthful claims" was "strong grounds" for a conscious avoidance instruction); United States v. Gray, No. 2:07 CR 166, 2011 WL 321454, at *3-8 (N.D. Ind. Jan. 28, 2011) (finding that defendant's duty to learn proper Medicaid billing codes and avoidance of knowledge about legitimacy of billing "supported an inference of deliberate action").

The defendant has already argued that that "there is no evidence shown to prove that Ms.

Bikundi had knowledge that she was in fact excluded from participating in any federally funded healthcare programs." Mem. in Supp. of Mot. for Recons. of Detention, ECF No. 18-1 at 3; see also Mem. in Supp. of Renewed Mot. to Recons. Order of Detention, ECF No. 30-1 at 4-5. The defense will undoubtedly make that same argument in its opening statement and comment on any failure of the Government to mention any evidence of the defendant's direct knowledge of her exclusion in its opening statement. The jury should be aware, before any evidence is presented, that the material issue as to the exclusion counts is not just whether the defendant had knowledge of her exclusion, but also whether she was willfully blind to that fact.

## CONCLUSION

Wherefore, the Government respectfully requests that the Court grant its motion.


Respectfully submitted,


VINCENT H. COHEN JR.
Acting United States Attorney


By:        _____/s/_____
Lionel A. André (D.C. Bar No. 422534)
Michelle Bradford (D.C. Bar No. 491910)
Christopher Brown (D.C. Bar No. 1008763)
Anthony Saler (D.C. Bar No. 448254)
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
Tel: 202.252.6971 (Saler)
Anthony.Saler@usdoj.gov

10