## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

-----------------------------------------------X

|  |  |  |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| v. | : | **Case:  1:14-cr-00030-BAH** |
| | : | |
| **FLORENCE BIKUNDI** | : | |
| | : | |

-----------------------------------------------X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FLORENCE BIKUNDI'S MOTION FOR NEW TRIAL

Florence Bikundi, through undersigned counsel, hereby moves this Honorable Court pursuant to Federal Rules of Criminal Procedure 33 to enter an order for a new trial in the interests of justice on Counts 1, 2, and 13-22.  Mrs. Bikundi submits this Memorandum of Points and Authorities in support thereof.

### I.      INTRODUCTION

Mrs. Bikundi was initially arrested on February 20, 2014 by Indictment charging her with Health Care Fraud (18 U.S.C. §1347), Medical Fraud-Concealing and Failing to Disclose (42 U.S.C. §1320a-7b(a)(3)), Laundering of Monetary Instruments (18 U.S.C. §1956),  Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity (18 U.S.C. §1957), and Aiding and Abetting; Causing an Act to Be Done (18 U.S.C §2).  On December 18, 2015 a Grand Jury returned a Superseding Indictment charging Mrs. Bikundi and eight others with Conspiracy to Commit Health Care Fraud (18 U.S.C. §1349),  Health Care Fraud – Fraudulent Billings (18 U.S.C. §1347), Medicaid Fraud – Failing to Disclose (42 U.S.C. §1320a-7b), False Statements in Health Care Matters (18 U.S.C. §1035), Conspiracy to Commit Money Laundering (18 U.S.C. §1956(h)), Laundering of Monetary Instruments (18 U.S.C.

§1956(a)(1)(B)(i)), and Engaging in Monetary Transactions in Property Derived From Specified

Unlawful Activity (18 U.S.C. §1957).  *See* Superseding Indictment at Dkt. 44.  After receiving

hundreds of thousands of pages of discovery, and remaining incarcerated for nearly twenty

months, on October 13, 2015 the trial against Mrs. Bikundi commenced.  The government called

numerous witnesses and introduced over 300 exhibits.  In addition to witness testimony, 404(b)

evidence was admitted that tainted Mrs. Bikundi in the eyes of the jury by learning of other

unrelated uncharged fraudulent behavior by Mrs. Bikundi and was very prejudicial to Mrs.

Bikundi.

Additionally, on what was scheduled to be the last day of the government's case-in-chief,

the government surprised defense counsel by providing Mrs. Bikundi with a "patient utilization

report" that they sought to introduce into evidence.  (*See* Govt. Ex. 439, attached hereto as Ex.

A) This "report" from the Department of Health Care Finance ("DHCF") listed approximately

567 beneficiaries who the government represented were patients of Global Healthcare Services

("Global") during January 2012 through the execution of the search warrant on February 20,

2014, but whom did not receive personal care aide services after the execution of the search

warrant.  11/4/15 AM, Trial Tr. 102:8-13; 11/3/15 PM Trial Tr. at 19:21-20:2.  The Government

alleged that after the execution of the search warrant, these patients did not seek services from

another home health agency, and as such they never really needed the services to begin with,

thus costing D.C. Medicaid approximately $30 million dollars. *See generally* 11/3/15 PM Trial

Tr. at 14-15.

Mrs. Bikundi was completely ambushed by this evidence in violation of Federal Rules of

Criminal Procedure 16.  Due to the untimely nature of the presentation of such evidence Mrs.

Bikundi was never given the opportunity to actually mount a defense against this evidence by

investigating and/or interviewing the beneficiaries that were listed on the report. Undersigned counsel objected to the untimely and prejudicial nature of this evidence. *See* 11/4/15 AM Trial Tr. at 101:18-20; 11/3/15 PM Trial Tr. at 16:7-17:8.  Despite objections the evidence was admitted, which ultimately improperly shifted the burden to Mrs. Bikundi to prove that the 567 beneficiaries did actually need the service.

