**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.  14-CR-0030-01 (BAH)** |
| | ) | |
| | ) | |
| **FLORENCE BIKUNDI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT FLORENCE BIKUNDI'S
MOTION FOR NEW TRIAL UNDER RULE 33**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files its memorandum in opposition to defendant Florence

Bikundi's Motion for New Trial under Rule 33 (ECF No. 394) ("Def.'s Mot."). As discussed

below, the defendant's arguments in support of her request for a new trial lack merit and should

be rejected.

**PROCEDURAL AND FACTUAL BACKGROUND**

The government hereby incorporates by reference the procedural and factual background

found in its Opposition to Defendant Florence Bikundi's "Renewed Motion under Federal Rule

of Criminal Procedure 29 for Judgment of Acquittal."

**STANDARD OF REVIEW**

Rule 33 permits "a court [to] vacate any judgment and grant a new trial if the interest of

justice so requires." Fed. R. Crim. P. 33(a). "The Rule does not define 'interests of justice' and

the courts have had little success in trying to generalize its meaning." *United States v. Cabrera*,

734 F. Supp. 2d 66, 87 (D.D.C. 2010) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th

Cir. 1989)). "Nevertheless, courts have interpreted the rule to require a new trial 'in the interests

of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.* "[A]ny error sufficient to require a reversal on appeal is an adequate ground for granting a new trial." 3 CHARLES ALAN WRIGHT & SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 589, at 547 (4th ed. 2011).

A defendant has a heavy burden under Fed. R. Crim. P. 33(a). "[T]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand . . . . This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991) (omission in original)).

A new trial "should be granted only if the defendant has shown that the error was substantial, not harmless, and that the error affected the defendant's substantial rights." *United States v. Williams*, 825 F. Supp. 2d 128, 132 (D.D.C. 2011) (internal quotation marks omitted). "An error affecting 'substantial rights' must have a 'substantial and injurious effect or influence in determining the . . . verdict.'" *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)).   Whether to grant a motion for a new trial is "a decision committed to the Court's sound discretion." *Id.* (quoting *United States v. Neill*, 964 F. Supp. 438, 441 (D.D.C. 1997)).

## ARGUMENT

## II.   DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED.

Defendant Florence Bikundi has filed a motion, pursuant to Federal Rule of Criminal Procedure 33, seeking a new trial for several reasons.  First, defendant claims that admission of Government Exhibit 439 was extremely prejudicial and its admission warrants a new trial.

Def.'s Mot. at 4.   Second, defendant contends that the Court's failure to give a unanimity instruction as to Count II (health care fraud) was prejudicial.   *Id.* at 7.   Next, defendant complains that the evidence at trial varied from the indictment and the variance mandates a new trial.   *Id.* at 8.   Defendant further contends that the testimony of some of the government's witnesses was "inherently incredible" and therefore such testimony cannot be relied upon to support the jury's verdicts.   *Id.* at 10-14.   Finally, defendant contends that the evidence concerning the money laundering counts was insufficient and a new trial is needed.   *Id.* at 14. The defendant's arguments, while numerous, lack merit, and should be rejected.

### A.   THERE WAS NO RULE 16 VIOLATION AND THE DEFENSE WAS NOT UNDULY PREJUDICED BY THE ADMISSION OF GOVERNMENT EXHIBIT 439.

Throughout the trial there was testimony from several witnesses regarding beneficiaries who did not actually need home health services.   The government attempted to further quantify the number of patients who may not have actually needed services.   On the afternoon of November 3, 2015, government counsel notified the Court that Donald Shearer, who had previously testified, had been able to comply with a request government counsel made prior to trial.   11-3-15 (PM) Tr. at 13.   Specifically, counsel had requested that Donald Shearer obtain information concerning how many patients/clients Global had submitted bills to Medicaid for services before Global was shutdown in February 2014.   *Id.* at 14.   Counsel sought to find out how many of those patients Medicaid was still being billed for home aide services between March and December 31, 2014, a period of six months after the shutdown.   *Id.* at 15. Government counsel informed the court, and counsel, that Mr. Shearer had finally provided a "PCA Services Utilization Report," which the government sought to move into evidence after re-calling Mr. Shearer to the stand.   Defense counsel objected.

