**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.  14-CR-0030-01 (BAH)** |
| | ) | |
| | ) | |
| **FLORENCE BIKUNDI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT FLORENCE BIKUNDI'S**
**RENEWED MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files its memorandum in opposition to defendant Florence

Bikundi's "Renewed Motion under Federal Rule of Criminal Procedure 29 for judgment of

Acquittal" (ECF No. 393). The defendant's arguments are legally and factually baseless, and

therefore her motion should be denied.

**STATEMENT OF FACTS**

A.      **The Government's Case**

Witness testimony, which was often corroborated by documentary trial exhibits, provided

the jury with powerful evidence of the defendants' intentions and actions in defrauding D.C.

Medicaid, and subsequently laundering the proceeds of the health care fraud scheme.

<u>DC Medicaid Program and Licensing Requirements for Home Care Agencies</u>

The government's first witness at trial was Donald Shearer, who was Director of Health

Care Operations Administration for D.C. Health Care Finance ("DHCF"), which oversees the

D.C. Medicaid program. *See* 10-15-2015 (AM) Tr. at 4.  Mr. Shearer further testified that when a

company applies to become a home health care provider, the names of the owners and managers

are compared against the [U.S. Health & Human Services] Office of the Inspector General's Exclusion List to make sure that the individuals affiliated with the company have not been excluded from participation in any federally run programs. *Id* at 7-9.  In 2009, Mr. Shearer was personally responsible for signing the provider agreement on behalf of DHCF.  *Id.* at 10.  Before a company was allowed to become a health care service provider, the company was required to secure a license through the District of Columbia Department of Health, Health Regulation and Licensing Authority ("HRLA").  *Id.* at 12-13.  According to Mr. Shearer, if he had known that the owner of Global was an excluded person, he would not have approved the Global provider agreement.  *See* 10-15-2015 (PM) Tr. at 7.  Similarly, if Mr. Shearer had known that any of the signatures on Global's Medicaid provider application and agreement (Government Exhibit 1), which was signed by Mr. Shearer on behalf of DHCF on July 30, 2009, were forged, he would never have approved the Global provider agreement.  *Id.* at 7-8.

Sharon Mebane, HRLA's Program Manager, who had oversight responsibilities over home care agencies and nurse staffing agencies, testified regarding the requirements for obtaining, and maintaining, a health care agency license.  *See* 10-16-15 (AM) Tr. at 40-42.  Ms. Mebane testified that a company cannot operate as a home care agency in the District of Columbia without a license.  *Id.* at 42.  Once a home care agency secures a license from HRLA, they are subject to annual licensure surveys to ensure that the company is operating within the rules and regulations of the District.  *Id.* at 46.  A home care company must have an active license from HRLA before they can be reimbursed for services by DC Medicaid.  *Id.* at 49.  If the company's license was suspended or revoked, they were not permitted to bill DC Medicaid. *Id.*  Ms. Mebane testified that if, during Global's initial licensing application, DOH had learned or knew that the administrator, president or director of Global had been an excluded person, "we

would recommend that that entity not be licensed." *Id*. at 73. According to Ms. Mebane, during HRLA's first annual survey of Global, which was completed on December 7, 2010, the HRLA surveyors noted major deficiencies in Global's corporate records, including the company's policies and procedures, its employee files and patient files. *See* 10-16-15 (AM) Tr. at 57-58. Furthermore, Ms. Mebane testified that the failure to maintain proper records, such as employee criminal background checks, could result in a fine to the agency. *Id*. at 74, 84. Of particular significance, Ms. Mebane testified that if HRLA's survey staff had learned that any documents that were presented to them by Global during the course of a survey were counterfeit or forged, "we would recommend to our legal arm that we recommend termination of their license." *Id*. at 74, 82.

Roland Follot, an HRLA surveyor, who participated in the February 2011 and September 2011 follow-up surveys of Global's December 2010 Annual Survey (in which major deficiencies had been noted), testified at trial about specific false statements that were made to him by certain by Global representatives. He stated on the first day of the survey on February 14, 2011, he met Global's owner, Florence Bikundi, at Global's office. *See* 10-22-15 (PM) Tr. at 11, 15. On that day, Michael Bikundi introduced himself to Mr. Follot as "just the president." *Id*. at 12-13. On February 14, 2011, when Mr. Follot asked Florence Bikundi for her personnel file, Florence Bikundi informed him that she did not have one. *Id*. at 16. The following day, Florence Bikundi advised Mr. Follet that Elke Johnson had "shredded her file on the day before." *Id*. at 27-28. During the December 2010 follow-up survey on September 27, 2011, Global's office staff informed Mr. Follot that Michael Bikundi was coming down from a hospital, and that Florence Bikundi was still in the hospital because "she had had children." *Id*. at 39. During the September 2011 follow-up survey, Global still had major deficiencies related to health

certificates for its employees, and an employee file missing a comprehensive background check, for which Mr. Follot issued Global a notice of infraction. *Id*. at 44-45. The infraction notice was sent to Michael Bikundi, CEO/Administrator, because DRLA listed him as Global's administrator. *Id*. at 47-48.

<u>Evidence Supporting Health Care Fraud Conspiracy</u>

James Mbide, who was, at various times, Global's Director of Nursing, testified that he met Florence Bikundi in approximately 2009. 10-16-15 (PM) Tr. at 89. Florence Bikundi, who also owned and operated Flo-Diamond, a home health agency in Maryland, told Mr. Mbide that she was going to start her own health care company in the District of Columbia and she would like him to become the director of nursing. *Id.* Subsequently, in late 2009, Mr. Mbide became the director of nursing for Global; at the time, he recalled Florence Bikundi was still using her maiden name, Florence Igwacho. *Id.* at p. 92. Mr. Mbide testified that he never submitted a Medicaid provider application to DC Medicaid for Global to become a health care provider, and never gave Florence Bikundi permission to use his name on a provider agreement. *Id*. at 93. Mr. Mbide testified that the signature on Global's Medicaid Provider application and agreement was not his signature and that he never authorized anyone to sign his name. *Id*. at 95-96.

Mr. Mbide testified Michael Bikundi was not initially working with Global daily, but at some point in approximately 2010, Michael Bikundi became the CEO of the company. 10-16-15 (PM) Tr. at 101. Mr. Mbide, who was responsible for supervising the other nurses, initially worked full-time; however he was "fired" by Michael Bikundi sometime towards the end of 2010. *Id.* at 105.[1] In the summer of 2012, Florence Bikundi asked Mr. Mbide to return to Global, but in a part-time capacity, in which he only worked in Global's offices on two days per

---

[1]    Even after being "fired" by Michael Bikundi, Mr. Mbide continued to work for Global through his staffing agency, Eban. 10-16-15 (PM) Tr. at 106.

week.  *Id.* at 103-04; 105-06.  Mr. Mbide testified that on several occasions he was telephoned

by Florence Bikundi or Michael Bikundi to come to Global's offices to assist with a "survey"

that was being conducted by Medicaid officials and create nurse notes that were missing from

patient files stating that a nurse visit was done, even when they were not.  *Id.* at 80, 84; *see also*

10-19-15 (AM) Tr. at 12-15.  According to Mr. Mbide, Florence Bikundi instructed him that

when he created fake nurse notes for patients he did not visit, he always had to write down that

personal care aide ("PCA") was present.  *Id*. at 85.  While Florence Bikundi sat at a table with

Mr. Mbide, other Global nurses who were at the table, such as Vanessa Sona and Eveline

Takang, also assisted in the creation of fake nurse notes for visits that did not take place.  10-19-

15 (AM) Tr. at 13-14.  Mr. Mbide stated that Michael Bikundi was present when Global nurses

were creating nurse notes to fill in gaps in preparation for surveys.  *See id*. at 14.

Mr. Mbide testified that there were times when he visited Medicaid beneficiaries, who

"who appeared not to be qualified to receive personal care services" because they were "able-

bodied."  10-19-15 (AM) Tr. at 21.  During a meeting with Michael Bikundi, Chris Asong and

Nicola White, Mr. Mbide informed Michael Bikundi that some of Global's patients did not

qualify for personal care services, and they need to be discharged.  Michael Bikundi directed Mr.

Mbide "to put a business hat on [his] head."  *Id*. at 22.  Thereafter, Mr. Mbide never complained

to Michael Bikundi again because he had "established what he want[ed] to do for his business."

*Id*.[2]

---

[2] According to Mr. Mbide, Michael Bikundi was aware that Elvis Atabe was creating counterfeit documents by "cutting and pasting" and backdating plans of care.  In one instance, Michael Bikundi deducted $3000 from Mr. Mbide's nurse staffing company, Eban, because the plan of care date had lapsed.  Michael Bikundi advised Mr. Mbide that Global was obligated to return the money to Medicaid. Mr. Mbide subsequently saw the patient's file on Elvis Atabe's desk.  Elvis Atabe was changing, cutting and pasting the patient's file.  Elvis Atabe informed Mr. Mbide that it was Michael Bikundi who gave him the patient's file "to . . . cut and paste" and backdate. 10-19-15 (AM) Tr. 31-32.

In April 2011, Elvis Atabe applied to work at Global.  10-21-15 (AM) Tr. at 110.  On the day of his interview, James Mbide introduced Mr. Atabe to Florence Bikundi, who then sent him to be interviewed by Michael Bikundi.  *Id.* at 111-112.  Michael Bikundi hired Mr. Atabe, who started working at Global about a week later.  When he arrived at Global to work, he shared an office with Florence Bikundi, who informed him that he would be doing quality assurance.  *Id*. at 114.  Florence Bikundi explained to Mr. Atabe that if a plan of care did not conform to the 30-day period that is required by Medicaid, he was to use white-out to alter the date to make sure the dates conform to Medicaid's requirements.  *Id.* at 115.  In his presence, Florence Bikundi used white-out to alter patient files.  *See id.* at 115-116.  Afterwards, Nicola White showed Mr. Atabe how to erase a signature on a computer and put in another signature.  He immediately told Nicola White that he was not very good with the computer.  *Id*. at 116.   Mr. Atabe testified that at times, he sat with Florence Bikundi and Irene Igwacho "in that little office" to try to figure out ways to better alter the documents.  *Id.* at 119.  Mr. Atabe and Florence Bikundi sat side by side, with their chairs "rubbing each other" while they created fake documents.  *Id*. at 120.   Irene Igwacho, Nicola White, and Eveline Takang assisted in creating fake documents too.  *Id.* at 120-121.   According to Mr. Atabe, Global had so many charts, that when surveyors were coming, one person couldn't do the job of fixing the charts, "it was like a [sic] teamwork." *Id*. at 121.  Elvis Atabe further testified that when plans of care were mailed to Global's offices, they went to Michael Bikundi's office.  When he opened them, if the dates "were not good enough," Michael Bikundi directed Mr. Atabe to alter the dates before giving them to Gwen Gosslee, who logged them into Global's system.  *Id*. at 125.

