**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **FLORENCE BIKUNDI, also known as** | **:** | **Criminal No. 14-CR-00030-BAH-1** |
| **"FLORENCE NGWE," and** | **:** | |
| **"FLORENCE IGWACHO,"** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The United States of America, by its attorney, the United States Attorney for the District of Columbia, hereby submits this memorandum in aid of sentencing for defendant Florence Bikundi. The government recommends that the Court impose a sentence of twenty years' imprisonment with a three-year period of supervised release, and order restitution in the amount of $80,620,929.20. The government also seeks a forfeiture order. <u>See</u> Gov't Mot. Prelim. Order Forfeiture, ECF No. 426.

## I. BACKGROUND

On December 18, 2014, a grand jury issued a superseding Indictment ("Indictment") charging Florence Bikundi with Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349 (Count One), two counts of Health Care Fraud, in violation of 18 U.S.C. § 1347 (Counts Two and Thirteen), one count of Federal Health Benefit Program Fraud, in violation of 42 U.S.C. § 1320a-7b(a)(3) (Count Fourteen), Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Fifteen), seven counts of Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts Sixteen through Twenty-Two), and three counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful

Activity, in violation of 18 U.S.C. § 1957 (Counts Twenty-Three through Twenty-Five). Indictment, ECF No. 44. On November 12, 2015, a jury returned a verdict finding the defendant guilty of Counts One, Two, Thirteen, Fourteen, Fifteen, and Sixteen through Twenty-Two.

The defendant owned, managed, controlled, and directed Global Healthcare, Inc. ("Global"). Its existence as a D.C. Medicaid provider was predicted on the defendant's fraud. Global was approved as Medicaid provider only because the defendant concealed her exclusion from all Federal health care programs. The defendant also caused the submission of forged signatures to D.C. Medicaid on Global's Medicaid provider agreement, including the forged signature of her own brother as Global's purported Chief Medical Officer.

After the defendant fraudulently obtained a Medicaid provider agreement for Global, she engaged in a multi-pronged scheme for Global to receive Medicaid payments to which it was not entitled and would have resulted in the suspension and termination of its provider agreement if D.C. Medicaid had been aware of the violations. The defendant's fraud in the operation of Global involved, among other things, payments to Medicaid beneficiaries to retain those beneficiaries as Global patients and to falsely certify that Global PCAs were providing home care services; falsification of Global patient files to make it appear that they were authorized to receive services; falsification of Global employee files to make it appear that they were qualified to provide services; and billing D.C. Medicaid for services that were never provided. The defendant caused counterfeit, false, and forged documentation to be presented during licensure surveys. The phony documentation included criminal background checks, home care aide training certificates, nurse notes, prescriptions or "intakes," plans of care, and time sheets.

The defendant's massive fraud led to extraordinary wealth. Between November 2009 and February 2014, D.C. Medicaid paid over $80 million to Global. The defendant, who filed

for bankruptcy in 2004, became a multi-millionaire with a fleet of luxury vehicles, a fully paid off million-dollar home, and a vast portfolio of financial accounts containing millions of dollars.

The defendant conducted tens of thousands of financial transaction in over 100 accounts to disguise her ill-gotten gains. She shuffled fraud proceeds in a convoluted manner through a labyrinth of corporate, personal, investment, trust, and international accounts, and used the proceeds to purchase life insurance policies, annuities, college savings plans, and IRAs. She utilized corporate accounts in the name of CFC and Tri-Continental to create the appearance that she was deriving income from a legitimate real estate investment business and import-export business. She purchased 184 cashier's checks totaling over $7.7 million and withdrew over $1 million in cash from her accounts to obscure the connection of the funds to her fraud.

## II. THE APPLICABLE GUIDELINES RANGE

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination. Gall v. United States, 552 U.S. 38, 49 (2007); see also United States v. Cano-Flores, 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range"). While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an  appropriate sentence. 18 U.S.C. § 3553(a)(4).

### HEALTH CARE OFFENSES

Counts One, Two, Thirteen, and Fourteen are Federal health care offenses as defined in 18 U.S.C. § 24. The government agrees with the defendant's presentence investigation report ("PSI") that section 2X1.1 applies to the defendant's conviction for Count One and section 2B1.1

controls for Counts Two, Thirteen, and Fourteen.  PSI, ECF No. 430, at ¶ 133.  Section 2X1.1(a) states that the base offense level for conspiracy is based on "[t]he base offense level from the guideline for the substantive offense."  USSG §2X1.1(a).  Section 2B1.1 is therefore the applicable guideline for all of the health care offenses.

The health care offenses group pursuant to section 3D1.2(d).  PSI at ¶ 129.  The offense level applicable to the Health Care Offense Group "is the offense level corresponding to the aggregated quantity."  USSG §3D1.3(b).  Specific offense characteristics and adjustments from Chapter Three, Parts A, B, and C are applied "based upon the combined offense behavior taken as a whole."  Id., comment. (n.3.).

**A.  Base Offense Level**

USSG §2B1.1(a)(2)                    Base Offense Level                    6

**B. Specific Offense Characteristics**

**<u>Loss Amount</u>**

"As a general rule, the Guidelines instruct that loss is the greater of actual loss or intended loss."  <u>United States v. Catone</u>, 769 F.3d 866, 876 (4th Cir. 2014) (citing USSG §2B1.1, comment. (n.3(A)).  However, Application Note 3(F) of section 2B1.1 contains certain "special rules" that are applicable "[n]otwithstanding subdivision (A)."  USSG §2B1.1, comment. (n.3(F)).