Lastly, despite testimony to the contrary and lack of evidence, there was no direct or circumstantial evidence that Mrs. Bikundi conspired to commit or actually committed money laundering by concealing the source of the funds that were received from D.C. Medicaid.  In fact the evidence demonstrated the exact opposite.  The government knew from the beginning that the funds came from D.C. Medicaid and all accounts that were mentioned were easily traceable to either Mr. or Mrs. Bikundi because they were kept in their names.  Additionally, the government was unable to demonstrate that Mrs. Bikundi's actions were nothing more than mere spending, which does not classify as money laundering.

On November 12, 2015, a jury found Mrs. Bikundi guilty of Counts 1, 2, and 13-22, which include conspiracy to commit health care fraud, health care fraud, participating in Federal health care programs while being excluded, false statements in health care matters, conspiracy to commit money laundering, and money laundering. (Dkt. 360)  In the interest of justice, the errors committed during the trial and the lack of evidence to demonstrate guilt beyond a reasonable doubt on these counts warrant the issuance of an order for a new trial in this matter.[1]

---

[1] Mrs. Bikundi has contemporaneously filed a Renewed Motion for Judgment of Acquittal, even though the standard is different in this Rule 33 Motion, she hereby adopts the arguments that were made in the Rule 29(c) Motion and incorporates those arguments in this Motion. Additionally, Mrs. Bikundi will file a Motion to Join and Adopt the arguments made in Mr. Michael Bikundi's Rule 29(c) and Rule 33 Motions, as to the arguments that apply to Mrs. Bikundi as well.

## II.     LEGAL STANDARD

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a trial court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a). The Court is allowed "to [grant] a new trial when it considers the evidence to be marginally sufficient but determines that the state of the evidence calls for a new trial in the interest of justice." *United States v. Wiley*, 517 F.2d 1212, 1218 (D.C. Cir. 1975).  In other words, the approach that is taken in evaluating a Rule 33 motion, differs from the standard that is used in evaluating a Rule 29 motion for judgment of acquittal.  *See United States v. Wilson*, No. 05-100-2 (RWR), 2010 U.S. Dist. LEXIS 65983, at *28 (D.D.C. July 3, 2010).  "In [assessing] a Rule 33 motion for a new trial … [a] [c]ourt need not accept the evidence in the light most favorable to the government, and the [c]ourt may weigh the testimony and may consider the credibility of the witnesses." *Id.* (quoting in part, *United States v. Walker*, 899 F. Supp. 14, 14 (D.D.C. 1995).

## III.     ARGUMENT

### A. The Admission of Government Exhibit 439 was Extremely Prejudicial and was used to Improperly Influence the Jury Resulting in Mrs. Bikundi's Conviction for Health Care Fraud

On November 3, 2015, the purported last day of the government's case-in-chief, the government presented defense counsel with a patient utilization report.  *See* Ex. 439, attached as Ex A.  The government sought to introduce this report and testimony from Donald Shearer because it showed that from January 2012 through February 2014, Global had 567 beneficiaries for which Global billed and received nearly $30 million dollars from D.C. Medicaid.  The government argued that the evidence was "extremely relevant to [their] case [because] the indictment … says that you cannot bill for services that were not provided or were not medically necessary."  11/3/15 PM Trial Tr. at pg. 14.  The government insisted that this report would

support their theory that because Medicaid was not billed for the 567 beneficiaries after the search warrant was executed on Global,  and therefore, their conclusion was that the beneficiaries never needed the services to begin with which would establish the "full extent of the fraud." *Id*. at 15.  Undersigned counsel raised numerous objections to the admission of this evidence as being untimely and prejudicial.

Federal Rules of Criminal Procedure 16 states specifically that "upon a defendant's request, the government must permit the defendant to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (ii) the government intends to use the item it its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E).  This rule is in place to avoid the exact occurrence that happened here – ambush at trial.

The government arrested Mrs. Bikundi in February 2014 and most if not all the evidence used by Mr. Shearer was information from government records, or seized in February 2014.  The government had nearly twenty months to gather this evidence and present it to Mrs. Bikundi prior to trial.  Not only did the government wait until the last day of their case-in-chief to present the evidence to the defense, there was never even a mention that this evidence would be forthcoming.  The government approached Donald Shearer about quantifying this evidence and compiling a report in September 2015.  11/5/15 Trial Tr. at 113.  Two weeks prior to trial, Mr. Shearer figured out how to quantify the data and he was quickly able to compile the data in an excel spreadsheet.  *Id*. at 114 Therefore, the government had at least two opportunities to inform defense counsel of the report, but failed to do so.