After hearing from both sides, the Court ruled that it would permit the testimony and admission of the report.  11-3-15 (PM) Tr. at 110.  In ruling that the evidence was admissible, the Court observed that the "relevance of this report is really hard to dispute."  *Id.* at 111.  Although the Court agreed that the timing of the report was not ideal, the Court observed "that the description of the report and the ability of defense counsel to talk to Mr. Shearer helps address some of the timeliness issues with production of this particular report."  *Id.* Counsel for Florence Bikundi met with Mr. Shearer prior to his testimony to ask questions regarding the report; counsel for Michael Bikundi, Sr., declined to do so.

Donald Shearer re-took the stand on November 4, 2015, at which time the PCA Services Utilization Report" was moved into evidence as Government Exhibit 439.  The exhibit showed that from January 2012 and February 2014, Global had 567 beneficiaries, for whom Global billed Medicaid nearly $30 million dollars.  Gov. Ex. 439.  For the period of March through December 2014, Medicaid was billed zero dollars for those same 567 beneficiaries.  *Id.*

Defendant Florence Bikundi now complains that admission of Government Exhibit 439 was unduly prejudicial.  Def.'s Mot. at 4.  Defendant contends that she was not afforded with the "appropriate time to investigate and interview the beneficiaries listed in the report to determine whether they did in fact need the services."  *Id.* at 6.  As a result, defendant contends that the Court should have excluded this evidence as a violation of Rule 16 of the Federal Rules of Criminal Procedure and cites *United States v. McCrory*, 930 F.2d 63 (D.C. Cir. 1991), in support of this argument.  Def.'s Mot. at 6.  Defendant's reliance on *McCrory* is misplaced.

In *McCrory*, the defendant was convicted of distribution of cocaine base.  *Id.* at 64.  His counsel sought to mount an identification defense, based on the fact that the undercover officers who purchased drugs from the defendant testified that the person who sold the drugs had been

wearing gold chains around his neck.  *Id.* at 70.  The police report regarding the arrest did not mention whether the defendant had worn jewelry; an officer testified at trial that the jewelry had been removed from the defendant, thus precluding the defense's theory.  *Id.*  On appeal, the defendant contended that the district court erred in failing to grant his motion for a mistrial based on the government's "belated compliance with his discovery request to produce 'physical evidence regarding any pretrial identification,'" which he contended "prejudiced his substantial rights and violated Rule 16 of the Federal Rules of Criminal Procedure."  *Id.* at 70.  In rejecting the defendant's claim, the court of appeals held that the district court's remedy – prohibiting the government from introducing the gold chains in its case-in-chief, and allowing the defense to cross-examine all the government witnesses about the existence of the gold chains – was sufficient, and therefore the defendant "suffered no prejudice to his substantial rights."  *Id.* at 69 (citations omitted).  As the appellate court observed, the defense had "no right to deceive a jury as to the true facts."  *Id.* at 70.  *McCrory* has no applicability to this case.  In *McCrory* the government was in possession of the evidence prior to trial however, it was not disclosed until an officer testified.  *Id.*  In this case, the government did not have Government Exhibit 439 until the day that it provided the exhibit to the defense; it had not been in the government's possession prior to that time and therefore there was no Rule 16 obligation to disclose the evidence.

A more helpful case is *United States v. Marshall*, 132 F.3d 63 (D.C. Cir. 1998).  In that case, the defendant was convicted of distributing crack cocaine.  *Id.*  His defense attorney argued to the jury in his opening statement that the phone calls between the government's confidential informant and the seller of the drugs would not show any link to the defendant because the defendant was not associated with the phone number used to communicate with the informant. *Id.*  Unbeknownst to the defense, the government had obtained, prior to trial, the jail visitation