Mr. Atabe testified that the "whole system" at Global was bad.  Various office workers participated in the fraudulent scheme at various levels.  *Id*. at 25-26.  Elke Johnson altered

personnel files and Eveline Takang created false nurse visit notes. *Id*. at 26-28. Atabe created cut-outs of a doctor's signature that were used by nurses to do corrections on the plans of care that were not signed with accurate dates. *Id*. at 21; Gov. Ex. 413. The use of cut-outs were kept a secret from the surveyors. *Id*. at 32. However, Michael Bikundi knew that Global employees were using the cut-outs "because he used to come and oversee sometimes what we are doing." *Id*. at 32-33. Florence Bikundi knew that Mr. Atabe used the cut-outs to alter documents because he did it "right in front of her." *Id*. at 33. Mr. Atabe further stated that Irene Igwacho, Nicola White and Chris Asong knew that Global was using the cut-outs because "we were doing it together." *Id*   During surveys, Mr. Atabe and various Global employees, including Irene Igwacho, James Mbide, Eveline Takang and Vanessa Sona sat in the chart room, where patient files were maintained, and created fake documents, such as nurse visit notes, to help Global pass the surveys. *Id*. at 57-58. Michael Bikundi knew that the Global employees were in the chart room altering documents while the surveyors were in the other room waiting for the files because "once in a while" he would walk around to check on the progress. *See id*. at 84.

Another co-conspirator, Nicola White, who was a former administrative assistant at Global, testified that Florence Bikundi told her to cut and paste doctors' signatures onto plans of care, so that they would appear to have been approved by the doctors. 10-20-15 (PM) Tr. at 73. Ms. White testified that she heard an argument between Florence Bikundi and Michael Bikundi, during which Michael Bikundi complained that the cut and paste job that Ms. White was performing on the computer did not look "real enough." *Id*. at 73-74. According to Ms. White, in an effort to improve the quality of the fake documents, Florence Bikundi would take the forged plans of care and fax them to one of Flo-Diamond's offices and have them faxed back to her so that the plans of care would look "more real." *Id*. at 74-75. Furthermore, on two

occasions when Ms. White was on maternity leave, Florence Bikundi – driven by Michael Bikundi– went to Ms. White's home to retrieve the plans of care that Ms. White had created.  *Id.* at 95-97; 10-21-15 (AM) Tr. at 82-83.  The plans of care were so numerous that they could not be emailed and did not fit into an envelope.  10-21-15 (AM) Tr. at 84.  Ms. White further testified that Florence Bikundi directed her, as well as other employees, to falsify documents when the Medicaid surveyors were still present at Global's Office so that Global would not be fined.  10-20-15 (PM) Tr. at 76-77.

Elke Johnson, who worked for Florence Bikundi at Flo-Diamond, worked at Global as the HR Coordinator, testified that during audits, she was directed by both Florence Bikundi and Michael Bikundi to make sure that she altered any expired documents that were in employee files so that Global wouldn't be cited by the surveyors, which could be as much as $500 per employee file.  10-20-15 (AM) Tr. at 51.  Ms. Johnson used white-out to alter the expired documents in the employee files and photocopied them to make them look valid.  10-20-15 (AM) Tr. at 51.

Melissa Williams testified that she started working for Flo-Diamond in 2007 as a home health aide. 10-29-15 (PM) Tr. at 33-34.  In 2009, Global moved to 1818 New York Avenue, in Washington, D.C.  Elke Johnson assigned Carolyn Baldwin to Melissa Williams as a patient.  *Id.* at 44.  After a few weeks of working with Carolyn Baldwin, Carolyn Baldwin started demanding money from Melissa Williams.  Carolyn Baldwin explained that she had been previously receiving money from Elke Johnson and Florence Bikundi.  *Id.* at 45-46.  Ms. Williams stated that she gave Carolyn Baldwin money from her paycheck and gave Ms. Baldwin money given to her by Elke Johnson.  *Id.* at 46.  Carolyn Baldwin testified that Florence Bikundi came to her house with her then-boyfriend to recruit her as a patient.  At the time, Mrs. Bikundi told Ms.

Baldwin that she "take[s] care of [her] girls."  11-3-15 (AM) Tr. at 30.  When Ms. Baldwin asked

what that meant, Florence Bikundi told her it meant she would give them money.  *Id.* at 31.

Thereafter, Ms. Baldwin became a patient,[3] and Florence Bikundi mailed Ms. Baldwin a check

of between $75 to $150.  *Id.*   Ms. Baldwin recalled picking up money from "Elke," one time

when the business was located on Georgia Avenue.  *Id.*  Thereafter, Ms. Baldwin would get the

money from Melissa, who was assigned as her home health aide.  *Id.* at 32-33.  Melissa brought

her money "a lot of times."  *Id.* at 45.  Timesheets signed by Ms. Baldwin established that Ms.

Baldwin was still receiving services in 2011 from Global.  *Id.* at 40; *see also* Government

Exhibit ("Gov. Ex.") 200.

Eventually, in approximately April 2011, Florence Bikundi permitted Ms. Williams to

work in Global's offices filing timesheets into the patient files after they came back from billing.

*Id.* at 53-55.  At the time when Ms. Williams started working at Global's offices, Global was on

the second floor of 1818 New York Avenue.  Ms. Williams corroborated Elvis Atabe's testimony

that Florence Bikundi sometimes shared the chart room office with him.  10-29-15 Tr. at 58.

Ms. Williams stated that during the first survey that she experienced at Global, she observed

nurses create false nurse notes that were missing from patient files.  *Id.* at 60-61.  Florence

Bikundi, Chis Asong, and Elvis Atabe were in the chart room at the time that the fake nurse

notes were created and then inserted into the patient files.  *Id.* at 61-62.  Ms. Williams also

observed Elvis Atabe change dates on the plans of care in Florence Bikundi's presence.  *Id.* at

65.  Chris Asong altered documents, such as employee physicals and CPR certificates, in

employee files in Florence Bikundi's presence too.  *Id.* at 66.  When Global moved to the first

floor of 1818 New York Avenue, Ms. Williams was promoted to Human Resources Coordinator.

---

[3]      At the time that Florence Bikundi initially recruited Ms. Baldwin, Flo-Diamond was the company
through which services were provided.  However, Ms. Baldwin became a patient of Global, and was
receiving services from Global as late as 2011.  Gov. Ex. 200.

*Id.* at 78.   At one point, Global had a contract with Kroll to conduct criminal background checks on the personal care aides.   When the reimbursements were not being properly monitored by Global's office workers, Florence Bikundi decided Global was not going to take the loss, and decided to let the personal care aides provide their own background checks.   *Id.* at 85-86.   During surveys, when criminal background checks were missing from employee files, Chris Asong and Nicola White started creating phony criminal background checks to insert in the employee files. *Id.* at 87.[4]

During social events, Ms. Williams would see Irene Igwacho socializing with Michael Bikundi and Florence Bikundi that coincided with times that Irene Igwacho was supposed to be providing home health aide services to Global patients.   10-29-15 (PM) at 103-104.   Ms. Williams testified that Michael Bikundi did not sign Irene Igwacho's paychecks without seeing the timesheets, because "without time sheets, you don't get paid."   *Id.* at 104.   Similarly, Berenice Igwacho attended social functions at the Bikundi residence at times that coincided with providing home health services to Global patients.   Both Florence Bikundi and Michael Bikundi observed Berenice Igwacho at the social functions.   *Id.* at 105.   Similarly, from December 22, 2012 through January 6, 2013, Ms. Williams accompanied Florence Bikundi, Michael Bikundi, Carlson Igwacho, Violet Igwacho and others on a family vacation to California.   They travelled to various cities throughout California together during the entire two-week trip.   *Id.* at 106 -107.

---

[4] Mr. Craig Olsen, manager of business intelligence for a company named HireRight testified that his company acquired Kroll, the company that used to perform background checks for Global, in 2010. 11-2-15 (PM) Tr. at 12.  Mr. Olsen was asked to review a sample of 31 background checks that were obtained from Global's offices.  *See id* at 14.; *see also* Gov. Ex. 440.  Of the 31 background reports, Mr. Olsen determined that only three were actually generated by Kroll.  11-2-15 (PM) Tr. at 15.  In addition, FBI Agent Heidi Hansberry testified that she reviewed the same 31 background reports and identified two employees who in fact had criminal convictions.  11-2-15 (PM) Tr. at 80; *see also* Ex. 441.

According to Ms. Williams, Florence Bikundi permitted Global office workers to work as personal care aides for Global patients on the weekends.  When Michael Bikundi learned that Nicola White had submitted a timesheet claiming that she had provided services to a Global patient while Nicola White was in Jamaica, Michael Bikundi decided that he was not going to allow Global office workers to work as personal care aides on the weekends anymore.  11-02-15 (AM) at 32-33.[5]  Ms. Williams testified that there were times that she submitted timesheets indicating she had provided home health services that coincided with the hours that she was supposed to work in the office.  11-2-15 (AM) Tr. at 116.  Florence Bikundi told Ms. Williams she could no longer work with the patient, but did not fire Ms. Williams.  *Id.*  Ms. White testified that she would submit timesheets for working with patients despite working full-time in the office.  10-21-15 (AM) Tr. at 78.  Michael Bikundi and Florence Bikundi had knowledge that Nicola White was working full time in the office yet also submitting timesheets that were used to bill Medicaid for patient home care services.  *Id.*[6]  Furthermore, FBI Agent Heidi Hansberry testified that there was a field supervisory report obtained during the search warrant executed at the home where both defendants resided.  11-2-15 (PM) Tr. at 84.  The report indicated that family members of a beneficiary reported to Global's field supervisor that the Global patient had been incarcerated for at least a month.  *Id.* at 84.  Department of Correction records further confirmed that for periods of October 26, 2012, through February 26, 2013, and June 7, 2013

---

[5]    Nicola White testified that she was supposed to care for the patient on the weekends, for which Medicaid was billed, but she had never provided services to the patient.  10-20-15 (PM) Tr. at 94.  She testified that Michael Bikundi told her if she was not going to work she should stop billing; he did not fire her for fraud or tell her that the money should be returned to Medicaid.  *Id.* at 95.