One of the special rules is for Federal health care offenses involving a government health care program.  Id., (n.3(F)(viii)).  Medicaid is such a program.  Id., (n.1).  Under the rule, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, <u>i.e.</u>, is evidence

sufficient to establish the amount of the intended loss, if not rebutted."[1]    Id.; see also United States v. Popov, 742 F.3d 911, 916 (9th Cir. 2014) (noting rule's application); United States v. Behnan, 554 F. App'x 394, 400 (6th Cir. 2014) (same); United States v. Gonzalez, 524 F. App'x 557, 564 (11th Cir. 2013) (same).  The "Guidelines permit a defendant to present rebuttal evidence showing that the total amount billed to a government health care program is not the "intended loss"; the rebuttal evidence provision does not apply to "actual loss" or the total amount *paid* on fraudulent claims."  United States v. Read, 710 F.3d 219, 229-30 (5th Cir. 2012) (emphasis in original).

Global billed $81,849,008.12 to D.C. Medicaid from November 2009, through February 2014.  See Ex. A.  All of these claims were illegitimate.  They were premised on a fraudulently obtained Medicaid provider agreement.  D.C. Medicaid would never have approved Global's provider agreement if it knew that Florence Bikundi was really Florence Igwacho, who was excluded from participation in all Federal health care programs, or that the signatures of James Mbide, Dr. Ernest Igwacho, and Nicola White had been placed on the agreement without their knowledge or permission.  Testimony of Donald Shearer, Transcript of Jury Trial, Oct. 15, 2015, Afternoon Session at 7-8.

Moreover, Global operated in complete contravention of Medicaid rules and regulations.  See Shearer Declaration, ECF No. 427-1.  Every Global claim submission was fraudulent because it functioned as a declaration that Global was complying with all of the provisions in the provider agreement.  See Trial Ex. 5.  If D.C. Medicaid had been aware of Global's violations it

---

[1] Several Circuits applied this rule before it was proposed as an amendment to the Guidelines and became effective on November 1, 2011.  See, e.g., United States v. Miller, 316 F.3d 495, 504 (4th Cir. 2003) ("amount [defendant] billed Medicare and Medicaid [i]s prima facie evidence of the amount of loss he intended to cause"); United States v. Isiwele, 635 F.3d 196, 203 (5th Cir. 2011) ("adopting the approach" in Miller).

would not have approved any payments to Global and would have suspended and terminated its provider agreement.  See Shearer Declaration.

| | | |
|---|---|---|
| USSG §2B1.1(b)(1)(M) | Loss Amount<br>(More than $65 million and less than $150 million) | 24 |

### Federal Health Care Offense Enhancement

Section 2B1.1(b)(7) provides a tiered enhancement for a defendant convicted of a Federal health care offense involving a Government health care program.

| | | |
|---|---|---|
| USSG § 2B1.1(b)(7)(A), B(iii) | Federal health care offense<br>(More than $20 million) | 4 |

### Violation of Prior Administrative Order

Section 2B1.1(b)(9)(C) mandates a two-level increase to the defendant's offense level because she violated a "prior, specific judicial or administrative order."  This enhancement "requires some specific directive that the defendant can defy."  United States v. Goldberg, 538 F.3d 280, 292 (3d Cir. 2008), as amended (Nov. 6, 2008).  The defendant defied the Department of Health and Human Services Order excluding her from participation in all Federal health care programs, including Medicaid.  See United States v. Nastasi, No. 00 CR 809(S-1)(ILG), 2002 WL 1267995, at *4 (E.D.N.Y. Apr. 17, 2002) (applying enhancement for "circumvent[ion] of HHS order).  This adjustment was not included in the PSI.

| | | |
|---|---|---|
| USSG § 2B1.1(b)(9)(C) | Violation of HHS Exclusion Order | 2 |

### C.  Chapter 3 Adjustments

### Organizer or Leader

Section 3B1.1 requires a court to adjust a defendant's offense level based on her "aggravating role" in the offense.  USSG §3B1.1.  "The magnitude of the enhancement varies with the culpability of the defendant: 4 levels for leading or organizing relatively extensive

criminal activity; 3 levels for managing or supervising such activity; and 2 levels for leading, organizing, managing, or supervising relatively confined criminal activity." United States v. Graham, 162 F.3d 1180, 1182-83 (D.C. Cir. 1998).

A four-level adjustment is appropriate in this case due to the defendant's role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG §3B1.1(a). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id., comment. (n.1). "[A] defendant may properly be included as a participant when determining whether the criminal activity 'involved five or more participants.'" United States v. Paccione, 202 F.3d 622, 625 (2d Cir. 2000).

Factors a court should consider "[i]n distinguishing a leadership and organizational role from one of mere management or supervision . . . include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG §3B1.1(a), comment. (n.4). "No single factor is dispositive." United States v. Olejiya, 754 F.3d 986, 990 (D.C. Cir. 2014). A four-level adjustment pursuant to section 3B1.1(a) "encompass[es] higher level managerial and supervisory conduct." United States v. Quigley, 373 F.3d 133, 139 (D.C. Cir. 2004).

The defendant satisfies the criteria in section 3B1.1(a) for her role in the criminal activity in Counts One and Two. The participants in the criminal activity included, among others, the defendant, Michael Bikundi, Sr., Carlson Igwacho, Violet Igwacho, Florence Igwacho, Melissa

7

Williams, Berenice Igwacho, Irene Igwacho, Elvis Atabe, James Mbide, Nicola White, Elke Johnson, Christian Asongcha, Eveline Takang, Vanessa Sona, and Francis James.