The untimely nature of the production, coupled with the admission of the document and testimony of Donald Shearer was extremely prejudicial to Mrs. Bikundi.  The government cannot shy away from their belief in the importance of this evidence to their case.  The government highlighted the importance of the evidence during argument for the admission of the evidence, during Mr. Shearer's testimony, and again in closing arguments.  Specifically, the government argued that D.C. Medicaid lost "over $30 million because 567 of these beneficiaries didn't need the service.  That's fraud."  11/9/15 AM Trial Tr. at 42.

The admission of this evidence was extremely prejudicial.  Even under a Rule 403 analysis, the prejudicial effect outweighed any probative value of the admission of this evidence and testimony.  While the Court allowed Mrs. Bikundi overnight to speak with Mr. Shearer prior to his testimony the next morning, this did not cure the prejudice.  Mrs. Bikundi was not allowed the appropriate time to investigate and interview the beneficiaries listed in the report to determine whether they did in fact need the services.  After all, as Mr. Shearer testified, there were four home health agencies that were closed, leaving nearly 3200 beneficiaries without service.  The D.C. Government attempted to reach all 3200 beneficiaries and place them with new agencies but they did not reach everyone.  Mr. Shearer could not even testify as to how many of the 567 beneficiaries listed in the report were actually contacted to determine if they needed service.  This type of inconclusive and speculative testimony was highly prejudicial, especially in light of the untimely nature and production of the report.

The appropriate remedy in this situation would have been to preclude the government from introducing the evidence at trial as a violation of Federal Rules of Criminal Procedure 16. *See for example United States v. McCrory*, 930 F.2d 63 (D.C. Cir. App. 1991) (remedy for the government's belated compliance with the defense discovery request was prohibiting the

government from introduction the jewelry in its case-in-chief).  This remedy should have been implemented here, especially in light of the fact that the government admitted that they were going to proceed without the report anyway.

Admitting the evidence at trial was in error and severely prejudicial to Mrs. Bikundi.  The interests of justice would require a new trial based on the admission of such prejudicial evidence and testimony.

**B.  The Failure to Give a Unanimity Instruction on the Health Care Fraud in Count 2 was Prejudicial and Resulted in Mrs. Bikundi's Conviction for Health Care Fraud**

The court erred by not giving the jury a specific unanimity charge regarding the Health Care fraud count. The health care fraud count required a unanimity instruction because the government sought to convict for one offense by proving six different acts. The court was required to instruct the jury that it had to unanimously agree to each manner and means alleged by the government.  Therefore, a general verdict on this count is not sufficient. In *United States v. Mangieri*, 694 F.2d 1270 (D.C. Cir. 1982), this Circuit considered a defendant's "argument ... that when the government seeks to convict for one offense by proving two or more acts, proof of either one being sufficient, the court must ... instruct jurors that they must be unanimous in their finding that the government has proven the same one (or more) act(s)." *Id*. at 1281. This Circuit urged trial courts to employ the unanimity instruction without request in cases where the possibility of non-unanimity as to specifics of the offense exists. *Id*.

When the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury. It cannot rely on a composite theory of guilt, producing twelve jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment

7

of which act supported the verdict. *Id* at 875 (citing *United States v. Beros,* 833 F.2d 455, 462 (3d Cir. 1987) (the Third Circuit concluded that the Sixth Amendment requires the jury to be unanimous as to the specific act and theory underlying the defendant's guilt and that the reviewing court "must be certain that the jury was properly instructed to achieve" that unanimity).

Unanimity instruction is required in this case because of the duplicitous indictment. A duplicitous indictment charges separate offenses within a single count and the overall vice of duplicity is that the jury cannot in a general verdict render its findings on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both. *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997).

Since a special unanimity instruction was not given on the health care fraud count and the verdict sheet was a general verdict, it is unclear on which set of facts form the guilty verdict, therefore the Court should vacate the judgment on Count 2 and order a new trial.