records of a proposed defense witness, to whom the phone calls could be tied, and who had a relationship with the defendant. *Id.* at 66. During the trial, after the supervising agent had testified, the prosecutor asked the agent to "conduct further investigation," into the defendant's prior arrests in Prince George's county. *Id.* That further investigation revealed that the defendant had been driving the same car involved in the drug transactions at issue at trial during a prior arrest in Prince George's county. *Id.* In addition, the Prince George's officer brought the defendant's pager that had been previously confiscated, which the agent used to obtain the serial number to obtain records from the pager company. *Id.* The district court declined to exclude the jail visitation records, holding that the defense was not prejudiced by the late disclosure. *Id.* However, with respect to the Prince George's county records, while criticizing the government for what it deemed was "sloppy police work [and] insufficient investigation," it found that the government's decision "to conduct an additional investigation in the middle of trial was not a product of bad faith," and held that there had been no Rule 16 violation. *Id.* at 67.

On appeal, and for purposes relevant to the current issue, the court of appeals agreed that there had been no Rule 16 violation regarding the information that had been obtained by the government during trial. *Id.* at 68. Significantly, the court observed that the "government cannot be required to disclose evidence that it neither possesses or controls." *Id.* (citation omitted). It was, the court observed,

> not disputed that the government turned over the P.G. County records to the defense as soon as it discovered them. Thus there is no violation unless the term "government," as used in Rule 16 encompasses local law enforcement officers, such as the P.G. County Police Department. There is ample authority that it does not.

*Id.* (citations omitted).[1]  As the court explained, "Rule 16 does not prevent the government from introducing any new evidence after a trial begins; indeed, Rule 16 itself contemplates that evidence may be disclosed 'during trial.'"  *Id.* at 70 (citing Fed. R. Crim. P. 16(c)).  In addition, while district courts have the option of suppressing evidence as a result of discovery violations, "such a severe sanction would seldom be appropriate where – as here –the trial court finds that the government's violation did not result from bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice."  *Id.*

In this case, as in *Marshall,* the information, as it was introduced in Government Exhibit 439, was not in the government's possession prior to the time it was disclosed at trial.  Thus, there was no Rule 16 violation.  The government turned over the exhibit as soon as it was provided to the government; and the Court ordered that Mr. Shearer be made available to the defense prior to his testimony the next day (an opportunity that counsel for defendant Florence Bikundi utilized).  The defense had the exhibit overnight to examine it and was fully able to cross-examine Mr. Shearer about the report the next day.  The exhibit was undoubtedly relevant as it gave the jury some idea of the scope of the fraud that may have been committed.  And defense counsel was able to show the limitations of the evidence during cross-examination.  As observed in *Marshall*, one of Rule 16's goals is "contributing to an accurate determination of the

---

[1] The *Marshall* court did observe that its ruling was "not an invitation for the United States to engage in gamesmanship in discovery matters[,]" by sandbagging a defendant by "leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial."  *Marshall*, 132 F.3d at 69 (citations omitted).  But, in the case before it, as here, "there [was] no evidence that the government purposely ambushed the defense when it proffered the P.G. County records during trial."  *Id.*  Furthermore, as in this case, there was no finding – or suggestion – that the government had acted in bad faith.  *Id.*

issue of guilt or innocence," and parties have "no right to deceive a jury as to the true facts." *Id.* (citing *McCrory*, 930 F.2d at 70).[2]

More importantly, the defense simply cannot claim surprise that the government sought to quantify the number of beneficiaries who did not actually need services – this was one of the key aspects of the government's case.  The government called several Medicaid beneficiaries to establish the fact that they did not receive or actually need services.  Several witnesses (such as, *inter alia*, Nicola White, Melissa Williams, Irene Igwacho, and Carlson Igwacho) testified that they had not actually provided services to beneficiaries for whom they billed.  Certainly, it cannot be claimed that it was a shock that the government sought to attempt to quantify, to some extent, the number of persons who may not have actually needed services.  In addition, the defense had access to the same claims data as the government and could have interviewed any of the many Medicaid beneficiaries contained in that data.  Indeed, some of those beneficiaries testified at trial, such as Sergio Zunega, who stated that after his Global aide stopped coming, he never sought services from another home health agency.  10-20-15 (PM) Tr. at 18.  Or Alma McPherson who testified that she never actually needed services.  Additionally, the defense was able to cross-examine Mr. Shearer about the report, including the fact that Mr. Shearer's office was unable to actually confirm with many of the beneficiaries that they no longer needed services.