[6]    Testimony by several witnesses, including Ms. White, established that Florence Bikundi and Michael Bikundi required that the timesheets supporting each employee's work be attached to the employee's paycheck before the employee would be paid.  10-21-15 (AM) Tr. at 78 (testimony of Nicola White); 11-2-15 (AM) Tr. at 122 (testimony of Melissa Williams).

through October 4, 2013, the patient was incarcerated; however, Global billed for services (home aide services and nurse visits) during these time periods. *Id.* at 85; Gov. Ex. 130.

The defendants hired several family members to participate in the conspiracy. Ms. White testified that Florence Bikundi's son, Carlson Igwacho, was assigned to work as a home health aide with two patients, eight hours every day. 10-20-15 (PM) Tr. at 100. Carlson Igwacho paid Mary Drayton $300 every pay period to sign fraudulent timesheets stating that she received 56 hours of services per week from Carlson Igwacho. *Id.* at 24-25. Both Florence Bikundi and Michael Bikundi knew that Carlson Igwacho had a serious drinking problem, which included alcohol related arrests and car accidents, and was purportedly providing 16 hours of PCA services per day, seven days a week for two straight years. *See id.* at 26-27, 29. Additionally, both Michael Bikundi and Florence Bikundi knew that Carlson Igwacho was a full time student at Prince George's Community College from fall 2009 through Spring 2011, and that he also took courses during the summer. *Id.* at 34, 36. Florence Bikundi helped Carlson Igwacho pay his school tuition on at least two occasions. *Id.* at 37-38; Gov. Ex. 245. Carlson Igwacho travelled to Orlando, Florida with Florence Bikundi and Michael Bikundi for one week in November 2010, but still submitted timesheets for Mary Drayton and W.S. *Id.* at 48-49. Carlson Igwacho regularly visited Florence Bikundi and Michael Bikundi on weekends and holidays, but they never questioned him about submitting timesheets claiming to have provided PCA services at times that he was visiting with them. *Id.* at 50.

Florence Bikundi's sister, Berenice Igwacho, also worked as a home health aide.[7] One of her patients, Tywonda Fenner testified that she was in need of a home health aide, but the aide never came to her home to provide any services. 11-2-15 (PM) Tr. at 43-44. At first, when the

---

[7]     Berenice Igwacho pled guilty to health care fraud; however she did not testify at trial.

first home health aide arrived, Ms. Fenner told the aide that she attended class during the day. *Id.* at 45.  The aide called her "boss," a female on the phone, who told Ms. Fenner that services could not be provided if Ms. Fenner would not be home.  *Id.*  Thereafter, however, Berenice Igwacho just showed up with doctor's forms for Ms. Fenner to complete. *Id.* at 47, 59.  Berenice Igwacho would pay Ms. Fenner approximately $140 every two weeks, and in exchange, Ms. Fenner would sign Berenice Igwacho's timesheets. *Id.* at 49-51.

Ms. Williams testified that Michael Bikundi Sr. prevented many aides from having two patients or working 16-hour days because he felt it was unlikely they were actually working those hours; he did not, however, preclude Violet Igwacho, who was Carlson Igwacho's wife, from doing so.  11-20-15 (AM) Tr. at 120-121.  Michael Bikundi Sr. was fully aware of which aides claimed to work 16-hour days because he required that the timesheets be attached to the aides' paychecks. *Id.* at 122.  Mary Drayton, one of Carlson Igwacho's patients, testified that she, and her son, R.C. were both paid money in exchange for signing timesheets that falsely indicated that Carlson Igwacho (and, at some period, his wife, Violet Igwacho), had provided sixteen hours of service every day.

Testimony also established that the defendants were aware that Medicaid beneficiaries were improperly paid money – either for becoming/staying Global patients or in lieu of home health services.  Elke Johnson testified that Florence Bikundi gave her money to pay at least three Medicaid beneficiaries for becoming and/or staying clients of the Global.  10-20-15 (AM) Tr. at 27.  Ms. Johnson further testified that there was a time when Carlson Igwacho was out of the country in Cameroon and would be unable to see his patient.  10-20-15 (AM) Tr. at 30. Florence Bikundi told Ms. Johnson to pay the patient $300 because Carlson's timesheet, which falsely indicated that he had provided services to the patient, had already been submitted.  *Id.* at

30-32.   Carlson Igwacho had submitted the post-dated timesheets for the beneficiary which contained the beneficiary's signature in advance of Carlson leaving for the Cameroon.  *Id* at 31. Melissa Williams recounted a conversation between herself and Nicola White, during which Ms. White informed her that Florence Bikundi had assigned Carlson Igwacho as the home health aide for Mary Drayton, who had previously been assigned to Ms. White.  11-2-15 (AM) Tr. at 22. Ms. White explained that because Mary Drayton had been a former client of Flo-Diamond, Florence knew she would accept money and had sent money over to Ms. Drayton.  *Id.*   In addition, Francis James testified that, after his girlfriend Elke Johnson suggested that he become a home health aide, he met with Florence Bikundi and she told him that she had a patient for him (beneficiary xxxx0062 - G.M.), who she herself had already been paying.  10-19-15 (PM) Tr. at 74-75.   Florence Bikundi told Mr. James that he did not have to see his patient for the full eight hours each day that Medicaid would be billed.  *Id.* at 75.   Mr. James further testified that, after he began working at Global, Michael Bikundi told him that he would have to pay Michael Bikundi $300 every two weeks, which Mr. James understood he would be required to do in order to keep his job.  10-19-15 (PM) Tr. at 88-89.

Medicaid beneficiaries testified that they were provided little-to-no services in exchange for money.  Sergio Zunega, who suffers from a spinal deformity, testified that he was recruited to Global through an aide named Darnell Williams.  10-20-15 (PM) Tr. at 5, 19.  Mr. Williams told Mr. Zunega that, because Mr. Zunega appeared to be able to care for himself, that Mr. Williams would not come to see him often.  *Id.*  at 8.   However, Mr. Williams agreed he would provide Mr. Zunega with money.  *Id.*   Mr. Williams also told Mr. Zunega that a different aide would be assigned to work with him on the weekends; that aide was Florence Bikundi's sister, Irene

Igwacho, who never went to see him.  10-20-15 (PM) Tr. at 15.  When Mr. Williams said he had

to stop seeing Mr. Zunega, Mr. Zunega never sought another home health aide.  *Id.*

Alma McPherson testified her brother-in-law introduced her to a woman named "Yvette,"

who came to her home and asked her if she wanted to make some extra money.  11-2-15 (PM)

Tr. at 63, 75.  Sometime thereafter, Mrs. McPherson, along with two others, went to a clinic with

Yvette.  *Id.* at 65.  Mrs. McPherson was told to walk with a cane even though she did not need

one.  *Id.*  She met with a doctor who prescribed home health services that she did not need.  *Id.* at

65.  After the doctor visit, she was then paid $100 by "Yvette."  *Id.* at 66.  Thereafter, Mrs.

McPherson and her husband were each assigned a home health aide however, the aide would

only come approximately once a week and would ask Mrs. McPherson to sign a timesheet.  *Id.* at

67-68.  "Linda" (or at times, Linda's sister, Yvette) would then pay Mrs. McPherson $200 in

exchange for the signed timesheet.  *Id.* at 69-70.[8]

Towards the end of the Government's case, Donald Shearer was recalled as a witness,

over defense objections.  Mr. Shearer testified that on February 20, 2014, law enforcement

conducted search warrants at four home healthcare agencies - - Global, Vizion One, Ultra and

American Quality.  The combined four companies had billed DC Medicaid for personal care

services for 3200 Medicaid Beneficiaries.  11-04-15 (AM) at 99.  Thereafter, DC Medicaid

attempted to reach the 3200 Medicaid beneficiaries to make sure that there was no disruption to

services to people who needed it.  *Id.*  DC Medicaid assigned beneficiaries to other agencies if

they still wanted the services.  *Id.* at 100.  Mr. Shearer was then shown Government Exhibit

Number 439, which was admitted over defense objections.  *Id.* at 101.  Mr. Shearer explained

that Exhibit 439 was generated by DHCF for beneficiaries who were receiving services from

---

[8]     Mrs. McPherson testified that her brother-in-law, who was named Eric, had a similar arrangement
to the one she and her husband had with his own aide.  11-2-15 (PM) Tr. at 75.

Global who, after the search warrant was executed at Global, did not receive services from another agency with the dates of service of March 31, 2014 through December 31, 2014. *Id.* at 100-101. Thus, the exhibit, which listed 567 Medicaid beneficiaries, consisted of a list of individuals who did not continue to receive PCA services after February 28, 2014. *Id.* at 102. For the 567 beneficiaries listed on Exhibit 439, from January 2012 through February 2014, DC Medicaid paid Global $29,498,252.91. After March 31, 2014 through December 31, 2014, DC Medicaid didn't have to pay any other agency money for the 567 Medicaid beneficiaries. *Id.* at 104.[9]

<u>Evidence Supporting Health Care Fraud (Counts 13 & 14)</u>

Defendant Florence Bikundi's nursing licenses had been revoked prior to the time she started Global. Karen Scipio-Skinner, who works for the Department of Health, Health Regulation Licensing Administration, Board of Nursing, testified regarding the order that was issued in May, 2005, revoking Florence Igwacho's licensed practice nurse (LPN) license and license as a registered nurse (RN). 11-2-15 (PM) Tr. at 38-39.[10] Defendant's licenses have

---

[9] There were also several exhibits that were introduced at trial that unequivocally established that Florence Bikundi and Michael Bikundi had engaged in health care fraud. These included, among others, Government Exhibit 325 (Spreadsheet for Global's Adjusted Claims), Government Exhibit 324 (Spreadsheet of Global's Void Claims) and Government Exhibit 442 (Incident Report dated April, 1, 2010, concerning the submission of false timesheets for Medicaid Beneficiary L. DeLoach). Based on Exhibit 442, it appears that when Global management learned that a PCA had submitted timesheets for L. DeLoach, who had been hospitalized, they wrote, "We hope you understand that this is Medicaid Fraud; consequently the hours from 02/23/10 to date shall not be paid for PCA services and monthly visits. Please consider this letter a warning and hope such incident does not happen again." Similarly, during the course of the Government's case, several witnesses testified that personal care aides who had submitted timesheets for services not provided were not terminated. Indeed, Florence Bikundi and Michael Bikundi often withheld checks from aides. 10-19-15 (AM) Tr. at 39-40; 10-20-15 (AM) Tr. at 39-40, 49-50, 110; 10-20-15 (PM) Tr. at 120-121; 10-28-15 (PM) Tr. at 31-32; 11-2-15 (AM) Tr. at 35-39. Global did not initiate reversals to repay Medicaid for the hours that Global billed for these aides nor did they void the claims. *See* 10-20-15 (PM) Tr. at 121-122.