"Ms. Florence," as she was referred to, was in charge of Global and "occupied the top position in the conspiracy hierarchy." United States v. Brodie, 524 F.3d 259, 271 (D.C. Cir. 2008) (affirming four-level enhancement). She had the decision making authority commensurate with her positions as the owner, president, and administrator of Global. She ordered employees to "fix" patient and employee files to make it appear that Global was in compliance with D.C. regulations. She directed the creation of fake nurse notes, plans of care, and other documents to deceive surveyors and auditors so that Global would not be fined and would remain in business. See United States v. Chi, 616 F. App'x 950, 953 (11th Cir. 2015) (per curiam) (applying four-level enhancement to defendants who "exercised decision-making authority within [Medicare fraud] conspiracy, participated in planning and organizing the conspiracy, and exerted control and authority over several participants in the conspiracy"); United States v. Kelley, 36 F.3d 1118, 1129 (D.C.Cir.1994) (defendant who instructed others to carry out criminal plan and received most of the proceeds was "properly characterized" as an organizer or leader). She reviewed timesheets and issued paychecks to her family members knowing that they had not provided the services reflected on the timesheets. She permitted office employees such as Melissa Williams and Nicola White to submit fraudulent time sheets claiming that they were providing PCA services when they were really in the office. She hired employees such as Carlson Igwacho and Francis James who were unqualified to provide PCA services and did not fire employees who committed fraud. She recruited and paid kickbacks to beneficiaries to become and remain Global patients. She assigned a beneficiary whom she had been paying to Francis James, and told Francis James that he would not have to provide eight hours of services.

She used her authority over Global's bank accounts to shower herself with millions of dollars in ill-gotten gains. See United States v. Wilson, 240 F.3d 39, 46-47 (D.C. Cir. 2001) ("[t]he exercise of decision making authority, recruitment, and a claimed right to a larger share of the proceeds are prominent among the factors that the commentary to the Guidelines indicates should be considered").

Fraud permeated every aspect of Global. The defendant oversaw all of it. She qualifies as an organizer or leader under section 3B1.1(a). See United States v. Weaver, 716 F.3d 439, 442 (7th Cir. 2013) ("those who are more culpable ought to receive the harsher organizer/leader enhancement, while those with lesser culpability and responsibility receive the lesser enhancement imposed on managers/supervisors.").

USSG § 3B1.1(a)                    Organizer/Leader                              4

### Abuse of Trust

Section 3B1.3 provides for a two-level adjustment "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." USSG §3B1.3. "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." Id., comment. (n.1).

The D.C Circuit "has not yet considered whether those who seek payment from the government for the provision of medical services occupy positions of trust vis-à-vis the government," but has noted that "the majority of circuits that have considered the issue have held they do." United States v. Wheeler, 753 F.3d 200, 209 (D.C. Cir. 2014) (collecting cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits). But see United States v.

Mills, 138 F.3d 928, 941 (11th Cir.) ("[A] Medicare-funded care provider, as a matter of law, does not occupy a position of trust vis-à-vis Medicare."), modified on reh'g on other grounds, 152 F.3d 1324 (11th Cir. 1998).

"The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996). As the Seventh Circuit recognized in United States v. Hoogenboom, 209 F.3d 665 (7th Cir. 2000), when it applied the adjustment, medical providers "enjoy significant discretion and consequently a lack of supervision" in the provision of services which "forces [government health care programs] to depend, to a significant extent, on a presumption of honesty when dealing with statements received from medical professionals." Id. at 671. The Court should apply the abuse of trust adjustment to the defendant because she was responsible for ensuring that Global complied with all of the rules and regulations for home care agencies and Medicaid providers, reviewed the time sheets that formed the basis for Global's claims to D.C. Medicaid, certified on the D.C. Medicaid provider agreement that each claim submitted complied with its rules and regulations, and had the discretion and authority to determine what claims were appropriate to submit. See United States v. Bolden, 325 F.3d 471, 505 (4th Cir. 2003) ("Because of the discretion Medicaid confers upon care providers . . . such providers owe a fiduciary duty to Medicaid. Indeed, we see it as paramount that Medicaid be able to 'trust' its service providers.") (internal citation omitted).

### D. Total Offense Level

The government has calculated the defendant's total offense level for the health care offenses as **42** based on the following:

USSG § 2B1.1(a)(2)          Base Offense Level                          6

| USSG § 2B1.1(b)(1)(M) | Specific Offense Characteristic Loss Amount (More than $65m and less than $150m) | 24 |
|---|---|---|
| USSG § 2B1.1(b)(7)(A), B(iii) | Specific Offense Characteristic Federal health care offense (More than $20m) | 4 |
| USSG § 2B1.1(b)(9)(C) | Specific Offense Characteristic Violation of any prior administrative order (HHS exclusion order) | 2 |
| **ADJUSTED OFFENSE LEVEL** | | **36** |
| USSG § 3B1.1(a) | Organizer Leader | 4 |
| USSG § 3B1.3 | Abuse of Trust | 2 |
| | Total Offense Level: | **42** |

## MONEY LAUNDERING OFFENSES

The government agrees with the PSI that the money laundering offenses in Counts 15 through 22 are governed by section 2S1.1  PSI at ¶ 133.  The money laundering offenses group pursuant to section 3D1.2(d).  Id. at ¶ 130.

### A.  Base Offense Level

Because the defendant committed the underlying health care offenses which generated the illegal proceeds that she conspired to launder and did in fact launder, her base offense level is "[t]he offense level for the underlying offense from which the laundered funds were derived." USSG §2S1.1(a)(1).  Application Note 2(c) provides that in cases where "subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived."  Id., comment. (2(c)). Therefore, the defendant's base offense level for the Money Laundering Group is her adjusted

11

offense level for the health care offenses exclusive of the applicable Chapter Three adjustments. See United States v. Salgado, 745 F.3d 1135, 1138 (11th Cir. 2014) ("when setting an offense level under § 2S1.1(a)(1), a court should make Chapter Three adjustments based on the defendant's conduct in the money laundering offense itself, not based on his conduct in the offense from which the money that was laundered was obtained"); United States v. Pass, 413 F. App'x 832, 835 (6th Cir. 2011) ("The text of the note is clear that chapter three adjustments may not be applied with respect to the underlying offense").