### C. The Evidence at Trial Varied From the Indictment Because It Established Multiple Conspiracies Rather Than the Single Conspiracy Charged in the Indictment

The government charged a single conspiracy to commit health care fraud in the superseding indictment. However at trial the evidence regarding the conspiracy varied because it established multiple conspiracies rather than the single one and this variance prejudiced Mrs. Bikundi. The evidence presented at trial is insufficient to convict Florence Bikundi of the charged conspiracy because she did not participate in any conspiracy with Melissa William or any of the individuals named in the indictment.  Additionally, the government did not offer any evidence that Florence Bikundi entered into an unlawful agreement with any other individual to commit health care fraud.

As is evident from Melissa Williams's testimony, Karen Galdamez, Nicola White, Chris Asongcha, Elvis Atabe and Raymond Nyiula had their own individual patient sharing arrangements with aides.  *Id.* at 7-8. In addition, Melissa Williams testified that apart from the patient sharing scheme that she engaged with four aides at Global, she was also involved in another scheme with another health care company known as Vizion One. *Id*. at 39. In that scheme, she conspired with an individual named Atawan Mundu John to perform services for a Medicaid beneficiary at Vizion One and shared the money with Atawan John. *Id*. She was paid by Vizion One for the services even though she did not perform the work all the time. *Id.*  She also testified that she paid the beneficiary because she was not able to provide the full eight hours of service. *Id*. at 40. Clearly, this was a different conspiracy from the conspiracy charged in the superseding indictment.  *Id*. at 35, 62, 66, 68.

In addition, the conspiracy engaged in by Chris Asongcha with aides and beneficiaries was a separate and distinct conspiracy from the conspiracy charged in the superseding indictment. *Id*. at 71. Similarly, the conspiracy engaged in by Nicola White, Elvis Atabe, Karen Galdamez, and Raymond Nyiula, which were established at trial were also separate and distinct and varied from the conspiracy charged in the superseding indictment. Therefore Mrs. Bikundi was substantially prejudiced by this variance because of the spillover effect of evidence from the other conspiracies, even those that occurred at Vizion One, KBC and Immaculate, that had nothing to do with Mrs. Bikundi. *See United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C Cir. 1988); *see also Kotteakos v. United States*, 328 U.S. 750 (1946).

In light of the foregoing, defendant's guilty verdict should be vacated and a new trial ordered in the interest of justice.

**D. The Court Should Vacate Defendant's Guilty Verdict Based on the Inherently Incredible Testimony Doctrine and the Testimony of Key Government Witnesses**

A witness testimony is inherently incredible if the events recounted by the witness were impossible "under the laws of nature" or the witness "physically could not have possibly observed" the events at issue. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir.1991)). The credibility of the cooperating witnesses in this case was questionable at best. The doctrine that Courts must reverse findings based on "inherently incredible testimony has long been accepted, and does not require such positive proof. It is appropriate to invoke the doctrine if the person(s) whose testimony is/are under scrutiny made allegations which seem highly questionable in light of common knowledge. *Norris v. Alabama*, 294 U.S. 587, 679 (1935); *see also United States v. Jackson*, 353 F.2d 862 (C.A.D.C. 1965) The witnesses that came to testify were inherently incredible and this Court should carefully weigh their testimony. Clearly, the purported co-conspirators were testifying to what they believed the government wanted them to say. Almost all the co-conspirators had a previous health care fraud experience prior to joining Global Health Care and engaged in identical conduct in their prior employment.

**i.       Melissa Williams**

Melissa Williams started paying patients to sign timesheets while working as a PCA and did not share this information with Mrs. Bikundi.[2] Once she started working in Global's office, she continued with her fraudulent scheme to make money by engaging in a patient sharing

---

[2] Mrs. Bikundi also incorporates by reference the arguments she made in regards to Melissa Williams in her Renewed Motion for Judgment of Acquittal.

arrangement with fellow Global employees.  *See* 11/2/15 AM Trial Tr. at pgs. 6-7. She even

began working for Global's competitor Vizion One, to continue engaging in patient sharing with

Atawan Mundu John.  *Id*. at 39:14-40:14.  Despite the government attempts to paint a picture

that Mrs. Bikundi was aware of this fraudulent behavior, Melissa Williams testified that Mrs.