---

[2] The exhibit was particularly useful to the jury in light of counsel for Florence Bikundi's closing argument, wherein he argued that Elke Johnson testified that "80 percent" of Global's roughly 840 aides were in compliance, "[s]o out of that 840, there might have been 30 aides" who were committing fraud.  11-9-15 (AM) Tr. at 106-07.  Not only was this calculation mathematically erroneous, it failed to accurately represent the actual number of aides who were employed at Global at the time.  In any event, the defendant would be guilty of aiding and abetting health care fraud even if she was aware of only *one* aide who was failing to provide services that were billed to Medicaid.

Under these circumstances, where there was no bad faith by the government regarding the timing of the disclosure of the report, the defense was in possession of the information contained in the report prior to trial, and the defense was able to cross-examine a witness concerning the report, there was no undue prejudice that warrants a new trial.

## B.   DEFENDANT FAILED TO REQUEST A UNANIMITY INSTRUCTION AND, IN ANY EVENT, ONE WAS NOT REQUIRED.

Defendant Florence Bikundi next contends that the court erred in failing to give the jury a specific unanimity charge regarding Count II (Health Care Fraud – Fraudulent Billings).  The defendant claims that because the government sought to convict for this charge by "proving six different acts," the court "was required to instruct the jury that it had to unanimously agree to each manner and means alleged by the government."  Def.'s Mot. at 7.  Defendant's arguments lack merit for two important reasons.

First, the defense failed to request a specific unanimity instruction.  Prior to trial the parties submitted a Joint Pretrial Statement, which contained the parties' proposed jury instructions.  (ECF No. 271).  The defense failed to request a specific unanimity instruction as to Count II.  This is telling, given that the defense did specifically request a specific unanimity instruction regarding Count I, which was given by the Court.  Thus, the defense failed to request a specific unanimity instruction and should not be heard to complain about the lack of one at this late date.[3]

Second, a specific unanimity instruction was not required, where, as here, the Court gave the jury a general unanimity instruction.  Specifically, the Court instructed the jury:

---

[3] Pursuant to Federal Rule of Criminal Procedure 30, failure to object to the jury's instructions, or to request an instruction before the jury retires to deliberate, "precludes appellate review, except as permitted under Rule 52(b)."  Fed. R. Crim. Pro. 30(d).

> A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict. In other words, your verdict must be unanimous *on each of the 15 charges*.

Jury Instructions, at 30. "In most cases, a general instruction on unanimity suffices . . . ." *United States v. Sayan*, 968 F.2d 55, 66 (D.C. Cir. 1992). Clearly, the Court's instruction advised the jurors that they had to agree on each of the charges to be considered. And because "[j]ury instructions are to be considered as a whole, rather than isolated passages,'" *United States v. Mangieri*, 694 F.2d 1270, 1281 (D.C. Cir. 1982) (citation omitted), this general unanimity instruction informed the jury that it had to be unanimous concerning its findings in Count II. *See also United States v. Hurt,* 527 F.3d 1347, 1353 (D.C. Cir. 2008) (holding that district court did not commit plain error in failing to give a special unanimity instruction where there were two ways by which the defendant could have committed theft of government property); *United States v. Hubbard*, 889 F.2d 277, 279 (D.C. Cir. 1989) (holding that charging a series of similar acts in furtherance of a fraudulent scheme falls into a single conceptual grouping that does not require a special unanimity instruction and finding that the district court did not commit plain error by failing to give a special unanimity instruction regarding the overt acts that were committed in further of the conspiracy).

### C.   THERE WAS NO IMPERMISSIBLE VARIANCE.

Defendant's next basis for a new trial is that the evidence at trial varied from the allegations set forth in the indictment. Specifically, defendant claims that the indictment charged a "single conspiracy to commit health care fraud in the superseding indictment." Def.'s Mot. New Trial at 8. However, according to the defense, at trial the evidence established "multiple conspiracies" and this fact prejudiced the defendant, particularly because "she did not participate

in any conspiracy with Melissa William[s] or any of the individuals named in the indictment."
*Id.* Defendant's argument should be rejected.