[10] Defendant Florence Bikundi was licensed as a LPN under the name " Florence Igwacho" and as a RN under the name "Florence Ngwe." 11-2-15 (PM) Tr. at 39. Testimony established that Igwacho was defendant Florence Bikundi's maiden name and "Ngwe" was her middle name. When Mr. Mbide first

never been reinstated.  *Id.* at 39.  No one named "Florence Bikundi" has been licensed as a nurse

in the District of Columbia.  *Id.*  Nancy Durrett from the Virginia Board of Nursing testified that

she sent a letter dated July 15, 1999, to defendant Florence Bikundi's (at the time Igwacho's)

address at 9127 Edmonton Terrace, #304, Greenbelt, Maryland, notifying her of the hearing to be

held regarding the revocation of Ms. Igwacho's LPN license.  10-26-15 (PM) Tr. at 11-12; *see

also* Gov. Ex. 104.  Subsequently, on August 4, 1999, the order revoking defendant's LPN

license was sent to the same Greenbelt address.  *Id.* at 12.  Defendant Florence Bikundi complied

with the order, which required her to send in her license, in a letter received by the Virginia

Board of Nursing on October 12, 1999.  *See id.* at 13; Gov. Ex. 102.  Defendant listed the same

Greenbelt address in her letter enclosing her license.  *Id.* Defendant applied to reinstate her

license in 2004, but it was not reinstated.  *Id.* at 16.  There was also testimony that defendant

Florence Bikundi submitted a plan of care to Unity Healthcare, which she signed as a "nurse"

even after her nursing licenses had been revoked.  11-2-15 Tr. (PM) at 29-30; *see also* Ex. 122

(pages 1-3).

Evidence further established that defendant Florence Igwacho had been excluded from

participating in all federal health care programs at the time she started Global.  Teresa Hoffman,

an investigations analyst at the Department of Health and Human Services ("HHS"), Office of

Inspector General, testified that Florence Igwacho was excluded from all federal health care

programs, including Medicaid.  10-26-15 (PM) Tr. at 22.[11]  The basis for the defendant's

exclusion was the revocation of her Virginia State Board of Nursing License, which Ms.

_____

joined Global, Florence Bikundi continued to use her maiden name, Florence Igwacho.  10-16-15
(PM) at 92.

[11]     Persons "excluded" from federal health care programs cannot be an administrator, director, or
officer of any Medicaid provider.  10-26-15 (PM) Tr. at 19.  An excluded person can be an owner of a
Medicaid provider, provided that they have no more than a five percent interest and are not involved in
the day-to-day operations of the company.  *Id.*

Hoffman's office received on September 2, 1999.  *Id.* at 22, 24.  On September 7, 1999, Ms. Hoffman sent a letter to defendant Florence Igwacho to the same Greenbelt address utilized by the Virginia Board of Nursing.  *Id.* at 26; *see also* Gov. Ex. 106.  The letter required defendant to respond within 30 days, which she did in a letter received by HHS on October 8, 1999.  *Id.* at 29; Gov. Ex. 107.  In her response, the defendant utilized the same Greenbelt address to which the letter had been sent.  *Id.*  The defendant requested that she be afforded additional time to obtain an attorney and asked that she be informed of HHS' decision.  *Id.*  Ms. Hoffman attempted to call the defendant several times to discuss the requested extension, however, her calls were never returned.  10-26-15 (PM) Tr. at 29.  Being unable to reach Florence Igwacho, Ms. Hoffman proceeded with the exclusion process, which culminated in a letter sent March 31, 2000, to Florence Igwacho notifying her of her exclusion.  *Id.* at 31-33.  The letter was via U.S. Mail[12] sent to the same Greenbelt, Maryland address that the defendant used in her letter requesting additional time to respond.  *Id.* at 33.  The letter was never returned to HHS as undeliverable.  *Id.*

<u>Evidence Supporting Money Laundering Conspiracy and Money Laundering</u>

Multiple exhibits, combined with the testimony of Special Agent Nicole Hinson, were introduced to establish the money laundering charges.  D.C. Medicaid paid $80,620,929.20 to Global from November 2009 to February 2014.  Gov. Ex. 5.  The defendants were the sole signatories on Global's accounts.  Gov. Ex. 184.  No one else at Global monitored the accounts.  10-21-15 (AM) Tr. at 91.  Florence Bikundi used funds in Global accounts to pay for personal expenses.  10-20-15 (PM) Tr. at 125-126.  Global bank records indicated approximately four occurrences where a fraudulent check was drawn from a Global account.  11-3-15 (PM) Tr. at

---

[12]     Susan Gillin, an attorney at HHS OIG, testified that certified mail was not required to be used for sending the notice of exclusion that applied to defendant Florence Bikundi's exclusion.  11-4-15 (AM) Tr. at 128, 139.  Ms. Gillin further testified it is the practice of HHS OIG to send such notices via U.S. Mail.  *Id.* at 129.

69.   There was no evidence from the bank records that the defendants ever asked a bank to close a Global account due to fraud.   11-4-15 (AM) Tr. at 95.   D.C. Medicaid payments to Global increased from $1,359,726.88 in 2009, to $9,956,505.60 in 2010, to $14,277,324.23 in 2011, to $23,696,990.89 in 2012, and to $27,166,587.08 in 2013.   Gov. Ex. 133; 11-3-15 (AM) Tr. at 89-90.   For January and February 2014, D.C. Medicaid paid a total of $4,193,079.12 to Global.   *Id.* Despite all of the revenues Global generated, it experienced financial difficulties according to Michael Bikundi.   10-22-15 (AM) Tr. at 8-9; 10-26-15 (AM) Tr. at 64.   Global bounced checks. 10-21-15 (AM) Tr. at 91; 11-3-15 (PM) Tr. at 83-84.

D.C. Medicaid payments went to three different Global "intake" accounts.   11-3-15 (AM) Tr. at 132-133.   The defendants moved D.C. Medicaid funds from the intake accounts into additional Global accounts and two Flo-Diamond accounts, Bank of America account number -2267 and PNC account number -6271.   11-3-15 (AM) Tr. 133-134; Gov. Ex. 184.   After the defendants transferred D.C. Medicaid funds to these secondary accounts, they moved the funds to over one hundred other accounts they controlled.   11-3-15 (AM) Tr. at 131, 134; Gov. Ex. 184.   The defendants conducted tens of thousands of transaction in their accounts.   11-3-15 (AM) Tr. at 130; 11-4-15 (AM) Tr. at 72, 73.   It took months of working seven days per week for Special Agent Hinson to trace all of the funds in the accounts controlled by the defendants.   11-4-15 (AM) Tr. at 74.   Approximately 90% of money that went into the defendants' accounts came from D.C. Medicaid.   *Id.* at 131.

The defendants made numerous false statements on account applications used to open accounts that received funds traceable to D.C. Medicaid payments.   11-3-15 (PM) Tr. at 38-41; Gov. Ex. 153.   Both Florence Bikundi and Michael Bikundi falsely claimed to be U.S. citizens. 11-3-15 (PM) Tr. at 39; Gov. Ex. 153-0001.   Florence Bikundi falsely claimed that she had not

had any bankruptcy proceedings against her in the last seven years when she opened a Life Insurance Company of the Southwest account.  11-3-15 (PM) Tr. at 39-40; Gov. Ex. 153-0003. Florence Bikundi made numerous false statements on her mortgage application, including that she was a U.S. citizen, had not filed for bankruptcy in the past seven years, and was not presently delinquent or in default on any mortgage.  11-3-15 (PM) Tr. at 40-42; Gov. Ex. 153-0004.

Special Agent Hinson obtained over 80 seizure warrants for financial institution accounts and five cars traceable to funds paid from D.C. Medicaid to Global.  11-3-15 (AM) Tr. at 118. The total value of the accounts and cars was approximately $11.8 million.  *Id.* at 118-119.  The types of financial institution accounts controlled by the defendants included accounts in the names of multiple corporations, personal bank accounts, life insurance accounts, investment accounts, trust accounts, college savings plans, annuities, IRAs, and international bank accounts. *Id.* at 119, 127-130; Gov. Ex. 184.

The defendants transferred millions of dollars from Global accounts to accounts in the name of CFC Home Trade & Investment ("CFC") and Tri-Continental Trade & Development ("Tri-Continental").  Gov. Exs. 151 & 152.  The defendants opened two accounts in the name of CFC and two in the name of Tri-Continental. Gov. Exs. 184, 250; 11-3-15 (AM) Tr. at 139. Florence Bikundi opened one additional account in the name of CFC.  *Id.*  Florence Bikundi and Michael Bikundi listed themselves as "managing members" of CFC for the two CFC accounts in which they were both signatories.  Gov. Ex. 250.

According to its Articles of Organization, dated October 17, 2012, CFC was a real estate investment business.  Gov. Ex. 249.  Although the registered agent listed on the Articles is Carlson Igwacho, someone else signed the name of Carlson Igwacho on the Articles.  Gov. Ex. 249; 10-28-15 (PM) Tr. at 68.  Carlson Igwacho testified that Chris Asongcha approached him

about forming a business to buy homes, fix them up, and then resell them.   10-28-15 (PM) Tr. at 66.   Carlson Igwacho asked his mother to invest in the company and that is how the name CFC was developed – the initials "CFC" represented the first initials of the names Chris, Florence, and Carlson.   *Id.* at 67.   Carlson Igwacho had no further involvement with CFC because he could not borrow the money needed to buy a house.   *Id.* at 67-68.     CFC never actually did any business while Carlson Igwacho was associated with it.   *Id.*   He did not open any bank accounts in the name of CFC.   Id. at 69.   Michael Bikundi was not supposed to have a role in CFC, which is why his name was not included in the company name.   10-29-15 (AM) Tr. at 5.   Michael Bikundi told Ernest Igwacho that he was not part of CFC.   *Id.* at 72.   CFC never actually purchased any real estate with CFC funds.   11-3-15 (AM) Tr. at 144.   A property in Baltimore was titled in the name of CFC, but it was actually purchased on June 5, 2013, with funds from Global payroll account number -2254.   Gov. Ex. 172; 10-29-15 (PM) Tr. at 23-26; 11-3-15 (AM) Tr. at 141-143.   The only expenditures from the three CFC accounts consistent with real estate investment were three checks totaling approximately $40,000 that may have been related to home renovations.   11-3-15 (AM) Tr. at 143-144.   There were no checks from the CFC accounts payable to title companies, insurance companies, home inspectors, or cleaning services.   *Id.* at 144.   There were no deposits into the accounts that appeared to be rent checks or proceeds from a real estate sale.   Id. at 144-145.   There was no evidence of any business relationship between Global and CFC or that CFC provided any services to Global.   11-3-15 (AM) Tr. 149.   There was no evidence that CFC generated any income.   *Id.*   All of the funds that went to CFC came from accounts controlled by the defendants.   *Id.*   There was no evidence that Global issued a Form 1099 to CFC, or that CFC issued a Form 1099 to Florence Bikundi or Michael Bikundi.