| | | |
|---|---|---|
| USSG §2S1.1(a)(1) | Base Offense Level<br>Offense Level for Underlying Offense<br>not including Chapter 3 adjustments | 36 |

### B. Specific Offense Characteristics

#### Conviction under Section 1956

Section 2S1.1(b)(2)(B) provides for a two-level enhancement if a defendant is convicted of violating 18 U.S.C. § 1956. The defendant was convicted of violating both 18 U.S.C. § 1956(a)(1)(B)(i) and § 1956(h).[2]

| | | |
|---|---|---|
| USSG §2S1.1(b)(2)(B) | Conviction under 18 U.S.C. § 1956 | 2 |

#### Sophisticated Laundering

The defendant's offense level should be increased by an additional two points pursuant to section 2S1.1(b)(3) because, as discussed above, subsection (b)(2)(B) applies and "the offense involved sophisticated money laundering." "'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. 1956

---

[2] There is an exception for the two-point enhancement "if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the *sole object of that conspiracy* was to commit an offense set forth in 18 U.S.C. § 1957." USSG §2S1.1, comment. (n.3(c)) (emphasis added). In this case, the jury found that the defendant conspired to violate sections 1956(a)(1)(B)(i) and 1957.

offense" and "typically involves the use of  (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts."  USSG §2S1.1, comment. (n.5(a)).

The defendant's money laundering scheme exemplifies sophisticated laundering.  She utilized a sham real estate corporation, CFC, and a sham import-export company, Tri-Continental, to launder her illegal proceeds.  She engaged in tens of thousands of transactions in order to move her ill-gotten gains to over 100 accounts that she controlled.  Those accounts included five bank accounts located in Cameroon.  The two-point enhancement for sophisticated money laundering is appropriate.  See United States v. Alaniz, 726 F3d 586, 625–626 (5th Cir. 2013) (laundering drug proceeds through sham corporations and 38 bank accounts, layered transactions, and foreign wire transfers sufficient to establish sophisticated concealment).

USSG §2S1.1(b)(3)                Sophisticated Laundering                    2

**D.  Total Offense Level**

The government has calculated the defendant's total offense level for the money laundering offenses as **40** based on the following:

| | | |
|---|---|---|
| USSG §2S1.1(a)(1) | Base Offense Level | 36 |
| USSG §2S1.1(b)(2)(B) | Specific Offense Characteristic Conviction under 18 U.S.C. § 1956 | 2 |
| USSG §2S1.1(b)(3) | Specific Offense Characteristic Sophisticated Laundering | 2 |

## GROUPING OF HEALTH CARE AND MONEY LAUNDERING OFFENSES

The Health Care Offense Group and the Money Laundering Offense Group are grouped together under section 3D1.2(c) because the defendant was "convicted of a count of laundering

funds and a count for the underlying offense from which the laundered funds were derived."
USSG §2S1.1, comment. (n.6)).   Section 3D1.3(a) instructs that when counts are grouped
pursuant to section 3D1.2(c), the applicable offense level is "the highest offense level of the
counts in the Group."   Id. §3D1.3(a).   The highest offense level is 42 for the health care counts.
This offense level determines the defendant's applicable Guidelines range.   See United States v.
Rushton, 738 F.3d 854, 858 (7th Cir. 2013) (noting that PSI "should have calculated offense
levels for both counts, fraud and money laundering, and selected the higher of the two as the
basis for calculating the defendant's guidelines").

**DEFENDANT'S CRIMINAL HISTORY**

On May 1, 2003, Florence Igwacho pleaded guilty in Baltimore City Circuit Court to two
counts of Practicing Nursing without a License (Counts One and Seven), and one count of
Identity Fraud (Count Twelve).   On July 8, 2003, the defendant was sentenced to one year for
Count One with six months suspended, one year for count Seven to run consecutive to Count
One, and one year for Count 12 to run consecutive to Count 7.   See Ex. B.   The total sentence
imposed was two and one-half years which adds three points to the defendant's criminal history
score.   See USSG §4A1.1(a) & PSI at ¶ 146.

As recounted in the Statement of Facts, see Ex. C.:

The Defendant used the personal identification information and Maryland
registered nursing license of Karen Awah to assume her identity in order to
fraudulently obtain registered nursing positions through at least three nursing staff
agencies.   The Defendant got registered nursing assignments through an agency
called Rose Services, Inc.   She assumed the identity Karen Awah and provided
Rose Services with the Social Security Number, date of birth, resident alien card
and Maryland RN license belonging to the "real" Karen Awah.

The Defendant gained assignments as a registered nurse at Mercy Medical Center
through Ace Star/Prime/RSA, a nursing agency in Towson, Maryland.   She
identified herself as Karen Awah and provided a copy of the actual Karen Awah's
Maryland RN license.

14

Awah was not an unknown faceless person to the defendant.  The defendant grew up with Awah, who was once engaged to the defendant's brother.  Statement of Facts, at 5.

On May 23, 2002, Florence Igwacho pleaded guilty in Prince George's County Circuit Court to Practicing Nursing without a License.  The court stayed the entry of judgment and placed the defendant on probation for six months.  See Ex. D.  This type of disposition is commonly known as probation before judgment.  A diversionary disposition such as probation before judgment is counted as a sentence under section 4A1.1(c) "even if a conviction is not formally entered."  USSG §4A1.2(f); see also United States v. Bagheri, 999 F.2d 80, 83 (4th Cir. 1993) ("under § 4A1.2(f) of the Sentencing Guidelines, probation without entry of judgment is considered a 'diversionary disposition' . . . [and] counted as a sentence under § 4A1.1(c)").  The sentence adds one point to the defendant's criminal history score.  USSG §4A1.1(c).  The PSI did not count this sentence when calculating her criminal history.  The defendant's total criminal history score is four points resulting in a criminal history category III.