Bikundi was unaware of the scheme.  *Id.* (Q: Did you tell Florence about [the] arrangement you

had with John at this point? A: No); *see also id.* at72:3-8 (Q: As a matter of fact, you never had

an argument with Mrs. Bikundi to engage in healthcare fraud, did you? A: No. Q: You never

engaged in any conspiracy with Florence Bikundi to commit healthcare fraud, did you? A: No).

Additionally, Melissa attempted to give testimony that she was involved in surveys in

which Mrs. Bikundi was present and that Mrs. Bikundi expected her and/or other employees to

forge paperwork whenever they had a survey.  However, the evidence was to the contrary.

Melissa Williams did not start in the office until April or May 2011, and therefore she was not

present for the initial survey that occurred in December 2010 or for the follow-up survey that

occurred in February 2011.  *See* 10/29/15 PM Trial Tr. at 55:3-6; 11/2/15 Trial Tr. at 5:16-24.  In

fact the first survey that Melissa Williams could have been present for  a survey was the one that

occurred in September 2011 and we know from multiple witnesses, that Mrs. Bikundi was not

present for this survey as she was in Johns Hopkins Hospital after delivering her twin children.

10/22/15 PM Trial Tr. at 5:19-20.

### ii.      Elke Johnson and Francis James

Elke Johnson was engaged in her own fraudulent scheme and devised a way to make

extra money while working for Global. In fact, she is the one that told her boyfriend Francis

James to come and "apply" for a job at Global, so that she could collect his paycheck. *See*

*generally* 11/19/15 PM Trial Tr. at 97:3-8.  The government attempted to show that Mr. James

met with Mrs. Bikundi and that she told him that he did not have to report to work, as long as he

paid his beneficiary.  However, this testimony should not be believed.  Instead, the Court should

examine the credibility and demeanor of both Elke Johnson and Francis James.

The more plausible explanation of what occurred, involved Elke Johnson, employed as a

staffing coordinator at Global, calling her boyfriend Francis James and telling him to "apply" for

a job at Global.  Elke Johnson then falsified Mr. James' documents so that he could work as a

Home Health Aide.  Elke Johnson assigned Mr. James a beneficiary and told him that he did not

have to go to work, as long as he paid the beneficiary to sign the timesheets. This scheme was in

place so that Elke Johnson could in Mr. James' words "get a little extra change."  *See*  11/19/15

PM Trial Tr. at 97:3-8.

### iii.    Elvis Atabe

Elvis Atabe is an admitted perjurer, and therefore the Court should carefully scrutinize

his testimony.  The government urged the jury to believe that within weeks of being hired at

Global, Mrs. Bikundi sat in a chart room with Mr. Atabe and showed him how to create false

documents.  Elvis Atabe was an individual who worked in the chart room at T&N Reliable,

where James Mbide worked and falsified documents.  His testimony should be inherently

incredible.  Additionally, Elvis Atabe did not start working at Global until April 2011 and

therefore the first survey that he could have been a part of would have been September 2011.  As

stated previously, Mrs. Bikundi was not present for this survey.

### iv.    James Mbide

The Court should recall the demeanor and testimony of James Mbide.  Mr. Mbide received a plea offer to a misdemeanor despite the fact that he was the Director of Nursing and played a large role in falsifying documents not just at Global but also at T&N Reliable.  For all the years that Mr. Mbide worked in the healthcare industry, he was all of a sudden ashamed of his actions and wanted to cooperate with the Government.  The evidence however, demonstrates that Mr. Mbide was involved with Global as early as the initial survey in January 2009, when he appeared as the Director of Nursing, despite the fact that he insisted that he started at Global in October 2009. Mr. Mbide falsified documents at T&N Reliable and continued to do so at Global without informing Mrs. Bikundi.  Mr. Mbide wanted to continue to perpetuate his own fraud until the search warrants were executed at Global and he was forced to admit his guilt.