"The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988) (citations omitted). To establish variance requiring reversal, the defendants must establish (1) that the evidence admitted at trial established multiple conspiracies rather than the one conspiracy charged in the indictment, and (2) that because of the "multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *United States v. Mathis*, 216 F.3d 18, 23 (D.C. Cir. 2000) (citation omitted). In determining whether the evidence established a single, as opposed to multiple, conspiracies, the court, "viewing the evidence in the light most favorable to the government . . . looks at 'whether the defendants shared a common goal, any interdependence among the participants, and any overlap among the participants in the allegedly separate conspiracies." *Id.* at 23-24 (citations omitted). "A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective." *Tarantino*, 846 F.2d at 1392 (citations omitted). The jury's verdict "must be upheld if the evidence adequately supports a finding that a single conspiracy existed." *Tarantino*, 846 F.2d at 1391 (citations omitted).

Here, the evidence established one single conspiracy between defendants Florence Bikundi, Michael Bikundi, Sr., and the co-conspirators identified in Count I of the indictment. The common goal of the conspirators was to commit health care fraud, which they did by submitting false claims for payment by Medicaid. While members of the conspiracy may have played different roles (Melissa Williams and Elvis Atabe, for example, primarily assisted in

falsifying documents, while Carlson Igwacho, Berenice Igwacho, and Irene Igwacho, as home health aides, submitted payments to beneficiaries and obtained signed timesheets falsely indicating that they had worked the full hours with the client), each had an overall goal of defrauding the Medicaid program.   Thus, this case is unlike *Kotteakos v. United States*, 328 U.S. 750, 758 (1946), where the Supreme Court found "one conspiracy only is charged and at least eight, having separate, through similar objects, are made out by the evidence . . . and in which the more numerous participants in the different schemes were, on the whole, except for one, different persons who did not know or have anything to do with one another."   Here, the evidence established that the conspirators each played a role in the overarching goal of defrauding the Medicaid program.   As Elvis Atabe testified, at Global, "the whole system was bad."  Mr. Atabe also identified Irene Igwacho as someone who assisted in falsifying documents. Similarly, Melissa Williams testified how it was "understood" that whatever documents needed to be forged would be forged. Thus, the government established a single conspiracy involving the defendants and named co-conspirators and there was no variance from the indictment.

However, even if there was any variance between the conspiracy charged in the indictment and the evidence adduced at trial, there was not sufficient prejudice warranting reversal.  To establish prejudice warranting a new trial, the defendants must show that they were "'substantially prejudiced' . . . through 'spillover prejudice.'"  *Mathis*, 216 F.3d at 25 (citations omitted).   "Substantial prejudice occurs when multiple defendants are charged with a large and complex conspiracy and spillover prejudice confuses the jurors."  *Id.* (citation omitted).   In this case, there was not an overly large and complex conspiracy; rather, these was one overall conspiracy to make false statements in connection with the delivery and payment for health care benefits (in violation of 18 U.S.C. § 1347) and false statements submitted in connection with

such payments (in violation of 18 U.S.C. § 1035).   The defendants were not prejudiced by evidence that some of the co-conspirators may have had agreements outside of this overall conspiracy because the witnesses' clearly testified that neither Michael Bikundi Sr., nor Florence Bikundi *knew of or participated in* these separate agreements.   *See, e.g., United States v. Richardson*, 833 F.2d 1147, 1155 (5th Cir. 1987) ("If the Government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights.") (citations omitted).   Thus, there could be no "spill-over effect" Def.'s Mot. at 9, that prejudiced the defendants because the evidence very clearly did not relate to the defendants' activities.   *See, e.g., Mathis*, 216 F.3d at 26 (holding that although there was "a variance between the indictment charging a single conspiracy and the trial evidence indicating more than one conspiracy . . . the variance did not substantially prejudice the appellants.") (footnote omitted).