11-4-15 (AM) Tr. at 80-81.  The defendants' accountant did not provide any tax returns for CFC in response to a subpoena.  *Id.* at 79-80.

Bank of America account number -6749 in the name of CFC was opened on April 25, 2013, and closed on February 20, 2014.  Gov. Ex. 151-0001; 11-3-15 (AM) Tr. at 145.  During that time period, over $6.3 million was transferred to the account from four different Global accounts and $150,000 was transferred from Tri-Continental account number -3303.  *Id.*  A total of $6,653,612.08 was deposited into the account.  Gov. Ex. 151-0001; 11-3-15 (AM) Tr. 146.  Approximately $2.39 million in checks were written from CFC account number -6749 to Florence Bikundi and $517,000 were written to Michael Bikundi.  Gov. Ex. 151-0002 to 0057; 11-3-15 (AM) Tr. at 146.  These checks included a $50,000 check payable to Florence Bikundi referencing "mortgage"; a $150,000 check payable to Florence Bikundi referencing "Citi bank saving/checking;"  a $300,010 check payable to Florence Bikundi referencing "M&T savings;" a $10,000 check payable to Michael Bikundi referencing "contractor pay bonus;" a $10,000 check payable to Florence Bikundi referencing "pay bonus;" a $91,000 check payable to Florence Bikundi; a $100,000 check payable to Florence Bikundi referencing "Money market savings (M&T Bank);" a $30,000 check payable to Florence Bikundi referencing "contractor's pay;" a $15,000 check payable to Michael Bikundi; and a $300,000 check payable to Florence Bikundi. Gov. Ex. 151-0007, 8, 11, 18, 19, 21, 30, 40, 48, 53; 11-3-15 (AM) Tr. at 147-149.

According to its Articles of Incorporation, Tri-Continental was an import/export business.  Gov. Ex. 187.  Florence Bikundi was the resident agent for Tri-Continental.  *Id.*  Citibank account number -3303 in the name of Tri-Continental was opened on August 23, 2012, and closed on February 20, 2014.  Gov. Ex. 152-0001; 11-3-15 (AM) Tr. at 136.  During that time period, a total of $6,390,028.31 was deposited into the account.  Gov. Ex. 152-0001.  The

deposits included over $3 million from two different Global accounts, almost $1.4 million from a Flo-Diamond account, and $30,000 from a CFC account. *Id.* There was no evidence of any business relationship between Global and Tri-Continental or that Tri-Continental provided any services to Global. 11-3-15 (AM) Tr. at 140. There was no evidence that Tri-Continental generated any income. *Id.* All of the funds that went to Tri-Continental came from accounts controlled by the defendants. *Id.* There was no evidence that Global issued a Form 1099 to Tri-Continental, or that Tri-Continental issued a Form 1099 to Florence Bikundi or Michael Bikundi. 11-4-15 (AM) Tr. at 63, 80-81. The defendants' accountant did not provide any tax returns for Tri-Continental in response to a subpoena. *Id.* at 79-80. Approximately $772,000 in checks were written from Tri-Continental account number -3303 to Florence Bikundi and $442,000 were written to Michael Bikundi. Gov. Ex. 152-0002 to 0026; 11-3-15 (AM) Tr. at 137-138. These checks included a $50,000 check payable to Florence Bikundi with "mortgage" written on the memo line; a $40,000 check payable to Michael Bikundi; and a $50,000 check payable to Florence Bikundi. Gov. Ex. 152-0010, 16, 24; 11-3-15 (AM) Tr. 139.

The defendants purchased luxury vehicles with funds from Tri-Continental and CFC bank accounts. They made the following payments towards the purchase of a 2013 Porsche Panamera: $7,245.49 in total from account number -3303 in the name of Tri-Continental; $34,056.70 in total from account number -7466 in the name of Florence Bikundi and Michael Bikundi; $17,026.58 in total from account number -2254 in the name of Global Health Care, D.C. payroll account; and $33,361 in total from account number -6749 in the name of CFC. Gov. Ex. 156-0009; 11-3-15 (PM) Tr. at 35. Additionally, they made the following payments towards the purchase of a 2014 Land Rover Range Rover: $10,000 in total from account number -3303 in the name of Tri-Continental; $30,000 in total from account number -7466 in the name

of Florence Bikundi and Michael D. Bikundi; and $70,000 in total from account number -6749 in the name of CFC. Gov. Ex. 156-0015; 11-3-15 (PM) Tr. at 35-36. The defendants transferred funds from Tri-Continental and CFC accounts to college savings accounts and accounts in Cameroon. The defendants transferred a total of $541,800, including $210,000 from Tri-Continent account number -3303, $30,000 from CFC account number -6749, and $30,000 from Global account number -8612 to seven college savings accounts. Gov. Ex. 158; 11-3-15 (PM) Tr. at 36-37. They wired a total of $624,500 to three accounts in Cameroon, including $50,000 from CFC account number -6749. Gov. Ex. 155; 11-3-15 (PM) Tr. at 28-29.

Special Agent Hinson prepared flowcharts documenting the movement of D.C. Medicaid funds to Global accounts and the subsequent transfers to Tri-Continental and CFC accounts. 11-3-15 (PM) Trial Tr. 42; Gov. Exs. 174-180. These transfers formed the basis for the money laundering charges in Counts Sixteen through Twenty-Two.

The defendants purchased $2.7 million in life insurance policies and annuities. Gov. Ex. 159-0001. Lincoln Financial account number P52794 was purchased with $100,000 from CFC account number -6749 and Lincoln Financial account number P47173 was purchased with $100,000 from Tri-Continental account number -3303. Gov. Exs. 159-0007 & -0008; 11-3-15 (PM) Tr. at 37-38. The defendants withdrew over $1 million in cash from November 2009 to February 2014. 11-3-15 (PM) Tr. at 25. The cash withdrawal amounts ranged from a few hundred dollars to $35,000 from Tri-Continental account number -3303 and included withdrawals of $10,000, $15,000, $20,000 and $22,000. *Id.* at 26.

Florence Bikundi and Michael Bikundi purchased 184 cashier's checks totaling over $7.7 million from accounts they controlled. Gov. Ex. 154; 11-3-15 (PM) Tr. at 26-27. The cashier's checks were deposited into other accounts the defendants controlled. Gov. Ex. 154; 11-3-15

(PM) Trial Tr. 27.  Most of these accounts were personal accounts, investment accounts, and college savings accounts.  Gov. Exs. 154 & 184.

Between November 9, 2009, and June 25, 2013, $825,840.98 was paid towards the mortgage on the defendants' residence.  Gov. Ex. 157- 0001 to 0004; 11-3-15 (PM) Tr. at 28-31. The defendants also paid over $500,000 to a company called "By Design" for work on their residence, including a pool.  Gov. Ex. 157 – 0013; 11-3-15 (PM) Tr. at 31- 32.  The funds used to pay By Design came from personal accounts and accounts held in the name of Global, CFC, and Flo-Diamond.  Gov. Ex. 157 – 0013 to 0032.

## B.    The Defense Case

The defense called three witnesses: Florence Bikundi's father, Joseph Igwacho, Global's attorney, Paul Toulouse, who handled civil and regulatory matters for Global, and HHS-OIG Special Agent Christopher Steinbauer.  Joseph Igwacho testified about a Cameroonian custom by which Michael Bikundi, who had been Florence Igwacho's boyfriend, expressed his intentions to marry Florence Igwacho by providing a gift of dowry "in 2003, 2005, thereabout."  11-04-2015 (PM) Tr. at 21.  Joseph Igwacho stated that Florence Igwacho started using "Bikundi" about ten years ago or more.  *Id*.[13]  Special Agent Christopher Steinbauer testified that there is an active arrest warrant pending for Chris Asongcha for his role in the Global health care fraud case.  11-04-2015 (PM) Tr. at 32-33.

Paul Toulouse testified that he has been an attorney for forty years, and began to represent Global as a client in 2010.  He was retained by Michael Bikundi to represent Global in regards to the government's efforts to not renew Global's home care agency license.  11-04-15

---

[13]      Most notably, during Joseph Igwacho's testimony, although he acknowledged that Florence Igwacho and Michael Bikundi were currently married, he never stated that Florence Igwacho and Michael Bikundi actually got married on or about the time of the purported "dowry."  All he said was that after the dowry, she continued to use Igwacho, then after, she started using Bikundi.  *See id*. at 22.

(PM) Tr. at 35-36.   Mr. Toulouse stated that over time, he reached a settlement agreement with the District rescinding its notice to revoke Global's license as a home care agency.   *Id.* at 36. One of the conditions of the settlement was that Global "had to stay in compliance with all regulatory requirements under the law."   *Id.*   Mr. Toulouse also negotiated a settlement with DHCF to allow Global to continue operating as a home care agency despite not obtaining a Certificate of Need.   *Id.* at 41.   Mr. Toulouse also reduced the recoupment amount that DHCF was seeking from Global from $625,000 to $610,000.   *Id.* at 44.   Global was allowed to operate until the search warrant in February 2014.   *Id.* at 53.

## STANDARD OF REVIEW

### A.      Rule 29

Rule 29(a) of the Federal Rules of Criminal Procedure provides:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim P. 29(a).

In ruling on a motion for judgment of acquittal, the Court must "'consider[] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.'" *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001) (*quoting United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)).   The Court must "accord[] the government the benefit of all legitimate inferences," *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), and "must view the evidence in light most favorable to the verdict."