On October 9, 1998, Florence Igwacho was convicted of Theft of Property with less than $300.00 Value in District Court for Montgomery County.  She was sentenced to thirty days imprisonment with thirty days suspended, and one-year of probation.  "A conviction for which the imposition of sentence or execution of sentence was totally suspended" qualifies as a "prior sentence" under section 4A1.1(c).  USSG  §4A1.2(a)(3).  However, it is not counted towards the defendant's criminal history because the sentence was not imposed within ten years of the defendant's commencement of the instant offense.  Id. §4A1.2(e)(2)-(3).

## DEFENDANT'S GUIDELINES RANGE

The defendant's Guidelines range is 360 months of imprisonment to life imprisonment based on a total offense level of 42 and criminal history category III.

### III.  OTHER SENTENCING FACTORS

#### A.  The Nature and Circumstances of the Offense

The defendant engaged in a systematic and brazen scheme to illegally obtain D.C. Medicaid funds.  As discussed in further detail below, the defendant lost her Virginia nursing license in 1999 due to her callous disregard for the needs of a four-year old patient who required 24-hour care.  The Department of Health and Human Services excluded her from participation in all federal health care programs because of the license revocation.

The defendant concealed her exclusion from D.C. Medicaid in order for Global to become a Medicaid provider.[3]  She submitted or caused to be submitted a Medicaid provider agreement with forged signatures, including the forged signature of her own brother.  She was willing to do anything and use anyone to line her pockets with D.C. Medicaid funds.

By deceiving D.C. Medicaid in order to obtain a Medicaid provider agreement for Global, the defendant was able to open a spigot to taxpayer funds.  Global became a runaway money train fueled by the defendant's unbridled greed.  Global was a corrupt enterprise and that corruption started at the top – with the defendant.  She engaged in rampant and pervasive fraud. She supervised, managed, directed, and participated in a massive swindling of D.C. Medicaid. Her fraud infected every aspect of Global's operations, including billing Medicaid for: (a) services that were not provided, (b) services that were not needed, (c) beneficiaries who were not authorized to receive services, (d) employees who were not qualified to provide services; and (e) falsifying patient records and employee files.

---

[3] The defendant also concealed her exclusion from Maryland Medicaid in order for Flo-Diamond to become a Medicaid provider.  See Gov't. Mot. in Limine, ECF No. 273 & accompanying exhibits.

16

The defendant even stooped to submitting a fraudulent 1099 to the IRS for her own son's business.  The Form 1099 for the 2012 calendar year reflected $496,760 in payments from Global to Cavicash.  Carlson Igwacho informed Florence Bikundi that the figure was inaccurate, but she did not change it.  Carlson Igwacho estimated that Global paid Cavicash approximately $60,000 per year.

Global was a rogue home care agency under the leadership and direction of the defendant.  She operated Global with complete contempt for all of the rules and regulations governing Medicaid providers and home care agencies. Providing legitimate services with qualified employees to deserving patients was an afterthought.  She exploited the economic vulnerability of Medicaid beneficiaries by having home care aides dangle a few hundred dollars in front of them as a pay-off for falsely certifying that the aides were providing services.   She utilized aides, including her own son, who had no training or skills.  She viewed criminal background checks for aides, required nurse visits to patients' homes, and accurate medical entries in patient files as impediments to her quest for riches.

D.C. Medicaid paid $80,620,929.20 to Global from November 2009 to February 2014. Florence Bikundi became a multi-millionaire from a government health insurance program that serves as a lifeline for those who cannot afford health insurance.  Her greed was insatiable.  D.C. Medicaid payments to Global increased from $1,359,726.88 in 2009, to $9,956,505.60 in 2010, to $14,277,324.23 in 2011, to $23,696,990.89 in 2012, and to $27,166,587.08 in 2013.

The defendant funneled millions of dollars in fraud proceeds to over 100 accounts she controlled, including multiple corporate, personal, investment, trust, and international accounts, and used the proceeds to purchase life insurance policies, annuities, college savings plans, and IRAs.  She utilized accounts in the names of two shell companies, CFC and Tri-Continental, to

create the appearance that her extraordinary wealth did not derive solely from Global, but also from a real estate investment business and an import-export business.

The defendant used her ill-gotten gains to fund an opulent and ostentatious lifestyle. She bought a million dollar home and spent another one-half million dollars on improvements. She purchased a fleet of luxury vehicles, including a $140,000 Land Rover, $120,000 Porsche, a $75,000 Mercedes, and a $70,000 Cadillac. The enormity of her money laundering matched the magnitude of her fraud.

### B. The History and Characteristics of the Defendant

#### Nursing History

The defendant has an extensive history of fraud and deceit beyond her criminal convictions. On August 4, 1999, the Virginia Board of Nursing ("Virginia Board") revoked her nursing license. The Findings of Fact state that "[on] or about October 15, 1998, by her own admission, Ms. Igwacho abandoned Patient A, a four (4) year old child, who is comatose ventilator dependent, with no cough reflex, and requires twenty-four (24) hour care, seven (7) days a week, in that she left the home to obtain a non-prescription medication for herself and failed to advise anyone that she was leaving the patient unattended." Ex. E. The Findings of Fact also note that on or about October 8, 1998, Florence Igwacho administered medications to Patient A at approximately 8:00 p.m., when the medications were ordered for administration at 6:00 p.m.

Florence Igwacho submitted a Virginia Application for Reinstatement of License as a Licensed Practical Nurse. In an Order, dated December 29, 2004, the Virginia Board denied her application because she, among other things, falsely answered "No" to the question "Have you ever been convicted, pled guilty to or pled Nolo Contendere to the violation of any federal, state

18

or other statute or ordinance constituting a felony or misdemeanor?"; and falsely claimed that she graduated from Bowie State with an RN, BSN, and graduated from Howard Community College and Anne Arundel Community College with an LPN. Ex. F. Florence Igwacho took courses at these institutions, but she never graduated from any of them. Id.