### v.       The beneficiaries (Carolyn Baldwin and Alma McPherson)[3]

The testimony of all of the beneficiaries should also be carefully scrutinized.  These are individuals who claim to have needed service but agreed to be paid money to sign timesheets instead.  Carolyn Baldwin told Melissa Williams that she needed to pay her money and Melissa Williams agreed to do so.  The testimony reflects that Mrs. Bikundi was not paying Ms. Baldwin for signing timesheets, but instead for fixing a broken chair or providing a gift after Ms. Baldwin's husband passed away.

Ms. McPherson claimed to have needed services, but never went to her doctor to request services.  In fact, she agreed from the beginning to participate in this scheme to collect money from her aides.  When questioned about whether she reported the lack of services to Global, she responded that she did.  However, her actions demonstrated otherwise due to the fact that she

---

[3] Other beneficiaries, not named here continued in the scheme to defraud Medicaid as they collected money from their aides, unbeknownst to Mrs. Bikundi, such as Tywonna Fenner and Sergio Zuniga.

continued to collect money every week from her aides instead of transferring to another agency

to receive the services that she claimed she needed.

### E.  There Was Insufficient Evidence Presented To Sustain a Conviction for Money Laundering and In the Interest of Justice The Court Should Grant a New Trial On the Money Laundering Counts

Mrs. Bikundi address the insufficiency of the evidence as it pertains to money laundering

in her Motion for Judgment of Acquittal and hereby incorporates those arguments.  Mrs. Bikundi

understands that the standard for a Motion for New Trial under Federal Rules of Criminal

Procedure 33 varies from that of a Rule 29(c) Motion.  Even removing the view of evaluating

evidence in the light most favorable to the government, the sheer lack of evidence that was

presented in the trial and the interests of justice, warrant a new trial for the Money Laundering

counts (Counts 15-22).

In addition to the fact that the government failed to prove any agreement to conspire to

commit money laundering as alleged in Count 15, and further failed to prove any intent to

conceal the source of the funds as alleged in Counts 16-22, this Court should grant a new trial

because the underlying facts of money laundering were also used to support a conviction for

health care fraud.  This Circuit as well as others, have determined that this evidence should not

be conflated.  For example, in *United States v. Adefehinti*, this Circuit held that:

> The [government's] proposed analysis would conflate the act of fraudulently
> obtaining money with the act of concealing it – two different activities which
> rarely are one and the same. Having carried out a fraud of which concealment was
> an integral part, defendants cannot be charged a second time, as if it were the
> ____ of independent manipulation of the proceeds required for money laundering.

510 F.3d 319, 324 (D.C. Cir. 2008).  Other Circuits have agreed with this approach, as well.  *See*

*for example*, *United States v. Castellini*, 392 F.3d 35, 47 (1st Cir. 2004) ("Money laundering

requires the proceeds of illegal activity and cannot be the same as the illegal activity which

produces the proceeds."); *see also United States v. Butler*, 211 F.3d 826, 840 (4th Cir. 2000) ("the laundering of funds cannot occur in the same transaction through which those funds first become tainted by the crime.")

Here, the government has alleged that both the money laundering counts and health care fraud counts occurred during the same time period and that the activity was part of the same transaction or set of transactions.  The funds involved in the money laundering counts were the same funds that were received from D.C. Medicaid as a result of the health care fraud. Therefore, it is undisputed that the activities and transfers of money in and out of bank accounts occurred contemporaneously with each other and involved the same facts as alleged in the health care counts and money laundering counts.  As such the money laundering counts should have been vacated because the activities conflate with the health care fraud allegations.  *See United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir. 1991) ("Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered.")

## CONCLUSION

Based on the above stated arguments, Mrs. Bikundi respectfully requests this Honorable Court grant her Motion for a New Trial.

Dated:  December 7, 2015                                    Respectfully submitted,


                                                           /s/ William R. Martin
                                                           William R. Martin (# 465531)
                                                           Sasha Hodge-Wren (# 976342)
                                                           Miles & Stockbridge, P.C.
                                                           1500 K Street, NW
                                                           Suite 800
                                                           Washington, DC 20005
                                                           (202) 465-8424 (Hodge-Wren)

bmartin@milesstockbridge.com
shodgewren@milesstockbridge.com

*Counsel for Florence Bikundi*