### D.     THE TESTIMONY WAS NOT INHERENTLY INCREDIBLE.

Next the defendant claims that a new trial is warranted because of the "inherently incredible" testimony of several witnesses.   Defendant's argument should be rejected.

Courts must reverse findings based upon "inherently incredible" testimony where "it is possible to disprove testimony as a matter of logic by the uncontradicted facts or by scientific evidence."   *Jackson v. United States*, 353 F.2d 862, 867 (D.C. Cir. 1965).   However, the court need not such definitive proof; "[it] is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seems highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave."   *Id.* (footnotes omitted).

In this case, none of the testimony falls within the category of being "inherently incredible."  Regarding Melissa Williams, the defense selectively cites to her testimony where she agreed that she never engaged in any conspiracy with defendant Florence Bikundi.  Def.'s Mot. at 11.  However, on re-direct, Ms. Williams clearly stated that defendants Florence and Michael Bikundi were "part of the team" to defraud Medicaid:

> Q: So why did you say you weren't? What do you mean by that? When you -- on cross-examination, defense counsel asked if you weren't in a conspiracy with Florence Bikundi, and you said no; what do you understand a "conspiracy" to be?
>
> A: Because I participated. So that's -- I think -- I'm thinking that because I participated in the forging of the documents in the office, I'm considered -- that would be considered conspiracy to Medicaid fraud.
>
> Q: Who was acting together to defraud Medicaid? What was the team? Who made up the team that was defrauding Medicaid?
>
> A: Myself, Chris, Nicola, Elvis.  Everybody except – with the exception of Gwen and probably Tihitina.
>
> Q: And was [sic] Michael Bikundi and Florence Bikundi considered part of that team?
>
> A:  Yes.

11-2-15 (AM) Tr. at 114.   Thus, the fact that Ms. Williams did not understand the legal implications of the term "conspiracy," does not make her testimony inherently incredible. Furthermore, while the defense contends that Ms. Williams could not have been present for the surveys during which Florence Bikundi gave orders to alter documents, the defense once again fails to cite the portions of Ms. Williams' testimony where she stated she was unsure of the year that this survey took place:

> Q: Now, I think the Government attempted to determine whether you knew the actual dates of any surveys that you attended. Do you recall the actual dates?
>
> A: I don't.
>
> Q: But you attended two surveys, correct?
>
> A: Two surveys downstairs, one on the upstairs.

*Id.* at 82.

Concerning the testimony of Elke Johnson and Francis James, the defense merely argues, without citation, that the Court should disbelieve Francis James and accept the defendant's alternate, unsupported view, of the evidence.  Def.'s Mot. at 12.   This does not amount to a basis for a new trial.  *See Johnson v. United States*, 426 F.2d 651, 654 (D.C. Cir. 1970) ("Having made this determination based on testimony which was not inherently incredible, the case was for the trier and not the trial judge, and the motion for a directed verdict of acquittal was properly denied.").   Similarly, as it concerns Elvis Atabe, the defense contends that Mrs. Bikundi was out of the office when the first survey occurred in September 2011; however, there was testimony regarding multiple surveys/audits, and Mr. Atabe did not identify the precise timeframe of each instance when he and Mrs. Bikundi forged/altered documents.

Nor does the defense identify any "inherently incredible" testimony by James Mbide; instead, the defense contends that Mr. Mbide was committing his own fraud without the knowledge or consent of Florence Bikundi.  Def.'s Mot. at 13.  This argument is belied by the testimony and the jury's verdict.

Finally, the defense attacks the testimony of Carolyn Baldwin. [4]  Def.'s Mot. at 13.  The defense contends that Ms. Baldwin was paid for a chair or a gift; however her testimony established that the very first time she met Florence Bikundi, the defendant offered to pay her to become a client, and she received a check shortly thereafter, prior to any chair being broken or the death of her husband.  Thus, her testimony was not "inherently incredible," and could be properly credited by the jury.

###    E.    THE EVIDENCE REGARDING THE MONEY LAUNDERING CHARGES WAS SUFFICIENT TO SUPPORT THE JURY'S VERDICT.

The defendant's Rule 33 motion for the money laundering counts incorporates her Rule 29 arguments.  In her Rule 33 motion, the defendant additionally asserts that the "Court should grant a new trial because the underlying facts of money laundering were also used to support a conviction for health care fraud."  Def.'s Mot. at 14.