*United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).  The Court must accept the jury's verdict of guilt if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quotations omitted); *United States v. Williams*, 825 F. Supp. 2d 128, 132 (D.D.C. 2011).  Typically, the jury's determination will stand unless no reasonable juror could have found a defendant guilty beyond a reasonable doubt.  *United States v. Cook*, 526 F. Supp. 2d 10, 18 (D.D.C. 2007), *aff'd,* 330 Fed. Appx. 1, 2 (D.C. Cir. 2009) (internal citations and quotation marks omitted).  "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States* v. *Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999).

## ARGUMENT

### I.   DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED.

Defendant Florence Bikundi has filed a "Renewed Rule 29 Motion for Judgment of Acquittal" ("Def.'s Mot."), in which she contends that the government's evidence at trial was insufficient to support the jury's guilty verdicts and therefore acquittal on all counts is required. For many of the reasons previously identified by the court when it denied defendant's prior motions, this renewed motion should be similarly denied.

### A.   THERE WAS MORE THAN SUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT FINDING THAT DEFENDANT FLORENCE BIKUNDI CONSPIRED WITH OTHERS TO COMMIT HEALTH CARE FRAUD AND AIDED AND ABETTED IN THE COMMISSION OF HEALTH CARE FRAUD.

Defendant Florence Bikundi contends that there was insufficient evidence to establish that she had an agreement with anyone to commit health care fraud as charged in Count I of the

superseding indictment.  ECF No. 44.  She makes this argument by selectively focusing on the testimony of Melissa Williams and a few other witnesses to show that there were conspiracies occurring of which she had no knowledge.  In addition, she contends that there was insufficient evidence to establish that she aided/abetted in the commission of health care fraud.  However, a full view of the evidence demonstrates there was more than ample evidence upon which the jury could find that Florence Bikundi conspired with others to commit health care fraud and aided and abetted in the commission of health care fraud.

As the Supreme Court has explained in discussing general principles of conspiracy law, an individual can join a conspiracy "in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.  One can be a conspirator by facilitating only some of the acts leading to the substantive offense." *Salinas* v. *United States*, 522 U.S. 52, 65 (1997). Indeed, it is not necessary that a co-conspirator be aware of every facet of the conspiracy; "the government need not show that [the defendant] knew all of the details of the conspiracy, so long as he knew its general nature and extent."  *United States* v. *Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994).  In order to prove a conspiracy, all that is required is "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *Id.*

The government more than satisfied its burden of establishing that there was an agreement among Florence Bikundi and other co-conspirators to commit health care fraud. There were several witnesses who directly implicated Florence Bikundi as a direct participant, and even the originator, of the conspiracy to bill for services that were not provided and to pay Medicaid beneficiaries. Testimony by Francis James established that it was Florence Bikundi who assigned him a patient, told him that she had already been paying the patient, and that he

should do the same so he would not have to work the full hours for which Medicaid would be billed.  10-19-15 PM Tr. at 74-75.[14]  Thus, Florence Bikundi directly facilitated Mr. James' entry into the conspiracy by assigning him a patient and explained to him how the conspiracy to defraud Medicaid worked.

In addition, further establishing Florence Bikundi's knowledge that patients were being paid in lieu of services was the testimony of Elke Johnson, who testified that Florence Bikundi told her to pay the patient of Carlson Igwacho when he was out of the country in Cameroon.  10-20-15 (AM) Tr. at 30.  Notably, Florence Bikundi told Ms. Johnson to pay the patient $300 because Carlson's timesheet, which falsely indicated that he had provided services to the patient, had already been submitted to Medicaid.  *Id.* at 30-31.  Thus, contrary to defendant's assertion that there "was no evidence presented that Mrs. Bikundi knew that Carlson Igwacho was not providing PCA services" to Mr. Smith (Def.'s Rule 29 Mot. at 11), Elke Johnson's testimony directly established that Florence Bikundi had knowledge that Carlson Igwacho was not providing full services to his patients, and aided and abetted in the fraud by directing Elke Johnson to pay Carlson Igwacho's patient.  Furthermore, the testimony of Nicola White demonstrated that Carlson Igwacho was assigned to work with two patients, eight hours every day, yet, he would also be working in the office.  10-20-15 (PM) Tr. at 100.  According to Ms. White, Florence Bikundi told her that she was just "trying to help Carlson" out.  *Id.*  This

---

[14] Defense counsel attempts to shed doubt as to whether the "Ms. Florence" Francis James met with was actually defendant Florence Bikundi, because Mr. Francis was unable to identify defendant in court. (Def.'s Mot. at 8).  This argument is meritless.  There was overwhelming evidence that defendant Florence Bikundi was the only "Miss Florence" who was an owner of Global; Francis James identified defendant Michael Bikundi as the husband of "Miss Florence," and Elke Johnson, the girlfriend of Francis James at the time he worked at Global, identified Florence Bikundi as the "Miss Florence" who hired Mr. James.  Therefore, there was no doubt about whom Mr. James testified, and his failure to identify Ms. Bikundi was not shocking given that Mr. James only testified to meeting with Florence Bikundi one time.

statement was, at the least, circumstantial evidence that Florence Bikundi knew her son was not going to work for the full amount of time that was being billed to Medicaid.

There were also numerous witnesses who testified that Florence Bikundi had direct knowledge of, and directed them to falsify documents to be included in patient and employee files. Elvis Atabe testified that it was Florence Bikundi who initially showed him how to white-out documents.[15] Nicola White testified that Florence Bikundi told her to cut and paste doctor's signatures onto plans of care, so that they would appear to have been approved by the doctors. 10-20-15 (PM) Tr. at 73. Indeed, Florence Bikundi told Ms. White that Michael Bikundi felt that the documents did not look real enough; and Ms. White heard Florence and Michael Bikundi arguing about this very issue. *Id.* at 73-75. According to Ms. White, Florence Bikundi would take the forged plans of care and fax them to one of Flo-Diamond's offices and have them faxed back to her so that the plans of care would look more real. *Id.* at 74-75. Furthermore, to assist in the conspiracy to defraud Medicaid, there were at least two occasions when Ms. White was on maternity leave when Florence Bikundi – driven by Michael Bikundi – came to Ms. White's home to retrieve the plans of care that Ms. White had created. *Id.* at 95-97; 10-21-15 (AM) Tr. at 82-83. The plans of care were so numerous that they could not be emailed and did not fit into an envelope. 10-21-15 (AM) Tr. at 84.

The evidence was similarly overwhelming concerning Count II – aiding and abetting health care fraud. As stated previously, as it concerns beneficiary xxxx4279 (W.S.), evidence at

---

[15] Defendant claims that because Mr. Atabe was "an admitted perjurer," and because, she was a "private person that did not socialize much with the staff at Global," there is no way that any juror could reasonably believe that, after a few weeks at Global, Florence Bikundi trusted Mr. Atabe enough to show him how to alter documents. Def.'s Mot. at 6-7. However, the evidence established that Mr. Atabe was introduced to Florence Bikundi by a man she did know well and trusted – James Mbide. *See* Testimony of James Mbide, 10-19-15 (AM) Tr. at 5. Thus, it was not implausible that Florence Bikundi would trust Mr. Atabe after knowing him for a few weeks given that she trusted Mr. Mbide to similarly falsify documents for her.

trial established that defendant Florence Bikundi instructed Elke Johnson to pay this beneficiary when Carlson was out of the country, and Carlson's timesheet had already been submitted for payment.  10-20-15 (AM) Tr. at 30.  As for beneficiary xxxx0062 (G.M.), Francis James testified that when he was hired as G.M.'s home health aide, Florence Bikundi told him that he did not have to go to work for the full eight hours that would be billed to Medicaid.  10-19-15 (PM) Tr. at 74-75.  Similarly, it was the defendant, Florence Bikundi who first recruited and paid beneficiary xxxx2921 (C. Baldwin); thus the argument that she was "unaware" that Melissa Williams, who subsequently became Ms. Baldwin's aide at Global, was doing so was rejected by the jury.  The evidence was also sufficient for the jury to conclude that the defendant knew that Carlson Igwacho and Violet Igwacho were not providing full services to beneficiary xxxx2282 – particularly when Violet Igwacho billed for providing services to this beneficiary while on a trip with the defendant to California.  *See* Ex. 443.   In addition, Melissa Williams testified that she was present at the defendants' home with Irene Igwacho at times on the weekend when Irene Igwacho should have been with her patient, S. Zunega (beneficiary xxxx7041).  11-2-15 (AM) Tr. at 100; 129-30.  Given this testimony, the jury's verdict convicting the defendant of aiding and abetting was grounded on sufficient evidentiary support.   In the end, however, the government was not required to prove that the defendant aided/abetted in the fraud for each and every beneficiary laid out in Count II; it would be sufficient if she only aided/abetted in fraudulently billing Medicaid for one of the beneficiaries identified above. Thus, even defendant Florence Bikundi's knowledge that Carlson Igwacho's *one* patient was paid money and Medicaid was billed at a time when Carlson did not provide services was sufficient for the jury's finding of guilt for conspiracy to commit health care fraud and for aiding and abetting in health care fraud.

In sum, the evidence was more than sufficient to support the jury's findings of guilt as to conspiracy (Count I) and health care fraud (Count II).


**B.    THE  EVIDENCE  WAS  SUFFICIENT  TO  SUPPORT  THE  JURY'S FINDING THAT FLORENCE BIKUNDI KNEW SHE WAS EXCLUDED FROM PARTICIPATING IN HEALTH CARE PROGRAMS (COUNT 13) AND THAT SHE MADE FALSE STATEMENTS IN HEALTH CARE MATTERS (COUNT 14).**

The evidence established, beyond a reasonable doubt, that defendant Florence Bikundi knew she had been excluded from participation in all federal health care programs.  There was *no dispute* that she received the initial letter Ms. Hoffman sent on September 7, 1999, -- defendant actually responded to that letter with her own letter.  Gov. Ex. 107.  In her response, the defendant utilized the same Greenbelt address to which the letter had been sent.  *Id.*  While the defense contends that there was evidence that the defendant had moved by the time the final letter was mailed on March 31, 2000 (Def.'s Mot. at 14), there was also evidence that the final letter notifying the defendant of her excluded status was never returned to HHS as undeliverable. 10-26-15 (PM) Tr. at 33.  Furthermore, the jury could conclude – as it apparently did – that it was simply unreasonable to suggest that the defendant did not know she was excluded – she received the notice telling her that the action was going to occur; and she wrote back asking for time to respond but never provided any additional information to the agency.  In light of the evidence that she clearly received the initial notice, which was sent via U.S. Mail, had responded, and then had no further contact with the agency, the jury's verdict of guilty as to Count 13 is well-grounded.