Florence Igwacho was licensed to practice nursing in South Carolina until January 31, 2004, when her license lapsed. Florence Igwacho filed an Application for Reinstatement, dated March 20, 2004. On November 21, 2007, the South Carolina Board of Nursing permanently revoked Florence Igwacho's nursing license. As the basis for its decision, the Board of Nursing cited: (1) Florence Igwacho's conviction for identity fraud; (2) her "willfully and repeatedly following a course of conduct that, by reasonable professional or ethical standards, renders [her] incompetent to assume, perform, or be entrusted with the duties, responsibilities, or trusts which normally devolve upon a licensed nurse;" and (3) her attempt to obtain a nursing license "through fraud, deceit, and misrepresentation" by falsely claiming she had never been convicted of violating any law. Ex. G.

On October 21, 2002, Florence Igwacho submitted a New License Application to the District of Columbia Department of Health seeking to be licensed as an L.P.N (Licensed Practical Nurse). On June 20, 2003, Florence Ngwe submitted an application to be licensed as an R.N. (Registered Nurse). Both applications required the applicant to "List all states and jurisdictions in which you have ever held a license." Florence Igwacho did not list Virginia. Both applications asked "Has any authority taken adverse action against your license or privileges or informed you of any pending charges not previously reported to this board?" The "No" box was checked on both applications.

On November 15, 2002, the District of Columbia Department of Health issued a license to Florence Igwacho as an L.P.N., and on September 4, 2003, it issued a license to Florence Ngwe as an R.N.  On May 18, 2005, the District of Columbia Board of Nursing revoked both of her nursing licenses.  Ex. H.  It cited her Baltimore City Circuit Court convictions, the revocation of her Virginia nursing license for abandoning a patient and failing to administer medications on schedule, and the false responses on her L.P.N. and R.N. applications.  Id.

Despite not being licensed as a nurse in the District of Columbia or any other jurisdiction, the defendant signed off on a Plan of Care for a Global patient.  Trial Ex. 122-0002.  The Plan of Care contained numerous errors, including the diagnosis and medication for the patient.

**False Statements on Financial Applications**

On September 23, 2009, Florence Igwacho purchased the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland ("the Jennings Mill property") for $880,000.  On August 11, 2009, Florence Igwacho submitted a Uniform Residential Loan Application for a mortgage on the Jennings Mill property.  The application was signed in the name of Florence Igwacho and contained numerous false statements.  Trial Ex. 153-0078 to 0081.

In section III of the application, Florence Igwacho listed her present address as 15703 Appleton Court, Bowie, Maryland.  She indicated that she rented the property and had lived there for over five years.  In Section VIII of the application, the "No" box was checked in response to question "m,": "Have you had an ownership interest in a property in the last three years?"  In Section VIII, question "f" of the application, the "No" box was checked in response to the question: "Are you presently delinquent or in default of any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee?"

All of these answers were false.  Florence Igwacho and Carlson Igwacho had previously owned the Appleton Court property until they defaulted on the mortgage in 2008, and the lender initiated foreclosure proceedings in 2009.

In Section VIII of the loan application, the "No" box was checked in response to question "b": "Have you been declared bankrupt within the past 7 years?"  On October 18, 2004, Florence Igwacho filed a Voluntary Petition for Bankruptcy, pursuant to Chapter 7 of the Bankruptcy Code, and on January 10, 2005, the United States Bankruptcy Court for the District of Maryland issued an Order discharging her debts.

The "Yes" box was checked on the loan application in response to question "j" in Section VIII, "Are you a U.S. citizen?"  Florence Bikundi has never been a United States citizen.

The defendant made numerous false statements on other financial documents.  Trial Ex. 153-0001 to 0077.  She falsely claimed that (a) she had never been convicted of a felony or misdemeanor; (b) there had been no bankruptcy proceedings against her within the last 7 years; and (c) that she was a United States citizen.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment; to Afford Adequate Deterrence; and to Protect the Public From Further Crimes of the Defendant**

Fraud involving government health care programs is "extremely serious."  United States v. Szilvagyi, No. 06-20062, 2007 WL 2121999, at *2 (E.D. Mich. July 24, 2007) (Medicare fraud).  It "affects the financial integrity of programs meant to aid tens of millions of people in need of health care.  Every dollar lost to fraud is a dollar that could have provided medical care" to deserving beneficiaries of government health care programs.  United States v. Thurston, 358 F.3d 51, 81 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1097 (2005).

As part of the Patient Protection and Affordable Care Act of 2010 ("Affordable Care Act"), Congress "amended the Guidelines to ensure that health care fraud is punished more severely." United States v. Mateos, 623 F.3d 1350, 1368 (11th Cir. 2010). Two provisions were added to section 2B1.1: (a) the tiered enhancement at subsection (b)(7) and Application Note 3(F) for determining intended loss. "Congress also directed the Sentencing Commission to review the Guidelines and policy statements for health care fraud offenses to ensure that they 'reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud' and to provide 'increased penalties for persons convicted of health care fraud offenses in appropriate circumstances.'" Id. (citing Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, § 10606(a)(3)(A)).

Government health care plans "depend[] on the integrity" of the doctors, medical practitioners, and patients who participate in the billing process." United States v. Plotkin, No. 1:06 CR 196, 2006 WL 3762125, at *3 (N.D. Ohio Dec. 20, 2006). The government cannot rely on the honesty of these participants to ensure that the taxpayer funds are used solely for legitimate health care needs. The lure of the massive amount of government money available for health care services is too great a temptation for far too many people. Health care fraud is rampant. It costs the country tens of billions of dollars per year. See https://www.fbi.gov/about-us/ investigate/white_collar/health-care-fraud.