As the D.C. Circuit has noted, "the offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered."  *United States v. Hall*, 613 F.3d 249, 254-55 (D.C. Cir. 2010).  "In other words, to launder money, a defendant must have money to launder."  *United States v. Baxter*, 761 F.3d 17, 31 (D.C. Cir. 2014).  The relevant inquiry is whether the charged money laundering transactions "took place after proceeds existed."  *Id.* at 32.

In this case, the government alleged that the underlying predicate offenses, or specified unlawful activity, that generated the laundered funds were Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349; Health Care Fraud, in violation of 18 U.S.C. § 1347;

---

[4] The defense alleges that Ms. McPherson stated she reported the lack of services to Global, which does not make sense because she continued to collect money from her aides.  Def.'s Mot. at 13.  The defense fails to cite to a transcript for this testimony, however, and a review of Ms. McPherson's testimony does not reveal that she made these statements.

False Statements in Health Care Matters, in violation of 18 U.S.C. § 1035; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(a)(3). *See also* Indictment, at 30-31, 36; Jury Instructions, at 21-22, 25. These health care fraud offenses were not part of any of the charged money laundering transactions. They created illegal proceeds when D.C. Medicaid payments were deposited into Global accounts. All of the money laundering counts involved financial transactions with money or property from the Global accounts. The "predicate crimes" in this case "produced proceeds in acts distinct from the conduct that constitutes money laundering." *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998) (affirming money laundering conviction when defendants' schemes generated proceeds and then defendants "committed separate acts to launder those proceeds."). Thus, there is no basis to overturn the jury's verdict.

The defendant is correct when she states that "[t]he funds involved in the money laundering counts were the same funds that were received from D.C. Medicaid as a result of the health care fraud." Def.'s Mot. at 15. However, that is not a basis to vacate the defendant's conviction. Money laundering "criminalizes" transactions involving illegal proceeds. *Mankarious*, at 705.

The defendant is also accurate when she asserts that "the money laundering counts and health care fraud counts occurred during the same time period." Def.'s Mot. at 15. But, that is likewise not a basis to vacate the defendant's conviction. For money laundering "it does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in *transactions* distinct from those *transactions* allegedly constituting money laundering." *Mankarious*, at 706 (emphasis added); *see also United States v. Butler*, 211 F.3d 826, 830 (4th Cir.2000) (holding that to establish a money

laundering offense "the laundering of funds cannot occur in the *same transaction* through which those funds first become tainted by crime.") (emphasis added).  When D.C. Medicaid paid funds to Global, "the crime of health care fraud was complete," and the funds in Global's accounts were health care fraud proceeds.  *United States v. Halstead*, 634 F.3d 270, 280 (4th Cir. 2011) (holding that transactions constituting health care fraud were separate from the transfers of health care fraud proceeds); *see also United States v. Morelli,* 169 F.3d 798, 800 (3d Cir.1999) (concluding for purposes of money laundering statute "that the money became the proceeds of fraud as soon as it entered the hands of members of the scheme").  The criminal activity charged in the money laundering counts were financial transactions conducted with D.C. Medicaid funds in Global accounts.  The money laundering offenses were separate and distinct from the health care offenses that generated the laundered proceeds.

## CONCLUSION

For the reasons set forth above, defendant Florence Bikundi's motion for a new trial pursuant to Rule 33 should be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

By:       _____/s/_____
          Michelle Bradford (D.C. Bar No. 491910)
          Lionel André (D.C. Bar No. 422534)
          Anthony Saler (D.C. Bar No. 448254)
          Assistant United States Attorneys
          Fraud and Public Corruption Section
          555 4th Street, N.W.
          Washington, D.C. 20530
          Tel: 202.252.7818 (Andre)
          Tel:202.252.7445 (Saler)
          Tel.202.252.7803 (Bradford)
          Michelle.Bradford@usdoj.gov

DATED:  December 23, 2015