There was also sufficient evidence to support the defendant's conviction for Medicaid Fraud – Concealing and Failing to Disclose, in violation of 42 U.S.C. § 1320a-7(b(a)(3), and

Aiding and Abetting, in violation of 18 U.S.C. § 2 (Count 14). To establish this count, the government was required to prove that Florence Bikundi (1) knew of the occurrence of an event affecting her right to a benefit or payment from a Federal health care program; (2) that she concealed or failed to disclose the event, and (3) that in concealing/failing to disclose the event, Florence Bikundi intended to fraudulently secure a payment or benefit from a Federal health care program. *See* Court's Jury Instructions, at 21. When viewed in the light most favorable to the prosecution, there is ample evidence for any reasonable jury to find beyond a reasonable doubt that the defendant was guilty of failing to disclose that she was excluded from participation in all federal health care programs, and did so intending to obtain payments from Medicaid in violation of her excluded status. The provider agreement the defendant submitted contained forged signatures of Nicola White, James Mbide, and the defendant's own brother, Ernest Igwacho, each of whom testified that they did not sign the document and did not give the defendant permission to sign their names. Furthermore, although there was evidence that at the time Global submitted its provider application the defendant was using the name "Florence Igwacho," on the Medicaid provider application she used the name "Florence Bikundi," even though she was not yet married and despite the fact that she continued to use her maiden name, Florence Igwacho, on other documents executed in the same timeframe as the Medicaid provider application was submitted. *See* Gov. Ex. 153. In addition, the government submitted a resume of Ernest Igwacho, defendant's brother, that had what appeared to Ernest Igwacho to be the defendant's handwriting. Ex. 428. This same resume had the web address to the exclusion database on it as well, and although Mr. Igwacho said he could not identify the writing of the web address as his sister's, this evidence was sufficient for the jury to conclude that the defendant had written the web address given that it was written in the same color ink and

appeared identical to the writing that Mr. Igwacho said was his sister's writing.  This evidence

provided sufficient evidence for the jury to conclude that the defendant knew she was excluded

from federal health care programs under the name "Florence Igwacho," and deliberately chose to

use the name "Florence Bikundi" to deceive Medicaid officials regarding her true identity.[16]

### C.     THE MONEY LAUNDERING COUNTS WERE SUPPORTED BY SUFFICIENT EVIDENCE.

#### Count 15 – Money Laundering Conspiracy

The defendant mistakenly claims that the jury found her guilty of money laundering

conspiracy "without specifying which object of the conspiracy there was a unanimous

agreement."  Def.'s Mot., at 17.  As evidenced by the verdict form, the jury unanimously found

that the defendant conspired to violate both 18 U.S.C. §  1956(a)(1)(B)(i) and 18 U.S.C. §  1957.

Verdict Form, ECF No. 360, at 2.

The defendant offers no evidentiary basis to vacate her conviction for conspiracy to

violate section 1957.  Instead, she argues that no reasonable juror could have found her guilty of

conspiracy to violate section 1957 yet acquit her on the substantive 1957 counts charged in

Counts Twenty-Three through Twenty-Five.  Def.'s Mot. at 17.  The jury's verdicts were not

inconsistent.[17]  "[C]onspiracy to commit money laundering is wholly separate and distinct from

the offense of money laundering, since prosecution under 18 U.S.C. § 1956(h) does not require

---

[16] Donald Shearer testified that it is *at the time that the Medicaid provider application is submitted* that a search of the exclusion database is conducted.  Thus, the defense's argument that defendant told one of the HRLA's surveyors that "her married [sic] name was Igwacho" during one of the surveys, Def.'s Mot. at 15, n.2, does not demonstrate that she "was not attempting to conceal or identity or the fact she was excluded."  There is nothing to suggest that the surveyor would, upon hearing that the defendant had another name that she used, have any reason to conduct another inquiry into the exclusion database, which was not even one of his job responsibilities.

[17] "[T]he fact that a jury comes to a factually inconsistent verdict is not, by itself, grounds for reversal." *United States v. Brown*, 504 F.3d 99, 102 (D.C. Cir. 2007).  "[I]inconsistent verdicts may well be nothing more than 'a demonstration of the jury's leniency.'"  *Brown*, at 102.  (quoting *States v. Powell*, 469 U.S. 57, 61 (1984)).

proof of the elements of the substantive offense of money laundering." *United States v. Elashi*, 440 F. Supp. 2d 536, 560 (N.D. Tex. 2006) (jury is "permitted to find" defendant entered into money laundering conspiracy without finding that defendant committed substantive money laundering counts), *aff'd in part, vacated in part, rev'd in part*, 554 F.3d 480 (5th Cir. 2008). The jury may have acquitted the defendant on the substantive section 1957 counts because it found that the Government failed to establish one of the elements – such as that at least $10,000 of the property involved in the transaction was obtained or derived from a crime. *See* Instructions to the Jury, ECF No. 350, at 29-30.

The defendant attempts to challenge the evidentiary basis for her conviction for conspiracy to violate section 1956(a)(1)(B)(i) by asserting that "the government clearly failed to prove the fourth element of the offense, namely that Mrs. Bikundi attempted to 'conceal or disguise' the allegedly fraudulently obtained funds." Def.'s Mot. at 18. To establish guilt under section 1956(h), the government need only prove two elements: (1) that two or more people agreed to try to accomplish a common and unlawful plan to violate Title 18, United States Code, Sections 1956 or 1957; and (2) the defendant intentionally joined in that agreement. Verdict Form, at 24; *see also* United States v. Farrell, No. CRIM.A.03-311-1(RWR), 2005 WL 1606916, at *8 (D.D.C. July 8, 2005) ("government's required proof [of money laundering conspiracy] included simply the existence of the unlawful agreement and [defendant]'s willful joinder in it.").

"[I]n the context of a sufficiency challenge to a money-laundering conspiracy . . . direct evidence is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Cessa*, 785 F.3d 165, 174 (5th Cir. 2015) (internal quotations and citation omitted). There was substantial circumstantial evidence to establish that the defendants conspired to

launder millions of dollars in fraud proceeds by disguising the nature, source, location, and ownership of those proceeds.    D.C. Medicaid payments went directly into Global intake accounts.  The defendants transferred the illegal proceeds to other Global and Flo-Diamond accounts.  They then funneled millions of dollars in fraud proceeds to over 100 other accounts they controlled.  "Moving money through a large number of accounts," even accounts that are in a defendant's own name, "has, in the light of other evidence . . .  been found to support" an intent to conceal or disguise the nature, location, source, ownership, or control of illegal proceeds. *United States v. Willey*, 57 F.3d 1374, 1386 (5th Cir. 1995).  The defendants had a Byzantine financial portfolio.    They moved fraud proceeds through multiple corporate, personal, investment, trust, and international accounts, and used the proceeds to purchase life insurance policies, annuities, college savings plans, and IRAs.

The defendant argues that all of her transfers were "done openly, in her name."  Def.'s Mot. at 20.  While some of the transactions "were made under relatively open circumstances . . . that does not foreclose the possibility that the transactions were designed to conceal some characteristic of the funds involved."  *United States v. Warshak*, 631 F.3d 266, 320 (6th Cir. 2010).  "The fact that a defendant personally engages in a transaction without trying to disguise his or her identity, however, does not negate the effect of other evidence pointing to an intent to conceal."  *United States v. Marshall*, 248 F.3d 525, 539 (6th Cir. 2001).

In *Warshak*, the defendants conducted "hundreds" of transactions over a period of a year and eight months "involv[ing] an assortment of business accounts, personal accounts, investments, and purchases," including "investment products such as life insurance policies and annuities in [one of the defendant's] own name."  *Warshak*, at 320.  The Sixth Circuit found that the volume and complexity of transactions was sufficient for a reasonable juror to "infer that the

transactions were made for the purpose of concealment. " *Id.* at 321 & n.63. The transactions in this case were more complex and voluminous than in *Warshak*. The defendants conducted tens of thousands of transactions involving fraud proceeds in over 100 accounts from November 2009 through February 2014. A jury could infer that "shuffling of the money" through these accounts "was an attempt to further separate the money from its illegal source" and therefore established the defendants' intent to conceal the illegal source of the funds. *United States v. Hall*, 434 F.3d 42, 51 (1st Cir. 2006).

The defendants' transfer of fraud proceeds to CFC and Tri-Continental accounts provides further evidence to sustain the defendants' conviction for conspiracy to violate section 1956(a)(1)(B)(i).[18] "Money laundering schemes assist criminals" who want to turn illegal proceeds "into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit." *United States v. Shepard*, 396 F. 3d 1116, 1120 (10th Cir. 2005) (quoting President's Commission on Organized Crime, *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering,* at 7). Bank of America account number -6749 held in the name of CFC received over $6.6 million in less than a year from accounts controlled by the defendants, including $6.3 million from Global accounts. Approximately $2.39 million in checks were written from account number -6749 to Florence Bikundi and $517,000 to Michael Bikundi. These checks included two checks for over $300,000 to Florence Bikundi and a $10,000 check to Michael Bikundi referencing "contractor pay bonus."

The defendants used the D.C. Medicaid funds in the CFC and Tri-Continental accounts to purchase luxury vehicles for themselves, fund college savings accounts, wire money to

---

[18] The analysis that follows regarding CFC and Tri-Continental is also applicable to the defendants' Rule 29 arguments for the substantive section 1956(a)(1)(B)(i) convictions for Counts Sixteen through Twenty-Two.

Cameroon, and purchase insurance policies and annuities. *See United States v. Naranjo*, 634 F.3d 1198, 1209 (11th Cir. 2011) ("evidence that a defendant placed or directed the deposit of illegal income into a bank account held by a . . . corporation and then received the benefit of those proceeds is sufficient to support a conviction of concealment money laundering."); *United States v. Willey*, 57 F.3d 1374, 1385 (5th Cir. 1995) ("using a third party, for example, a business entity . . . to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal."); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476-77 (10th Cir. 1994) (reversing judgment of acquittal because defendant's use of funds connected to defendant's business "not only create[d] the false impression that the [business] was his source of wealth, but it create[d] documentary evidence in support of that deception that could mislead an investigator."). These corporate accounts created the appearance that the defendants' extraordinary wealth did not derive solely from Global, but also from a real estate investment business and an import-export business. *See United States v. Law*, 528 F.3d 888, 896 (D.C. Cir. 2008) (transaction designed to "create the appearance of legitimate wealth" violates the money laundering statute).