Health care fraud is "extremely difficult to detect." Szilvagyi, 2007 WL 2121999, at *2. The risk of getting caught is low. The government does not have the resources to investigate and prosecute everyone who commits health care fraud. The only mechanism to contain and perhaps narrow the overall fraud loss is general deterrence.

General deterrence is a "crucial factor in sentencing decisions for economic" crimes. United States v. Morgan, No. 13-6025, 2015 WL 6773933, at *22 (10th Cir. Nov. 6, 2015). The legislative history of section 3553 documents Congress' emphasis on the importance of general deterrence in white collar crime. See S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted). The sentence in this case must match the scope and magnitude of the defendant's fraud and money laundering to have any possible deterrent effect on others.

A sentence of 20 years' imprisonment is an appropriately severe sentence that will promote respect for the law. It takes into account the enormity of the defendant's criminal conduct, the damage and harm that the defendant inflicted to patients and D.C. Medicaid, and the need to deter others from committing similar offenses. It reflects her history of fraud and deceit beyond her criminal offenses.

The defendant will be approximately 70 years-old if she is released from prison after serving 20 years. The defendant is currently under a removal order and will likely be deported from the United States. Even if she stays in the United States, the likelihood of recidivism will be low based on her age. While a twenty year sentence is below the applicable Guidelines range, it is sufficient, but not greater than necessary, to serve the purposes of section 3553(a)(2). Under the circumstances, it is a just punishment.

### Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment

There is no indication that the defendant needs any type of training or medical care.

23

**The Kinds of Sentences Available**

The defendant is eligible for not less than one nor more than five years' probation under 18 U.S.C. § 3561(c)(1).  PSI at ¶ 213.  The Guidelines do not authorize probation.  Id. at ¶ 215.  The Court may impose a term of supervised release of not more than three years under 18 U.S.C. § 3583(b)(2).  Id. at ¶ 206.

The government recognizes that section 5D1.1(c) provides that a "court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment."  USSG §5D1.1(c).  The commentary states that a "court should, however, consider imposing a term of supervised release on such a defendant if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case."  Id., comment. (n.5).

The government believes that imposition of supervised release is warranted under the circumstances.  The defendant has successfully avoided removal from the United States in the past.  On July 18, 2005, an Immigration Judge granted withholding of removal[4] to the defendant.  There is no guarantee that upon her release from prison she will not once again be able to remain in the United States.  The imposition of supervised release provides some measure of deterrence and protection for this possibility.

**The Sentencing Range Established by the Guidelines and Pertinent Policy Statements**

As discussed above, the defendant's Guidelines range is 360 months of imprisonment to life imprisonment.

---

[4] "[W]ithholding of removal does not confer any status on its recipient in the United States."  Law of Asylum in the United States, Appendix A § A6:4.

**The Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

As the District of Columbia Circuit has recognized, there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." United States v. Gardellini, 545 F.3d 1089, 1096 (D.C. Cir. 2008); see also United States v. Saez, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). A sentencing court "necessarily gave significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." Gall v. United States, 552 U.S. 38, 54 (2007).

**The Need to Provide Restitution to Any Victims of the Offense**

"The court, in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663." 18 U.S.C. § 3556. Sections 3663A and 3663 are the two primary restitution statutes. Courts often refer to section 3663A as the Mandatory Victims Restitution Act ("MVRA") and section 3663 as the Victim and Witness Protection Act ("VWPA"). See, e.g., United States v. Freeman, 741 F.3d 426, 433 (4th Cir. 2014).

"[T]he MVRA requires the sentencing court to order restitution to the victims of defendants who are convicted of certain enumerated crimes." United States v. Smith, 297 F. Supp. 2d 69, 71 (D.D.C. 2003); see also 18 U.S.C. § 3663A(a)(1) (stating that "court shall order" restitution). The offenses subject to the MVRA are listed in section 3663A(c). See 18 U.S.C. §

25

3663A(c).  They include "any offense that is . . . an offense against property under this title . . . including any offense committed by fraud or deceit."[5]  18 U.S.C. § 3663A(c)(1)(A)(ii).

"The  MVRA applies to health care fraud because it is an offense committed by fraud or deceit and an offense against property."  United States v. Jafari, 104 F. Supp. 3d 317, 322 (W.D.N.Y. 2015); see also United States v. Cohan, 798 F.3d 84, 89 (2d Cir. 2015) (MVRA "makes restitution mandatory" for violation of 18 U.S.C. § 1347); United States v. Fogel, 494 F. Supp. 2d 136, 138 (D. Conn. 2007) ("health care fraud is undisputably 'an offense against property' [and] an 'offense committed by fraud or deceit'").

The "purpose of the MVRA is essentially compensatory: to restore a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury."  United States v. Fair, 699 F.3d 508, 512 (D.C. Cir. 2012) (internal quotations and citation omitted).  "The proper amount of restitution is the amount wrongfully taken by the defendant."  United States v. Sapoznik, 161 F.3d 1117, 1121 (7th Cir. 1998).  In this case, that amount is $80,620,929.20, the total amount paid from D.C. Medicaid to Global.  See Trial Ex. 5.

Restitution orders under the MVRA are "issued and enforced in accordance with section 3664."  18 U.S.C. §  3663A(d).  Section 3664(h) provides that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to

---

[5] "[T]he MVRA applies to conspiracies when . . . their underlying purpose was an offense against property."  United States v. Quarrell, 310 F.3d 664, 678 (10th Cir. 2002).

reflect the level of contribution to the victim's loss and economic circumstances of each defendant."[6]  18 U.S.C. § 3664(h).