"The creation and use of sham businesses is highly relevant to the proof of concealment money laundering." *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003). CFC and Tri-Continental were not functioning businesses. CFC was supposed to be a real estate investment business company controlled by Carlson Igwacho, Florence Bikundi, and Chris Asongcha. Carlson Igwacho had no role in CFC beyond discussions about forming the business. His signature as the resident agent on the CFC Articles of Organization was forged.   All of the bank accounts in the name of CFC were controlled by the defendants.  Michael Bikundi was listed as a CFC managing member on CFC account applications even though he was not supposed to have

any role in the business and told Ernest Igwacho that he was not part of CFC. CFC never actually purchased any real estate. CFC did not issue any checks to pay title companies, insurance companies, home inspectors, or cleaning services. There were no deposits into CFC accounts that appeared to be rent checks or proceeds from a real estate sale. The only property titled in the name of CFC was a property purchased with funds from a Global payroll account. Tri-Continental was incorporated as an import-export business. There was no evidence that Tri-Continental generated any income. All of the funds that went to Tri-Continental came from accounts controlled by Florence Bikundi or Michael Bikundi.

Although the defendants transferred millions of dollars from Global to CFC and Tri-Continental, there was no evidence of any legitimate business relationship between Global and CFC and between Global and Tri-Continental, or that either entity provided any services to Global. There was no evidence from the search warrants and a subpoena issued to the defendants' accountant that any Form 1099s were prepared reflecting payments from Global to CFC or Tri-Continental, or from CFC and Tri-Continental to the defendants.

"Evidence that a defendant converted funds into a form that is more difficult to trace, easier to hide, or less suspicious may also support a conviction for concealment money laundering." *Naranjo*, 634 F.3d at 1210. The defendants withdrew over $1 million in cash from accounts they controlled. "[C]ash cannot be traced." *United States v. Dvorak*, 617 F.3d 1017, 1024 (8th Cir. 2010). In *Narango*, the Eleventh Circuit found that "[a] reasonable jury could have inferred that [the defendant] made cash withdrawals so that the funds could not be easily traced to their source. By converting funds into cash, [the defendant] would have been able to spend illegal proceeds without leaving a paper trail connecting his purchases to his [fraud]." *Narango*, at 10. The defendant in *Narango* made cash withdrawals of $5000, $6000, and

$20,000.  *Id.*  The court characterized these withdrawals as "large," *id.* at 1211, and found them sufficient "to suggest to a reasonable jury" that the purpose of the withdrawals was "to hide the source of the funds and [the defendant's] connection to them."  *Id.* at 1210.  In this case, there were cash withdrawals of $10,000, $15,000, $20,000, $22,000, and $35,000.

The defendants' extensive use of cashier's checks is further evidence of their conspiracy to violate section 1956(a)(1)(B)(i).  A cashier's check cannot be traced to the source of the funds used to purchase the check.  The defendants purchased 184 cashier's checks totaling over $7.7 million from accounts they controlled.  They deposited the checks into other accounts they controlled.  Most of these accounts were personal accounts, investment accounts, and college savings accounts.  The use of cashier's checks made it more difficult to trace the source of the funds deposited into these accounts back to fraudulently obtained payments from D.C. Medicaid. *See United States v. Byrd*, 377 F. App'x 374, 377 (5th Cir. 2010) (evidence was sufficient for a reasonable juror to . . . conclude that [the defendant's]  procurement of numerous  cashier's checks constituted an attempt to conceal the proceeds of his [fraudulent] activities."); *United States v. Kneeland*, 148 F.3d 6, 17 (1st Cir. 1998) (finding that months of research "to find the relevant accounts and to compile the paper trail . . . in combination with the evidence of [defendant's] numerous transfers of ill-gotten funds and his repeated use of cashier's checks, sufficed to support the jury's guilty verdicts on [money laundering] counts.").

The defendants made numerous false statements on applications used to open accounts through which they laundered their illegal proceeds.  Florence Bikundi falsely claimed to be a U.S. citizen, falsely claimed that she had not previously filed for bankruptcy, and falsely claimed that she was not in default on any mortgage.  All of the false statements related to areas that might have prompted a financial institution to further scrutinize the source and nature of the

funds used to open the accounts and inquire as to how the defendants were able to accumulate so much wealth in such a short period of time.  A reasonable juror could infer that the defendants made the false statements in order to minimize any potential examination of Global and lessen the likelihood that the financial institution would inform Medicaid or law enforcement that the defendants were possibly using the accounts to launder illegal proceeds.  These false statements are probative of the defendants' intent to hide the fact that they were funding these accounts with fraudulently obtained proceeds. *C.f.*, *United States v. Hall*, 434 F.3d 42, 51 (1st Cir. 2006) (misstatement about source of funds "is probative of concealment.").

The circumstantial evidence discussed above regarding the entirety of the defendants' financial portfolio and the manner in which they conducted their financial transactions provided sufficient evidence to support their convictions for conspiring to violate 18 U.S.C. § 1956(a)(1)(B)(i).

### Counts Sixteen through Twenty-Two

Counts Sixteen through Eighteen involved the deposits of fraud proceeds into Tri-Continental accounts, and Counts Nineteen through Twenty-Two involved the deposits of fraud proceeds into a CFC account.  The defendant argues that the transactions did not conceal her identity.  Def.'s Mot. at 20.  The defendant's "identity argument is without merit, because the money laundering statute does not require an intent to conceal the launderer's identity." *United States v. Delgado*, 653 F.3d 729, 737 (8th Cir. 2011).

As discussed in the previous section, there was substantial evidence that the defendants transferred fraudulently obtained D.C. Medicaid funds in Global accounts to CFC and Tri-Continental accounts, in part, to conceal or disguise the nature, source, location, or control of the

illegal proceeds. "The concealing or disguising of illegal proceeds must only be one of the defendants' purposes in conducting the charged transactions; it need not have been their sole purpose." *United States v. Wynn*, 61 F.3d 921, 924 (D.C. Cir. 1995), *amended* (Oct. 4, 1995).

The movement of funds from Global accounts to CFC and Tri-Continental accounts turned ill-gotten gains obtained from D.C. Medicaid into ostensibly legitimate receipts of a real estate investment company and an import-export company. *See United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008), *judgment entered*, 264 F. App'x 16 (D.C. Cir. 2008) ("In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business.") (quoting *United States v. Esterman,* 324 F.3d 565, 570 (7th Cir.2003)); *Law*, 528 F.3d at 896 (transaction designed to "create the appearance of legitimate wealth" violates the money laundering statute); *Shepard*, 396 F. 3d at 1120 ("Money laundering schemes assist criminals" who want to turn illegal proceeds "into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit."). The defendants then used these "corporate" funds for their personal benefit. *See Naranjo*, 634 F.3d at 1209 ("evidence that a defendant placed or directed the deposit of illegal income into a bank account held by a . . . corporation and then received the benefit of those proceeds is sufficient to support a conviction of concealment money laundering."); *Willey*, 57 F.3d at 1385 ("using a third party, for example, a business entity . . . to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal."); *Garcia-Emanuel*, 14 F.3d at 1476-77 (reversing judgment of acquittal because defendant's use of funds connected to defendant's business "not only create[d] the false impression that the [business] was his source of wealth, but it create[d] documentary evidence in support of that deception that could mislead an investigator.").

The movement of funds from Global to CFC and Tri-Continental and then to the defendants had "the 'convoluted' character associated with money laundering." *Adefehinti*, 510 F.3d at 324.  If the defendants intended to openly and directly use Global funds for their personal benefit, they could have simply issued Global checks to themselves.  Instead within a few days of D.C. Medicaid payments to Global, the defendants conducted multiple transactions to move funds from Global to CFC and Tri-Continental accounts where the funds could then be used to issue checks to themselves, fund other financial institution accounts, and purchase luxury vehicles.  The use of CFC and Tri-Continental accounts disguised the fact that the funds in these accounts were unlawfully obtained D.C. Medicaid payments.  CFC and Tri-Continental were sham businesses.  *See Bolden*, 325 F.3d at 490 ("The creation and use of sham businesses is highly relevant to the proof of concealment money laundering.").  The "funnel[ing]" of illegally obtained Global profits into "fictitious business accounts and then eventually to [the defendants'] personal accounts" was "plainly sufficient to prove that [the defendants] intended to conceal the funds that were generated from" their fraud.  *United States v. Thayer*, 204 F.3d 1352, 1354-55 (11th Cir. 2000) (per curiam).

The financial transactions in Counts Sixteen through Twenty-Two are similar to the transactions in *United States v. Majors*, 196 F.3d 1206 (11th Cir. 1999).  In *Majors*, the defendants transferred illegitimate funds in business accounts to legitimate business accounts and then "directly into their own pockets."  *Id.* at 1214.  The court found sufficient evidence to supports the jury's finding that the defendants "had a specific intent to structure their financial transactions so as to conceal or disguise the true nature and source of the transfer of funds between corporations and, ultimately, to them."  *Id.*

"[I]n order to establish the design element of money laundering, it is not necessary to

prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual." *Willey*, 57 F.3d at 1386.  "[A] particular transaction must be viewed in context when determining whether it was designed to conceal."  *United States v. Burns*, 162 F.3d 840, 848 (5th Cir. 1998). In this case, the charged transactions in Counts Sixteen through Twenty-Two involved the rapid movement of hundreds of thousands of dollars in D.C. Medicaid payments from Global accounts into sham business accounts.  These transactions were a small fraction of the tens of thousands of transactions occurring in the defendants' accounts.  The defendants used the D.C. Medicaid monies in the sham business accounts to issue millions of dollars in checks to themselves, purchase luxury cars, and fund other accounts they controlled.  The defendants could have used D.C. Medicaid funds in Global accounts to write checks to themselves or pay personal expenditures rather than cycling the funds through CFC and Tri-Continental accounts.  There is no basis to overturn the jury's verdicts for Counts Sixteen through Twenty-Two.

## **CONCLUSION**

For the reasons stated above, the government respectfully requests that the Court deny defendant Florence Bikundi's Renewed Motion for Judgment of Acquittal.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

By:    _____/s/_____
       Michelle Bradford (D.C. Bar No. 491910)
       Lionel André (D.C. Bar No. 422534)
       Anthony Saler (D.C. Bar No. 448254)
       Assistant United States Attorneys
       555 4th Street, N.W.
       Washington, D.C. 20530
       Tel.202.252.7803  (Bradford)
       Michelle.Bradford@usdoj.gov

DATED:  December 23, 2015