Although section 3664(h) does not explicitly refer to joint and several liability, the D.C. Circuit has recognized that such liability may be "appropriate" in cases, such as the instant one, "where there is more than one defendant and each has contributed to the victim's injury."  United States v. Monzel, 641 F.3d 528, 538 (D.C. Cir. 2011).  The government has sought and will seek restitution from the other co-defendants in this case, and Nicola White and James Mbide, who were members of the same conspiracy but are individual defendants in separately filed cases. The government's proposed restitution for the other defendants (except Michael Bikundi) is not for the full amount of the loss to D.C. Medicaid.  Rather, it is for the loss that they individually caused.

[T]he MVRA does not authorize restitution in excess of the amount of the victim's losses."  United States v. Fair, 699 F.3d 508, 512 (D.C. Cir. 2012).  In order to ensure that D.C. Medicaid does not recover more than its loss amount, the government requests that the defendant's restitution liability be joint and several with the other members of the conspiracy. See United States v. Trigg, 119 F.3d 493, 501 (7th Cir. 1997) ("[A] district court may impose joint liability on multiple defendants in different amounts."); United States v. Nucci, 364 F.3d 419, 423 (2d Cir. 2004) (applying common law rule that "joint and several liability does not permit double recovery").[7]

---

[6]  "[W]hile the district court has the option under § 3664(h) to apportion the restitution payment among defendants, a district court is not required to do so."  United States v. Bogart, 576 F.3d 565, 576 (6th Cir. 2009).

[7] The D.C. Circuit has not addressed whether defendants in one case can be jointly and severally liable with a defendant in another case.  See Monzel, 641 F.3d at 539 ("It is unclear, however, whether joint and several liability may be imposed upon defendants in separate cases.).

27

The government further requests that the Court's restitution orders for all members of the conspiracy explicitly state that D.C. Medicaid's total recovery from all of the defendants may not exceed $80,620,929.20, and that each defendant's restitution liability will be discharged if D.C. Medicaid recovers that amount.  See Trigg, at 501 (modifying district court order to "provide explicitly that [victim's] recovery is limited to the amount of its loss" and that "each defendant's liability for restitution ceases if and when [the victim] receives full restitution"); United States v. Scott, 270 F.3d 30, 53 (1st Cir. 2001) ("[B]etter practice for district courts [is] to refer explicitly to the limit placed on the government's total recovery.").

"Trial courts have broad discretion in ordering restitution."  United States v. Laney, 189 F.3d 954, 966 (9th Cir. 1999).   The government requests that the Court's restitution order direct the Clerk of the Court to credit any restitution payments from the defendant and Michael Bikundi jointly towards their restitution balances and not credit any of their restitution payments towards the other conspirator's restitution balances.  Once the remaining restitution balance for the defendant and Michael Bikundi is equal to that of another member of the conspiracy, any further payments from the defendant or Michael Bikundi or the other member of the conspiracy should be jointly credited to all three conspirators.

"The primary and overarching goal of the MVRA is to make victims of crime whole and to restore these victims to their original state of well-being."  United States v. Emor, 850 F. Supp. 2d 176, 202 (D.D.C. 2012) (internal quotations and citations omitted); see also United States v. Placensio, 2011 U.S. Dist. LEXIS 155014, at *15 (S.D. Fla. June 28, 2011) ("Restitution is ultimately for the benefit of the *victim*.") (emphasis in original); United States v. Hensley, 91 F.3d 274, 276 (1st Cir. 1996) ("restitutionary sentences by the district courts [are] for the benefit of victims of federal offenses").  The United States intends to restore any forfeited

28

property from the defendant and Michael Bikundi to D.C. Medicaid. See 21 U.S.C. § 853(i)(1) (authorizing Attorney General "to restore forfeited property to victims"). The restoration process involves the transfer of forfeited funds to the Clerk of the Court for distribution to D.C. Medicaid in accordance with the Court's restitution orders. The value of the property that the Government seeks to forfeited from the defendant and Michael Bikundi is approximately $12 million. If these funds were credited jointly to the restitution obligations of all the conspirators, it would wipe out all of their restitution amounts and the United States would be limited to obtaining restitution only from the defendant and Michael Bikundi, who both may be deported from the United States.

The government's proposed crediting is consistent with the purposes of the MVRA. It will "maximize" the potential monetary return to D.C. Medicaid. United States v. Kaczynski, 416 F.3d 971, 977 (9th Cir. 2005) (ordering the government to present a plan, "the principal purpose of which shall be to maximize monetary return to the victims" through restitution). It permits the government to continue its efforts to collect restitution from the other conspirators after any forfeited funds from the defendant and Michael Bikundi are restored to D.C. Medicaid.

## IV.  CONCLUSION

The statutory maximum term of imprisonment for the defendant's offenses are:  (a) five years for Count Fourteen, (b) ten years for Counts One, Two, Thirteen, and Fifteen, and (c) twenty years for Counts Sixteen through Twenty-Two. PSI at ¶¶ 199-203. The court has the discretion to impose multiple terms of imprisonment concurrently or consecutively "as guided by 18 U.S.C. § 3584(b)." United States v. Ayers, 795 F.3d 168, 172 (D.C. Cir. 2015) (holding that section 3584(a) provides no "presumption in favor of consecutive sentencing"). Section 3584(b)

29

instructs the court to consider the 3553(a) factors in making its determination. 18 U.S.C. § 3584(b).

The government requests that the Court impose the follow terms of imprisonment: (a) ten years for Counts One, Two, Thirteen, and Fifteen; (b) five years for Count Fourteen; and (c) twenty years for Counts Sixteen through Twenty-Two, and that all of the sentences run concurrently to one another. The Government further requests that the Court impose a term of three years of supervised release for each count to run concurrently to one another, and order the defendant to pay $80,620,929.20 in restitution to D.C. Medicaid.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney


By: _____/s/_____
Lionel A. André (D.C. Bar No. 422534)
Michelle Bradford (D.C. Bar No. 491910)
Anthony Saler (D.C. Bar No. 448254)
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
Tel: 202.252.6971 (Saler)
Anthony.Saler@usdoj.gov